IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

_____

UNITED STATES OF AMERICA,
                    Plaintiff,

                                        Criminal Action
          vs                            No. 12-92
                                        Day 5, JURY TRIAL
RICHARD BUSH and MAYANK MISHRA,
                    Defendants.

_____


          Transcript of jury trial proceedings continuing on
Monday, December 7, 2015, United States District Court,
Pittsburgh, Pennsylvania, before the Honorable Cathy Bissoon,
U.S. District Court Judge.


APPEARANCES:

For the Government:            Brendan T. Conway, Esq.
                              Donovan Cocas, Esq.
                              United States Attorney's Office
                              700 Grant Street
                              Suite 4000
                              Pittsburgh, PA 15219
                              brendan.conway@usdoj.gov
                              Donovan.Cocas@usdoj.gov


For the Defendant Bush:        Alonzo Burney, Esq.
                              502 Fifth Avenue, Suite 301
                              McKeesport, PA 15132
                              aburneysr@comcast.net


For the Defendant Mishra:      Norman J. Silverman, Esq.
                              Daphne Pattison Silverman, Esq.
                              Silverman Law Group
                              501 North IH 35
                              Austin, TX 78702
                              lawyernorm@msn.com
                              daphnesilverman@gmail.com

Court Reporter:               Shirley Ann Hall, RDR, CRR
                              6260 U.S. Courthouse
                              Pittsburgh, PA 15219
                              (412) 765-0408


Proceedings recorded by digital stenography; transcript
produced by computer-aided transcription.

I N D E X

* * * * *

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Robert Thomas | | | | |
|   By Mr. Cocas | 13 | | 28 | |
|   By Mr. Silverman | | 30 | | |
|   By Mr. Burney | | 19 | | |
| Robert Ian Barrett | | | | |
|   By Mr. Conway | 36 | | | |
|   By Mr. Burney | | 55 | | |
|   By Mr. Silverman | | 67 | | |
| Matthew Lebedda | | | | |
|   By Mr. Conway | 143 | | | |
|   By Mr. Burney | | 149 | | |
| Jason Binder | | | | |
|   By Mr. Conway | 156 | | | |
|   By Mr. Burney | | 159 | | |
|   By Mr. Silverman | | 173 | | |
| James Muha | | | | |
|   By Mr. Conway | 180 | | 193 | |
| | | | 196 | |
|   By Mr. Silverman | | 190 | | |
| Robert Ian Barrett | | | | |
|   By Mr. Conway | 197 | | | |

1                   P R O C E E D I N G S

2          (In open court, with Defendants seated.)

3               THE COURT:  Good morning.

4               I do understand — which juror number is this, Jim —

5     not that one —

6               MR. IMHOF, DEPUTY CLERK:  I'm not certain of that,

7     the basketball?

8               THE COURT:  Yes.

9               MR. IMHOF, DEPUTY CLERK:  I don't know.

10              THE COURT:  I don't know if you know about this,

11    Mr. Conway —

12              MR. CONWAY:  Yes, Your Honor, I just informed —

13    well, I informed defense counsel and Mr. Imhof.  Apparently

14    Mr. — or Detective Barrett was at the same venue as an

15    alternative juror, and so I wanted to bring him up here and

16    explain the circumstances so that the record is clear as to

17    what happened.  And if Your Honor wants to inquire any further

18    of Detective Barrett, you could.  So that was my suggestion in

19    that regard.

20              THE COURT:  Okay.  You can have Detective Barrett —

21    before we get the jury, Jim.

22              MR. IMHOF, DEPUTY CLERK:  Yes, Your Honor.

23              THE COURT:  Okay.  Swear in Detective Barrett,

24    please.

25              MR. IMHOF, DEPUTY CLERK:  Yes, Your Honor.

1    RICHARD IAN BARRETT, a witness herein, having been

2    first duly sworn, was examined and testified as follows:

3                              EXAMINATION

4         THE COURT:  Tell us what happened.

5         THE WITNESS:  I was at a basketball game Saturday at

6    Peters Township High School.  I'm an assistant coach for one of

7    the schools that was playing in the tournament.  And after the

8    game I was walking out and I was talking with one of the

9    parents and the parents made a comment about seeing me in a

10   suit, they're not used to seeing me in a suit.  They're used to

11   seeing me in basketball clothes or civilian clothes.

12        And then I turned around and at the concession stand

13   was the alternate juror.  And I just made the comment:  I'm

14   just going to keep walking.  And I walked right -- I walked out

15   of the gym.

16        THE COURT:  I'm sorry, just so I understand, there

17   was dialogue between you and the alternate juror?

18        THE WITNESS:  No, the dialogue was between me and a

19   parent.

20        THE COURT:  Another parent.

21        THE WITNESS:  A parent for the team that I coach.

22        THE COURT:  Okay.

23        THE WITNESS:  And as I turned around, I saw the

24   alternate juror working the concession stand at the game.

25        THE COURT:  I see.

9:11:53AM 1          THE WITNESS:  And that's when I made the comment:

2   I'm just going to keep walking.  And I walked out of the gym.

3          THE COURT:  Do you have any reason to believe the

4   alternate juror saw you?

5          THE WITNESS:  Yes, she saw me.

6          THE COURT:  Okay.  But there was no dialogue between

7   you?

8          THE WITNESS:  No.

9          THE COURT:  Okay.

10          THE WITNESS:  Other than my comment of -- I did speak

11   to her with that comment.

12          THE COURT:  Okay.  You mean the last comment you

13   made.

14          THE WITNESS:  Yes, I said:  I'm going to keep

15   walking.  And I walked out of the gym.

16          THE COURT:  Okay.

17          Any voir dire for Detective Barrett?

18          MR. SILVERMAN:  Briefly, Your Honor.

19          THE COURT:  Okay.

20          MR. SILVERMAN:  Briefly.

21          THE COURT:  Yes.

22          MR. SILVERMAN:  All right.  Detective Barrett, what I

23   heard you say was -- and correct me if I'm wrong -- but the

24   comment was that:  I'm not used to seeing you in a suit.

25   Right?

9:12:58AM 1          THE WITNESS:  That was from a parent of one of the

2    teams that I coach.

3          MR. SILVERMAN:  Right.  And that's the person that

4    knew you from coaching?

5          THE WITNESS:  Yes.

6          MR. SILVERMAN:  But you weren't wearing a suit that

7    night, right?

8          THE WITNESS:  Yes, it's the first two games of the

9    year.  You wear -- in high school you dress up.

10          MR. SILVERMAN:  Okay.

11          THE WITNESS:  But practices and everything and

12    usually scrimmages you just wear basketball clothes.

13          MR. SILVERMAN:  Okay.

14          THE WITNESS:  But for the regular season and the

15    tournament games the coaches dress.

16          MR. SILVERMAN:  Okay.  So what comment did the

17    alternate juror make?

18          THE WITNESS:  No, I made the comment to the alternate

19    juror.  I saw -- as I was talking to the parent, I turned

20    around to go to the concession stand and she was working in the

21    concession stand.  And I just said:  I'm going to keep walking.

22    And I walked away.

23          MR. SILVERMAN:  So the alternate juror didn't say

24    anything to you?

25          THE WITNESS:  No, no.  It was a parent that commented

9:13:51AM 1  about the suit.

2            MR. SILVERMAN:  And then the comment about the suit

3  didn't have anything to do with the fact that you wear a suit

4  to court when you testify, and that's not what it was about.

5            THE WITNESS:  No, no.  It was about -- yeah,

6  coaching.

7            MR. SILVERMAN:  Okay.  So you had no conversation

8  other than --

9            THE WITNESS:  I'm leaving.

10           MR. SILVERMAN:  Okay.

11           THE COURT:  Anything else, Mr. Burney?

12           MR. BURNEY:  No, Your Honor.

13           THE COURT:  Any issues?

14           MR. SILVERMAN:  Not with this testimony, but I would

15  just ask if the Court would talk to the juror in chambers or

16  something and make sure that their perception is the same and

17  then seal that for later record if need be.

18           THE COURT:  Do you know if the alternate juror even

19  recognized you in the context of this?

20           THE WITNESS:  Yes, she did.

21           THE COURT:  All right.  Okay.  Do you know which

22  juror this was?  Was this Juror No. 13, I guess?

23           THE WITNESS:  The alternate juror that is sitting

24  right in the second to the last.

25           THE COURT:  That's Juror No. 13.

9:14:50AM 1       If counsel would like, what I'll do is invite Juror

2    No. 13 back to my conference room, rather than have her be

3    intimidated in court, and invite counsel back to witness that

4    voir dire.  Okay?

5       MR. SILVERMAN:  And I just ask —— I don't —— I

6    probably won't ask any questions assuming everything is

7    consistent, but I would just ask the Court to admonish the

8    juror not to talk about that with the other jurors.

9       THE COURT:  Sure.

10       MR. SILVERMAN:  Okay.

11       THE WITNESS:  Your Honor, if I may add, too, as soon

12    as we got on the bus to leave Peters Township, I immediately

13    called Brendan Conway and advised him of what happened.

14       THE COURT:  Okay, thank you.  Thank you,

15    Detective Barrett, you can take a seat.

16       THE WITNESS:  Okay, thank you.

17       THE COURT:  All right, Jim.  Why don't we take a

18    brief recess; and if you could get me Juror No. 13 in

19    chambers —— and, counsel, I'll ask if you'd wait and ——

20       MS. SILVERMAN:  Your Honor, we did have another

21    thing.  I have a complete copy of the exhibits of the

22    Defendant's case-in-chief that I wanted to give to you, and it

23    includes in it the zip drive that we talked about of the

24    records that are voluminous.  And the other we have print

25    copies, and the additional documents that we were trying to

9:16:12AM 1   send by e-mail on Friday to Brendan.  We also made Mr. Conway a

2   copy of those in case they didn't go through on his e-mail as

3   well.  They are photographs and a few more business records.

4        But also for the record I just wanted to make it

5   clear these are for our case-in-chief and we want to re-lodge

6   an objection to producing anything related to impeachment.

7   Rule 16 specifically excludes -- it specifically says it's only

8   for providing documents that are for the case-in-chief and not

9   for anything in impeachment.

10        And also there's actually a case directly on point in

11   the Western District of Pennsylvania talking about pretrial

12   orders and that's US versus Kubini, and it's 304 FRD 208.  It

13   is out of this -- out of this jurisdiction and it says that

14   impeachment and rebuttal exhibits that the Defendants intend to

15   use during cross examination of Government witnesses are not

16   exhibits that have to be produced pursuant to pretrial orders.

17   I just wanted to re-lodge our objection to that.

18        If the Court still wants us to produce impeachment

19   exhibits, we did make complete copies of all of the potential

20   impeachment exhibits to give to the Court.  Otherwise I have --

21        THE COURT:  Any exhibits that you know that you are

22   planning to use, I expect you to provide those to defense, to

23   the Government.

24        MS. SILVERMAN:  So as far as impeachment, we don't

25   know what we expect to use.

9:17:25AM 1          THE COURT:  I understand that you say you don't know.

2    But given the way that your exhibits are marked, I know that

3    you do know.  So —

4          MS. SILVERMAN:  No, no.  Those are not marked.  The

5    other ones are not marked.

6          THE COURT:  I'm not talking about the other one, I'm

7    talking about the ones that we've discussed thus far during the

8    course of the trial.  So —

9          MS. SILVERMAN:  So what I will do then is, over

10   objection, I have copies of each of those to reproduce to the

11   Government and a copy for Your Honor as well.

12         THE COURT:  Okay.  Whatever you have, just if you can

13   pass it up and we'll get started with the voir dire.  You can

14   just leave it here on the counter and Jim will get it to me.

15       (Off the record discussion.)

16         THE COURT:  We'll stand in brief recess, and

17   Shirley —

18       (Brief recess taken in open court, reconvened in the

19   conference room with Juror No. 13 present.)

20         THE COURT:  All right.  Juror No. 13, right?

21         JUROR NO. 13:  Uh-huh.

22         THE COURT:  We hear that you perhaps saw

23   Detective Barrett this weekend.  Do you have any recollection

24   of having so seen him?

25         JUROR NO. 13:  I did see him at a basketball game.

9:24:07AM 1              THE COURT:  Did you have any dialogue whatsoever with

2  him?

3              JUROR NO. 13:  No, I waved.

4              THE COURT:  Okay.  All right.  I would ask that you

5  not discuss your sighting of Detective Barrett with anyone.

6              MEMBER OF THE JURY:  Okay.

7              THE COURT:  If there's any other voir dire from —

8              MR. CONWAY:  Not from the Government, Your Honor.

9              MR. SILVERMAN:  No, Your Honor.

10             THE COURT:  Okay.

11             MR. BURNEY:  No, Your Honor.

12             THE COURT:  That really is it.

13             JUROR NO. 13:  Okay.  All that for this?  I was

14  working the concession stand.

15             THE COURT:  We understand.

16             JUROR NO. 13:  Okay.

17             THE COURT:  Thank you very much.

18             JUROR NO. 13:  Sure.

19    (Juror No. 13 exits conference room.)

20             THE COURT:  Any objection?

21             MR. CONWAY:  Not from the Government.

22             THE COURT:  You all have to put it on the record.

23  Mr. Burney and Mr. Silverman?

24             MR. SILVERMAN:  No.

25             THE COURT:  Mr. Burney?

1          MR. BURNEY:  No, Your Honor.

2       (In open court, with Defendants seated.)

3          THE COURT:  What we're back on the record now.

4          Mr. Conway, I know that you sent a heads up with

5 respect to who the witnesses are.  For the record if you could

6 just briefly tell us what we're going to hear today.

7          MR. CONWAY:  Sure, Your Honor.  We'll obviously

8 finish with the cross examination of Mr. Thomas, and then we'll

9 recall Detective Barrett, who I expect will basically take us

10 through the telephone calls up until March 14th of 2002.

11         We then intend to present the testimony of Detective

12 Matthew Lebedda who was involved in the execution of the search

13 warrant of the Honda vehicle.  We also intend to present the

14 testimony of James Muha.  He was the custodian of records for

15 the Honda search warrant and also what we call the Rankin

16 search warrant, which was Mr. Wheeler's residence.  And then

17 after that, Detective Jason Binder, who was involved in the

18 surveillance that led ultimately to the search warrant of the

19 Mills Avenue apartment which we sort of refer to as the Wheeler

20 stash house.  And then if we get there, we'll call Special

21 Agent David Hedges to testify about a number of different

22 matters.

23         THE COURT:  Just so I understand with respect to

24 Detective Barrett, will that conclude Detective Barrett's

25 testimony as far as the Government is concerned?

9:30:32AM 1      MR. CONWAY: In all likelihood, Your Honor. He was

2   at the Middle Road search warrant, so if there's any issues —

3   he wasn't really involved in the seizure of evidence, so I

4   believe that will conclude it. But just for the sake of

5   protection, I'm going to reserve the right to recall him, but I

6   do believe that will conclude his testimony.

7      THE COURT: All right. Very good.

8      Jim, if you could get the jury.

9      MR. IMHOF, DEPUTY CLERK: Yes, Your Honor.

10   (Jurors seated.)

11      THE COURT: Okay. Have a seat, welcome back, jurors.

12   I see you're all bright eyed and bushy tailed and ready to go,

13   right? Without further ado, we'll have Mr. Thomas retake the

14   stand.

15      And, Jim, if you wouldn't mind swearing in Mr. Thomas

16   again, please.

17      MR. IMHOF, DEPUTY CLERK: Yes, Your Honor.

18      ROBERT THOMAS, a witness herein, having been

19   previously duly sworn, was examined and testified as follows:

20            CROSS EXAMINATION

21      THE COURT: Mr. Silverman.

22      MR. SILVERMAN: Yes, ma'am.

23   BY MR. SILVERMAN:

24   Q   Okay, Mr. Thomas, just to get us back on track here. So

25   you're the chemist that tested the substance that was allegedly

9:33:07AM 1 | seized from Steave's, correct?

2 | A    Yes.

3 | Q    All right. And we had been talking about the fact that

4 | you had received 250, roughly, little wax paper bags in total.

5 | Right?

6 | A    Correct.

7 | Q    Okay. And there were two designs on the bags, right?

8 | A    There's — yes.

9 | Q    All right. Out of that group, 250, you selected 14 at

10 | random and did a color screen, right?

11 | A    From each design group, yes.

12 | Q    Fourteen from each design group?

13 | A    Each design group; so there was a 250, a white one and one

14 | with a stamp.

15 | Q    All right. Now, from these groups of 14 — so that's 28

16 | in total?

17 | A    Correct.

18 | Q    And how many GCMS runs did you do? Did you do one for

19 | each group of 14 or did you combine the two groups?

20 | A    There was one run per 14.

21 | Q    Okay. And so the GCMS is the confirmatory test, right?

22 | A    Right.

23 | Q    Gas chromatograph mass spectrometer?

24 | A    Yes.

25 | Q    Sorry about my tongue getting in the way, but you know

9:35:03AM 1  what I mean.  And so to do the GCMS you took a little bit from

2  each of the 14 bags, right?

3  A    Correct.

4  Q    And you then combined them into a -- two different

5  composites, is that right?

6  A    Correct.

7  Q    Okay.  And this -- these composites were then analyzed to

8  determine whether heroin was present.  Right?

9  A    Yes.

10  Q    All right.  And so as a matter -- and the GCMS we've

11  already established is a highly sensitive instrument, right?

12  A    Yes.

13  Q    All right.  And what that told you then as a matter of

14  pure logic is that at least one of these little bags that made

15  up the composite contained some amount of heroin.  Correct?

16  A    No, we can get back to the color test.  The color test

17  tells me that there's a classification of opiates.  The GCMS

18  run tells me specifically what classification of opiates is

19  contained.

20  Q    Okay.  And so the color test -- it doesn't -- it's your

21  testimony today that the color test has no false positives for

22  anything other than an opiate, right?

23  A    No.

24  Q    Okay.  In fact, any alkaloid substance turns the color

25  test colors, right?

9:36:50AM 1    A    Can I explain the color test further?

2    Q    No, you can answer that question.  Isn't it true that it

3    reacts to alkaloids?

4    A    Yes.

5    Q    All right.  So when you say the color test told me it was

6    an opiate —

7    A    Yeah.

8    Q    — if that — that's — the color test will react to other

9    non-opiates, fair, alkaloids?

10    A    Yes.

11    Q    All right.  So we're back to where we were.  The GCMS is

12    so sensitive that if one of the 14 members of the composite set

13    contained some heroin, the GCMS would come back positive for

14    heroin.  True?

15    A    True.

16    Q    All right.  So that tells us that at least one of the 14

17    contained some heroin.  Right?

18    A    Sure.

19    Q    All right.  You did not run — and so the way the

20    instrument works is you inject the unknown, right?

21    A    Yes.

22    Q    And you inject the profile or you inject the substance

23    that will — that's a control, that will show the same spikes

24    as the unknown, correct?

25    A    No.

9:38:00AM 1    Q    You just compare after the injection to what the NIST

2    standard is?

3    A    The NIST library.

4    Q    Okay.  And the NIST library is National Institute of

5    Standards and Technologies, and they have these chromatograms

6    for many different substances, right?

7    A    Right.

8    Q    Okay.  And so in addition to your experience working in

9    the Crime Lab, you also work presently for Smith --

10    A    Thermo Fisher Scientific.

11    Q    Okay.  And it -- Smith Detection or -- you had worked at

12    Smith Detection, is that right?

13    A    No.

14         MR. SILVERMAN:  May I approach the witness?

15         THE COURT:  Yes.

16    BY MR. SILVERMAN:

17    Q    I'm showing you your resume, and I guess I misspoke.  Is

18    what you're saying here is you're trained by Smith Detection?

19    A    Yes.

20    Q    Okay.  And the thing that you're trained -- and that was

21    back in 2010, June, right?

22    A    Correct.

23    Q    And that's in Pittsburgh, right?

24    A    Yes.

25    Q    Okay.  And the thing that Smith Detection trained you on

9:39:45AM 1  is the ion scan, right?

2  A    Correct.

3  Q    And the ion scan is the familiarity that most of us would

4  have with something like that is the instrument in the airport

5  when you are the lucky person that gets selected for more

6  thorough screening and they swab your hands, right?

7  A    Correct.

8  Q    And they put that little thing in and they -- and the ion

9  scan tests for trace residue of -- in the airport it's probably

10  explosives or something.  But -- right?

11  A    Yes.

12  Q    But then it's also used in law enforcement to test for

13  traces of narcotics, right?

14  A    Yes.

15  Q    You know quite well that the ion scan is capable of being

16  utilized to examine money, don't you?

17  A    Yes.

18  Q    And that's why when money is seized.  It's very important

19  to examine the money --

20        MR. COCAS:  Objection, foundation, lacks relevance;

21  not talking about money here with this expert.

22        THE COURT:  Objection sustained.

23  BY MR. SILVERMAN:

24  Q    Well, were you asked to examine any currency in this case?

25  A    No.

9:40:59AM 1    MR. SILVERMAN:  Pass the witness.

2    THE COURT:  Mr. Burney, anything?

3    MR. BURNEY:  Yes, Your Honor.

4      CROSS EXAMINATION

5 BY MR. BURNEY:

6 Q Mr. Thomas, going back to your time that you worked in

7 the — is it the Allegheny County Crime Lab?

8 A Yes, sir.

9 Q Okay.  And the Allegheny County Crime Lab, as far as

10 analysis purposes, you and how many other chemists work in the

11 same capacity?

12 A In my department there was eight.

13 Q Eight.

14 A Eight.

15 Q Okay.  And Allegheny County services how many different

16 police departments and entities?

17 A I couldn't tell you a number.

18 Q Are you the Crime Lab for all the police departments in

19 Allegheny County?  You know or you don't know?

20 A We also get outside submitting agencies, but we serve the

21 Allegheny County Crime — the Allegheny County Police, other

22 jurisdictions, townships contained in the county.

23 Q So if I'm correct, besides different police departments in

24 Allegheny County, you say you also service other police

25 departments outside of Allegheny County.

9:43:05AM 1  A    Correct.

2  Q    Now, you said there's eight people in your department and

3  you would share the load of the cases that come in?

4  A    Correct.

5  Q    And the procedure for as cases would come in, can you tell

6  me a little bit about that.  You come to work, you're going to

7  work on a case, how does that start?

8  A    At the beginning of the day I see what court cases are

9  coming up.  So if something gets submitted today, there is

10  normally a six month to a year window that requires you to

11  analyze that.  We have cases that are backed up and you want to

12  get everything completed before the court dates.

13       So what the front office does is they will pick up

14  the evidence in the folders of the drugs that are closer to the

15  court date.  So I will go –– they will bring those drug cases

16  up, they seal them into an evidence locker, which we each have

17  our own identifying card to swipe into.  I sign that evidence

18  into my jurisdiction and I put it in a locked case and work

19  from there.

20  Q    Okay.  So when you first see an envelope, it is in your

21  sealed locker, is that correct?

22  A    Yes.

23  Q    And who would be the person that would bring it up to that

24  sealed locker?

25  A    The evidence clerks.

1    Q    At your department.

2    A    At our department.

3    Q    And, of course, where would they obtain that evidence?

4    A    From the submitting agency.

5    Q    And the submitting agency, that process, they come -- they

6    hand it over personally to someone or they just put it in

7    another locked container or do you know how that works?

8    A    There is an overnight procedure which I'm not familiar

9    with, but the daytime procedure is they will come in and submit

10   the evidence to the evidence clerk.

11   Q    Okay.  And who is the evidence case -- excuse me.  Who was

12   the evidence person on the Steave case that it was submitted

13   to?

14   A    That's something I didn't look up.

15   Q    Okay.  And as far as who brought the evidence to the

16   location for the Allegheny County Crime Lab, did you have that

17   information also in the records?

18   A    Yes, that would be on the submittal form that I spoke of

19   on Friday.

20   Q    Okay.  Now, all the records -- cases that you deal with

21   are criminal cases?

22   A    Yes.

23   Q    And in this particular situation with there being criminal

24   cases, they're normally that someone has been arrested or

25   stopped, these items have been confiscated, and now they're

9:46:18AM 1 submitting it to your department for an analysis.

2 A    Correct.

3 Q    And these are usually suspected illegal narcotics, is that

4 correct?

5 A    Correct.

6 Q    Is it true that most of the time, if not all of the time,

7 that these items from these persons that have -- that have been

8 confiscated from are people that are unlicensed and not like

9 yourself as far as being a chemist or pharmacist or whatever?

10 A    You mean the submitting agent or --

11 Q    No, no, no, not the submitting agent.  The person -- you

12 said they're criminal cases.  There's a name on the case such

13 as Mr. Steave's was on the case.  But that person usually, if

14 not all the time, is someone who is not someone such as a

15 chemist like yourself or a licensed pharmacist.  It's just

16 someone who is a citizen out there that now they need an

17 analysis of what was confiscated from that person.

18 A    Yes.

19 Q    And usually those persons, being unregistered and

20 unlicensed, are people who don't have the background of doctors

21 and chemists or whatever as far as to deal with packaging or

22 materials.  Is that normally the case?

23 A    I don't know what you mean by that.

24 Q    What I mean is if I go to a pharmacy and I am going to

25 obtain some type of prescription, usually the person who is

9:47:47AM 1    making up the prescription and packaging the prescription is

2    someone who has had some type of specialized training in the

3    area, some type of expertise, could be similar to yourself, in

4    dealing with packaging analysis.  Is that correct?

5    A    Yes.

6    Q    What I'm saying is like these persons that — when these

7    substances come in and you're now going to analyze it, most of

8    the time, if not all of the time, these persons don't have that

9    background as far as being someone who is a specialist,

10   pharmacist, a chemist, as far as to be able to deal with like

11   you would deal with as far as packaging or analysis.

12              MR. COCAS:  Objection, lacks foundation.

13              THE COURT:  Objection sustained.

14   BY MR. BURNEY:

15   Q    Now, the date that the Steave case came in was what date?

16   A    I don't have that in front of me.

17   Q    Okay.  And looking at the records, I think you testified

18   that they were received in your office on December the 3rd,

19   2011?  Would that be something that would refresh your memory?

20   A    Is that what's — is that what's on the submittal form?

21   Q    Okay.  Well, let me ask you this.  Do you have any

22   independent knowledge whatsoever about the Steave case?

23   A    No.

24   Q    Okay.  So your testimony would be from being refreshed by

25   looking at the records, is that correct?

9:49:43AM 1    A    Yes.

2    Q    Okay.  And now — at the time when you were working there

3    and working the Steave case, do you recognize the name

4    Erin Mullin who is also a forensic evidence specialist?

5    A    Yes.

6    Q    And who was she?

7    A    She was the evidence clerk.

8    Q    She was the evidence clerk.

9    A    Yes.

10   Q    Okay.  And she would be the one who would receive it from

11   the submitting agency?

12   A    Correct.

13   Q    And she would be the one therefore that would bring it to

14   you for the evidence locker, is that correct?

15   A    She would be one of three.  We have three evidence clerks.

16   She could just be the one who received the evidence, but one of

17   the three bring those up to our locker.

18   Q    Okay.  And so therefore, like you said, you wouldn't have

19   direct contact with the submitting police agency yourself.

20   A    No.

21   Q    Now, do you have any independent recollection as far as

22   how long it was before you were able to then deal with, what

23   your testimony has been, the analysis of the items in this

24   particular case?

25   A    Are you talking about the time between submittal and

9:50:59AM 1  analysis?

2  Q    Yes.

3  A    No, I don't.  I would have to look at the record.

4  Q    Okay.  So would -- your time period you're saying is -- it

5  could be anywhere from one month to six months or whenever.  It

6  depends upon your caseload, is that correct?

7  A    It's caseload, importance, rush.  You can get a rush on a

8  case.

9  Q    And like you said, you have no recollection that there was

10  any rush on this particular case.

11  A    Not at this time, no.

12  Q    Now, I know you -- you've been questioned regarding the --

13  what was submitted, and I think your testimony was that there

14  were -- when you looked at it, there were two groups of

15  suspected heroin and it was labeled already when you looked at

16  it, or it was not?

17  A    It came in bundles, so it was packaged.  And to look for

18  the homogenous of the sample, I take all of the -- all the bags

19  out of the packaging.

20  Q    Uh-huh.

21  A    And then I separate based on some of the characteristics.

22  In this case there was just white bags and the other, and then

23  the other one was the one with the stamps, so those were

24  separated.

25  Q    Right.  There was 92 and 150.  Correct?

9:52:26AM 1  A    Yes.

2  Q    And the 92, they were all in similar looking bags,

3  correct?

4  A    Yes.

5  Q    And the 150, they were all in similar looking bags ––

6  A    Yes.

7  Q    –– correct?  Now, is there –– I know you went through by

8  saying that you took 14 of 292 and you took 14 of 150 for

9  analysis purposes.

10  A    Yes.

11  Q    Is there some reason that you don't analyze all 92 and all

12  150?

13  A    It's not the sampling plan that we were given.

14  Q    I'm sorry, I didn't hear that.

15  A    It's not the sampling plan that we follow.

16  Q    Okay.  You said there's a sampling plan that you follow.

17  And who –– who gives the sampling plan to you?

18  A    That's given to us by our managers.

19  Q    Okay.  And the sampling plan –– but is there anything to

20  prevent you from testing all 92 or all 150?

21  A    The cases that I would sample –– we'll just use the 92 for

22  example.  If all 92 –– if I were to empty them out and they

23  would have different colored powders inside or if those colors

24  tested differently, that would require me to test all of them.

25  Q    I know you're talking about what's required in the sample,

9:53:50AM 1 but I'm saying is there anything from stopping you from testing

2 all 92 or testing all 150?

3 A   No.

4 Q   And so, therefore, when you say the sampling, so you

5 really — of the 92, you really only analyzed, from your

6 description, 14.  Correct?

7 A   Correct.

8 Q   And of the 150, you really only analyzed 14.  Correct?

9 A   Correct.

10 Q   And in that analysis I know, as you've been questioned, is

11 that of the 14 you took — and correct me if I'm wrong — and

12 you combined all 14 samples before you performed your test in

13 the one, and then you also did the same procedure by combining

14 all 14 samples with the other one.  Correct?

15 A   After the color testing, they were combined.

16 Q   Okay.  And so, therefore, you might have a suspicion, but

17 you really don't positively know what the other 78 were — that

18 was of the 92?

19 A   Those were not tested.

20 Q   And of the 150, you really don't know what the other 136

21 were, correct?

22 A   Those were not tested.

23 Q   Now, as far as this procedure, you said you were

24 instructed to do this sampling method.  Like you said, this was

25 by your superiors and they have their reasons why they give you

9:55:21AM 1   that when things come in of that nature, correct?

2   A    Correct.

3   Q    Are there different sampling procedures for different

4   suspected substances?

5   A    Yes.

6   Q    Okay. And is there a — any time — that is, if it say

7   was suspected cocaine, would you use the same sampling method

8   or is there a different sampling method?

9   A    The same sampling method for all drugs in the number of

10   samples. So, for example, marijuana. I don't use GCMS for

11   marijuana. But if there was 92 baggies of marijuana, they

12   would be sampled the same way.

13   Q    You would only take — sample 14?

14   A    Correct.

15   Q    Okay.

16        MR. BURNEY: No further questions, Your Honor.

17        THE COURT: Okay.

18        Redirect?

19               REDIRECT EXAMINATION

20   BY MR. COCAS:

21   Q    Mr. Thomas, you were asked on cross by Mr. Silverman about

22   the color test, and you seemed to want to explain what that is.

23   Would you explain the color test now.

24   A    Sure. The color test that I use is for suspected opiates.

25   It's used in alkaloids, as counsel explained. It's also

9:56:48AM 1   utilized for amphetamines -- methamphetamines or just the

2   amphetamines. The color test I used in this specific test was

3   Marquis, which is one color text, Mecke, which is another, and

4   Froehde. When I suspect heroin, the colors I would expect to

5   see is purple, green and purple. If it was morphine, I would

6   see a purple, green and a blue. You can tell by the battery of

7   tests, you can tell or get a better understanding of what

8   you're looking at by using multiple color tests. So this just

9   wasn't one color reaction I saw a reaction that was it.

10   Q    Okay. And did you perform the color test on the material

11   in all of the bags?

12   A    No.

13   Q    Okay. And so in this case I take it you found purple,

14   green and purple?

15   A    For Marquis, Mecke, Froehde, the same order, purple,

16   green, purple.

17   Q    But you performed two other tests on the material, did you

18   not?

19   A    The GCMS.

20   Q    Okay. And after performing those two other tests, were

21   you left with any doubt at all that the material you had had a

22   combined weight of 7.43 grams of heroin?

23   A    The Exhibit 1-A-1 and the total of 1-A-2, correct.

24   Q    Correct. You conclude -- so is it accurate to say that

25   you concluded in your expert opinion that you had 7.43 grams

9:58:05AM 1  total of a material containing heroin?

2  A    Correct.

3  Q    And these tests –– are these the same tests you have used

4  in the other hundreds of times that you tested for heroin?

5  A    Yes.

6  Q    Did you ever in all of that time get any feedback from

7  someone in saying:  Hey, you've tested this and you've said

8  it's heroin but, in fact, it's not heroin?

9  A    No.

10           MR. COCAS:  Okay, thank you.

11           THE COURT:  Okay.

12           Any recross?

13           MR. SILVERMAN:  Yes, ma'am.

14                     RECROSS EXAMINATION

15  BY MR. SILVERMAN:

16  Q    But, in fact, that's happened before in other labs and you

17  know it.  Right?

18  A    Not to my knowledge.

19  Q    You haven't heard of labs falsely calling a substance a

20  controlled substance based on random sampling?

21           MR. COCAS:  Objection, lacks foundation and asked and

22  answered.

23           MR. SILVERMAN:  I'm asking him.

24           THE COURT:  The objection is sustained, asked and

25  answered.

9:59:00AM 1   BY MR. SILVERMAN:

2   Q    Are you familiar with the Dallas Sheetrock case?

3   A    I am not.

4   Q    Okay.  Are you familiar with turkey dope?

5   A    No.

6   Q    Okay.  It's a Texas thing.

7   A    Okay.

8   Q    Are you familiar with counterfeit or simulated controlled

9   substances?

10   A    You're referring to synthetic marijuana?

11   Q    No, I'm referring to, for example, a brick comes in that

12   is suspected cocaine, but only the outermost layer is cocaine.

13   It's designed to defraud prospective buyers.  Are you familiar

14   with that?

15   A    I am not.

16   Q    Okay.  So you've never had any fraudulent controlled

17   substances come across your table.

18   A    Not to my knowledge.

19   Q    All right.  So you were talking just now on a —

20        MR. SILVERMAN:  I want to mark this drawing I just

21   made as Defendant's Exhibit 17-M.

22        MS. SILVERMAN:  No.

23        MR. SILVERMAN:  No —

24        THE COURT:  Objections?

25        MR. SILVERMAN:  It's going to be for demonstrative

10:00:27AM 1    purposes.

2              THE COURT:  Then it's not an exhibit.

3              MR. SILVERMAN:  I just want the jury to refer back to

4    it to understand the process.

5              THE COURT:  You can call it something else; it's not

6    an exhibit.

7              MR. SILVERMAN:  Okay.  A summary chart?

8              THE COURT:  Sure.

9              MR. SILVERMAN:  Summary Chart 1.

10              For that purpose I offer Summary Chart 1.

11              THE COURT:  For what?

12              MR. SILVERMAN:  For the jury to be able to refer back

13    to it so they can remember the process.

14              THE COURT:  Okay, that will not go back with the jury

15    because it is not an exhibit.  Your notes are not an exhibit.

16              MR. SILVERMAN:  But it's a summary of —

17              THE COURT:  Any objection?

18              MR. COCAS:  Yes, for the reasons Your Honor has

19    stated.

20              THE COURT:  Okay.  The objection is sustained.

21              MR. SILVERMAN:  Okay.

22    BY MR. SILVERMAN:

23    Q    So you threw out the word homogeneous, right?

24    A    Yes.

25    Q    G—E—N—I—U—S — you know what I mean.

10:01:33AM 1   A    Yeah.

2   Q    All right.  Homogeneous means — that's a term from

3   physical chemistry, right?

4           MR. COCAS:  Objection, we're beyond the scope of

5   redirect now.

6           THE COURT:  Objection sustained.

7           MR. SILVERMAN:  It's not beyond the scope of

8   redirect, Your Honor, if I could have just a couple of

9   questions.

10          THE COURT:  I'll bear with you.

11          MR. SILVERMAN:  All right.

12   BY MR. SILVERMAN:

13   Q    That's a — that's from physical chemistry, right?

14   A    Yes.

15   Q    And that means that the suspected substance is in a

16   constant state, right?

17   A    Yes.

18   Q    Okay.  The -- the suspected controlled substance, right?

19   A    Yes.

20   Q    Okay.  You didn't even open 200-and-something bags, right?

21          MR. COCAS:  Objection, that misstates the testimony.

22   BY MR. SILVERMAN:

23   Q    Did you open every bag?

24   A    Did not.

25   Q    All right.  So you don't know what state the suspected

10:02:30AM 1  illegal substance was in, right?

2  A    I was referring to the packaging.

3  Q    I know.

4  A    Okay.

5  Q    It's not the packaging that you're testing for illegality,

6  though, is it?

7  A    I'm not testing the packaging, no.

8  Q    So it doesn't really matter if the packaging is

9  homogeneous, right?

10       MR. COCAS:  Objection, argumentative.

11  BY MR. SILVERMAN:

12  Q    Does it?

13       THE COURT:  Objection overruled.

14       THE WITNESS:  I'm sorry, restate that again.

15  BY MR. SILVERMAN:

16  Q    Does it matter that the packaging is homogeneous?

17  A    For testing purposes.  For population of testing purposes

18  it does.

19  Q    But you're here to test suspected heroin, a powder, right?

20  A    Yes.

21  Q    Okay.  And sometimes the powder in each bag is

22  homogeneous, right?

23  A    Yes.

24  Q    And other times you might open one little bag and see blue

25  specks in it and open another little bag and not see blue

10:03:30AM 1   specks in it, right?

2   A   Right.

3   Q   So those two — correct me if I'm wrong — would not be

4   homogeneous, right?

5   A   Correct. But they would be sampled differently.

6   Q   Only if you opened the bag to see, correct?

7   A   Correct.

8       MR. SILVERMAN: Pass the witness.

9       THE COURT: Anything more, Mr. Burney?

10       MR. BURNEY: No, Your Honor.

11       THE COURT: Okay.

12       Thank you, you may step down.

13       THE WITNESS: Thank you.

14     (Whereupon, the witness was excused.)

15       THE COURT: The Government's next witness?

16       MR. CONWAY: The United States calls — recalls

17   Detective Ian Barrett.

18       RICHARD IAN BARRETT, a witness herein, having been

19   previously sworn, was examined and testified as follows:

20               DIRECT EXAMINATION

21       THE COURT: Put that mike right in front of you,

22   Detective Barrett, please.

23       THE WITNESS: Yes, ma'am.

24       THE COURT: Thank you.

25       All right. You can proceed, Mr. Conway.

10:04:49AM 1 | BY MR. CONWAY:

2 Q   Detective Barrett, I believe when we left off we had

3 finished playing calls from the end of November of 2011.  Is

4 that consistent with your recollection?

5 A   Yes.

6 Q   Now I want to move into December, specifically

7 December 2nd, 2011.  At this point in time are you still

8 intercepting Sherron Whitehead's phone?

9 A   Yes, we are.

10 Q   And do you intercept his phone in connection with

11 conversations that occurred subsequent to the Deandre Steave

12 seizure?

13 A   Yes.

14       MR. CONWAY:  I want to play for the jury what's been

15 admitted into evidence as Government Exhibit FBI-327.

16     (Exhibit FBI-327 played in open court.)

17 BY MR. CONWAY:

18 Q   All right, sir.  Would you explain to the jury what's

19 happening in this telephone call?

20 A   Yes, Sherron Whitehead is talking to the male in that call

21 and he's letting him know he was just at Doodle's crib, or

22 DeLo, both nicknames for Deandre Steave, when the police ran in

23 there and they took all the joints, all the cheese.  That means

24 they took all the heroin and all of the money.

25       And you'll hear -- there's another reference in there, you

10:08:56AM 1   hear — you keep hearing them say, "M—O—B word, M—O—B word."

2   That just means like: I'm not lying, I'm telling you the

3   truth. M—O—B word, M—O—B meaning Member of Blood. So they're

4   saying: I'm not lying, this really just happened.

5   Q    Now, they also refer to Shuman in that telephone call?

6   A    Yes. The male asks Sherron if Deandre Steave is going to

7   get a bail. And he said no, they took him to Shuman. And

8   Shuman is the juvenile detention center for juveniles. And the

9   male was confused. He said: But — but Deedle is 19. You

10   know, why would they take him to Shuman?

11       The reason that they took him to Shuman is that he had a

12   juvenile attachment. There was a warrant for Deandre Steave,

13   and that's what he was arrested on.

14   Q    And in this case at the end Mr. Whitehead said something

15   about: It's not about anything, I just have to make one

16   telephone call?

17   A    Yeah, at the end. After all of the talk about — and it

18   sounds very distressed. They're — they sound very distressed,

19   like, "What?" "M—O—B word," you know, like — but then at the

20   end Sherron Whitehead calms everything down and says, "It ain't

21   about nothing, I just have to make one phone call."

22   Q    And approximately ten minutes later who does he call?

23   A    Richard Bush.

24       MR. CONWAY: Let's play Government Exhibit FBI—328.

25       (Exhibit FBI—328 partially played in open court.)

10:10:42AM 1         THE COURT:  Could we pause it?  This is probably —

2    there are too many interruptions in the tape for it to be

3    meaningful for the jury.

4         What I'll ask is we'll take a break right now and,

5    Jim, can you see if Sean can come up here, Sean Fox, and maybe

6    help out with trying to discern what's wrong?

7         MR. IMHOF, DEPUTY CLERK:  Yes, Your Honor.

8         THE COURT:  Okay.  Ladies and gentlemen of the jury,

9    we will take a recess to see if we can make these wiretaps more

10   audible for you.

11       (Jurors exit courtroom.)

12       THE COURT:  Okay, Jim is going to see if he can

13   contact Mr. Fox to see if he can discern what's happening with

14   the audio as it's filtered through here.  This one was

15   particularly — just seemed like a lot of breaks in this

16   particular one.  So we'll take a recess to see if we can get

17   that hammered out and hopefully we can.

18       (Brief recess taken.)

19       (In open court with Defendants seated.)

20       THE COURT:  I understand we were not able to resolve

21   the issue with the audio?

22       MR. CONWAY:  We are not, Your Honor, and so — but we

23   believe we have identified a solution that will take overnight

24   to do.  So what we intend to do is finish up with

25   Detective Barrett with regard to his non-telephone call

10:34:15AM 1    testimony and then move on to other witnesses.

2              THE COURT:  Okay.  Will there be more witnesses than

3         you anticipated for today or will it still be the same?

4              MR. CONWAY:  If I could get back to you perhaps after

5         lunch, Your Honor, with regard to that, I'd appreciate that

6         time to make that determination.

7              THE COURT:  Okay.

8              MR. CONWAY:  But we sort of overplanned, so my guess

9         is we'll still be just those witnesses; but if I could have

10        that time to answer you --

11             THE COURT:  What I intend to tell the jury is that

12        we're still experiencing some technical difficulties so we are

13        going to postpone the review of the wiretap information until

14        tomorrow.

15             MR. CONWAY:  Yes, I think from what I can tell it

16        will likely be resolved by tomorrow.

17             THE COURT:  Okay.

18             MR. CONWAY:  Basically convert the .wav files to MP3

19        files which we believe will solve the problem.  That's what we

20        did for the opening, we used MP3 files.  And I thought the

21        problem was playing it through PowerPoint, but maybe it was

22        more of a problem than I anticipated.

23             THE COURT:  Okay.

24             Any issues?

25             MR. SILVERMAN:  No, ma'am.

10:35:23AM 1          THE COURT:  Mr Burney?

2          MR. BURNEY:  No.

3          THE COURT:  Good; get the jury.

4      (Jurors seated.)

5          THE COURT:  Okay, have a seat.

6          And, ladies and gentlemen of the jury, we are still

7    experiencing some technical difficulties with respect to the

8    audio on the wiretaps, so we're going to postpone that wiretap

9    evidence until tomorrow and accordingly postpone

10   Detective Barrett's testimony regarding those wiretaps until

11   tomorrow.  But Detective Barrett is going to continue on with

12   his testimony regarding other issues.

13          MR. CONWAY:  Thank you, Your Honor.

14   BY MR. CONWAY:

15   Q    Now, Detective Barrett, in connection with your

16   investigation, you did review text messages between Mr. Wheeler

17   and Mr. Bush, is that correct?

18   A    Yes.

19   Q    And those are — we — are admitted into evidence already,

20   is that correct?

21   A    Correct.

22   Q    Can you just describe generally speaking what those text

23   messages were.

24   A    Yes, they were real simple text messages.

25          MR. SILVERMAN:  I'm sorry, can we see what the

10:37:35AM 1    message, best evidence -- 403, can we actually see the text --

2              THE COURT:  The text messages have already been

3         admitted.

4              MR. SILVERMAN:  I don't know which one we're talking

5         about.

6              THE COURT:  I don't know he's talking about a

7         particular one, is he?

8              MR. CONWAY:  I was not, Your Honor.  I was asking

9         generally speaking can you describe them to the members of the

10        jury.

11             THE COURT:  The objection is overruled.

12             MR. SILVERMAN:  The objection then is it's cumulative

13        and the text messages themselves are the best evidence.

14             THE COURT:  The objection is overruled.

15        BY MR. CONWAY:

16        Q    Just generally speaking can you describe them very briefly

17        to the members of the jury.

18        A    Yes.  Mr. Bush would send out a simple text message to

19        Mr. Wheeler and it would just say "Yo".  And if he didn't get a

20        response, he would send another text message that just said

21        "Yo".  And then eventually Mr. Wheeler would always text back

22        something, and it was usually "On my way."  And typically an

23        hour or so later Mr. Wheeler would show up at Mr. Bush's house.

24             MR. SILVERMAN:  Okay, that's non-responsive to the

25        question about text messages between Bush and Mishra.  That was

10:38:42AM 1   the question.

2           THE COURT: Objection overruled. That was not. It

3   was Bush and Wheeler. Wheeler.

4           MR. SILVERMAN: Can I ask the court reporter to check

5   that, please?

6           MR. CONWAY: Well, Your Honor — just to make it

7   perfectly clear, if one of us misspoke.

8   BY MR. CONWAY:

9   Q   Are the text messages we're talking about between Mr. Bush

10   and Willis Wheeler?

11   A   Yes.

12           MR. SILVERMAN: Okay.

13   BY MR. CONWAY:

14   Q   And did you participate in the preparation of sort of a

15   timeline that compared the pole camera data that we had with

16   the text messages that you're referring to?

17   A   Yes, I did.

18   Q   And would it be fair to say that you participated in only

19   sort of one-half of that preparation of that demonstrative

20   exhibit?

21   A   Yes, I prepared the text messages.

22   Q   Okay.

23           MR. CONWAY: Your Honor, we would like to display a

24   demonstrative exhibit marked FBI-483.

25           THE COURT: And that is that a text message?

1          MR. CONWAY:  The demonstrative exhibit we just talked

2    about, Your Honor.

3          THE COURT:  Any objection?

4          MR. SILVERMAN:  Yes, I don't think the proper

5    predicate has been laid for the second half of that.  This

6    person has testified that he knows what the content of those

7    texts is, but not what the content of the pole cam is.  So

8    we're halfway there.

9          MR. CONWAY:  And I'm not asking for it to be admitted

10   at that point, Your Honor.  All I'm asking for is to display it

11   so that he can describe what he did do on the bottom of that

12   exhibit.

13         MR. SILVERMAN:  There's not a foundation to display

14   that yet.

15         THE COURT:  Objection sustained.

16         MR. CONWAY:  Okay.

17   BY MR. CONWAY:

18   Q    Well, with regard to the bottom half of this exhibit, this

19   timeline exhibit, could you explain to the members of the jury

20   what you did.

21   A    Yes.  I just prepared the text messages between

22   Willis Wheeler and Richard Bush and exactly what I talked about

23   before, the text messages reading "Yo" and text messages

24   reading "On my way."  There's also in there -- there was a

25   phone call from Sylvia Bush to Richard Bush saying, "Willis is

10:40:51AM 1  here."  And Mr. Bush saying that — okay.

2  　　　　　MR. CONWAY:  If you could switch to the ELMO,

3  Mr. Imhof.

4  BY MR. CONWAY:

5  Q    So this document that you prepared, it will have various

6  dates here throughout, for example, March of 2014.  Is that

7  correct?

8  A    Correct.

9  Q    And it will have — on the bottom part of it it will have

10  text messages from Mr. Wheeler that basically say something to

11  the effect "On my way" or something like that.

12  A    Yes.

13  Q    So, for example, if we could look at — you have the

14  exhibit in front of you, is that correct?

15  A    I do.

16  Q    Could you give me an example of one on, for example,

17  March 13th, 2012.

18  A    March 12th — I'll give you March 12th.

19  Q    All right.

20  A    It's a text message.  It just says, "On my way."

21  Q    "On my way."  And there is an exhibit number on the

22  exhibit that would tell us where the jury could find the text

23  messages that say, "On my way"?

24  A    FBI-459.

25  　　　　　MR. CONWAY:  If we could switch back to the —

1  BY MR. CONWAY:

2  Q    459 did you say?

3  A    Yes, 459.

4  Q    And that exhibit number is referenced right on that

5  exhibit, is that true?

6  A    It is.

7         MR. CONWAY:  If we could switch back to the laptop --

8  and if we could display Government Exhibit FBI-459.

9  BY MR. CONWAY:

10  Q    What would we see there?

11  A    You'll see a text message from Richard Bush to

12  Willis Wheeler saying, "Yo."

13  Q    And if we wanted to look at the times --

14         MR. CONWAY:  Can we see that?  Can we go up a little

15  bit and see the time of that particular text message?

16         THE WITNESS:  Yes.  Yes, you have the date,

17  3-12-2012, and then you have the start time and the end time

18  are the same.  13-0-5 is military time for 1:05 p.m.

19  BY MR. CONWAY:

20  Q    And then do we have Mr. Wheeler ultimately responding to

21  that text message?

22  A    We do.  At -- I'm sorry -- at -- on the same date, roughly

23  four minutes later, thirteen-zero-nine or 1:09 p.m., "On my

24  way."

25  Q    And you did that essentially for March of 2012 in

10:44:14AM 1  connection with the timeline that's in front of you.

2  A    Yes.

3  Q    March 14th, 2012, let me turn your attention to that day.

4  Was there an operational sort of plan that was put in place

5  to — to sort of execute search warrants and that type of thing

6  on that day?

7  A    Yes.

8  Q    Can you explain that plan to the members of the jury?

9  A    Yes, we were coming towards the end of the case and we

10  felt we established —

11            MR. SILVERMAN:  Objection, non-responsive.

12            THE COURT:  Objection overruled.

13            THE WITNESS:  We established what we wanted to do

14  operationally to — to begin the takedown of the case.  In

15  particular, we were waiting for —

16            MR. SILVERMAN:  Objection, non-responsive.

17            THE COURT:  Objection overruled.

18            THE WITNESS:  We were waiting for the text message

19  that you saw, we were waiting for the text message, "Yo" and

20  then we were waiting for, "On my way."  And then we were going

21  to execute our plan to execute search warrants of

22  Willis Wheeler's vehicle, his residence in Rankin, and

23  Richard Bush's house.  But what we had established was because

24  of the timeline, Richard — Willis Wheeler was, we believed,

25  stopping at a stash house, so —

1          MR. SILVERMAN:  Objection, narrative.

2          THE COURT:  That's what the question calls for.

3   Objection overruled.

4          MR. SILVERMAN:  Okay.  Then the objection is that

5   it's — it calls for a narrative.

6          THE COURT:  Objection overruled.

7          THE WITNESS:  We also knew that Willis Wheeler was

8   very surveillance conscious.  We had already been burned by him

9   on surveillance.

10          MR. SILVERMAN:  Objection.  Can we please do it in

11   Q-and-A so it's not just a narration?

12          THE COURT:  Objection overruled.

13          Continue, Detective Barrett.

14          THE WITNESS:  So again we waited for that text

15   message.  We were going to execute the plan of the three search

16   warrants and, again, we didn't want to get too close to

17   Willis Wheeler.  So we utilized an airplane to follow

18   Willis Wheeler from his office and eventually to Richard Bush's

19   house.  The plane did report — the text message did come.  It

20   came "Yo," "On my way" so we executed the plan.

21          MR. CONWAY:  Well, let's display for the members of

22   the jury Government Exhibit FBI-440.

23   BY MR. CONWAY:

24   Q    What's that, sir?

25   A    This is the incoming text from Willis Wheeler to

1  Richard Bush.  You could see it at 11:49 a.m. and it's — he's

2  telling Richard Bush, "On my way."

3  Q    And during the events of March 14th, 2012, where were

4  you physically located?

5  A    In the wire room.

6  Q    Now, I next want to fast forward to February 26th, 2013.

7  On that day did you interview Mayank Mishra?

8  A    Yes.

9  Q    Do you recognize the person that you interviewed on

10  February 26th, 2013, in the courtroom today?

11  A    I do.

12  Q    Could you please point him out to the members of the jury.

13  A    He's sitting over at defense table between

14  Attorney Burney and Mr. —

15        MR. SILVERMAN:  To be clear, it's Mr. Mishra here in

16  the gray shirt and the gray and white tie.

17        THE COURT:  Okay, the record will so reflect

18  Mr. Mishra has been so identified.

19  BY MR. CONWAY:

20  Q    And would you take the members of the jury through your

21  interview with Mr. Mishra on February 26th, 2013.

22  A    Yes.  We brought Mr. Mishra — myself and Special Agent

23  O'Mahoney brought Mr. Mishra out to my vehicle.  At this point

24  Mr. Mishra was Mirandized.  We notified him of his Miranda

25  rights and he waived those rights and agreed to speak with us.

1   So we brought him out to my vehicle and played him some of the

2   calls that you heard already.  And we wanted to ask him

3   questions about those calls.

4       So in talking to Mr. Mishra about one certain call, he was

5   speaking with Richard Bush and we asked him about that, and he

6   said, "Oh, you mean the stamps."  And so we wanted to talk

7   about the stamps obviously and also the other things that he

8   was providing for Mr. Bush, the cut.  But first we wanted to

9   ask Mr. Mishra if he could identify the other person speaking

10   on the call and he said he could not.  He said he didn't know

11   the other person's name.

12       We asked him if he knew a nickname.  He said he didn't

13   know a nickname.  So after receiving answers like that, we

14   determined that Mr. Mishra was not being truthful because we

15   knew he knew the other person on the other end of the line from

16   calls.  So we decided to end the interview.

17   Q    And did you give him multiple opportunities to identify

18   Richard Bush?

19   A    We did.

20   Q    And did he refuse to do so?

21   A    Yes.

22   Q    Now, did you also ask him about the other things, other

23   than stamps, that Mr. Mishra was selling to this individual on

24   the telephone?

25   A    Yes.  At one point we brought up the ketamine and —— which

10:51:02AM 1  is a cutting agent.  And Mr. Mishra stated that he gave all —

2         MR. SILVERMAN:  Can we approach?

3         THE COURT:  No.  Do you have an objection?

4         MR. SILVERMAN:  I think we need to approach.

5         THE COURT:  Do you have an objection?

6         MR. SILVERMAN:  Yes.  I think we need approach.

7         THE COURT:  What is the objection?

8         MR. SILVERMAN:  I need to approach to —

9         THE COURT:  If there's no pending objection, then

10  there's no need for a side bar.

11         MR. SILVERMAN:  All right.  Well —

12         THE COURT:  What is the nature of the objection?

13         MR. SILVERMAN:  Oh, it's got to do with the Fifth and

14  Sixth Amendment to the Constitution of the United States of

15  America.

16         THE COURT:  What is the nature of the objection?

17         MR. SILVERMAN:  I really would prefer to say at side

18  bar because it's —

19         THE COURT:  Side bar.

20      (At side bar.)

21         MR. SILVERMAN:  The nature of the objection —

22         THE COURT:  Wait, we don't have everybody.

23         MR. SILVERMAN:  The nature of the objection — the

24  nature of the objection is that Mr. Mishra invoked his right to

25  counsel and I don't really want to hear that in court because

10:52:22AM 1    it violates his rights under the Fifth and Sixth Amendment.

2              MR. CONWAY:  And the witness — you know, this is not

3       my first rodeo, Your Honor.  I've informed the witness not to

4       talk about his invocation of his right to counsel.

5              THE COURT:  Okay.  We're done.

6              Objection overruled.

7            (In open court.)

8              MR. CONWAY:  I'm sorry, could you please read back

9       what my last question is.

10             MRS. HALL, COURT REPORTER:  "Question:  Now, did you

11      also ask him about the other things, other than stamps, that

12      Mr. Mishra was selling to this individual on the telephone?"

13      BY MR. CONWAY:

14      Q    Now, I understand there was a decision about ketamine.

15      Put that aside for the moment.  Was there a discussion about

16      other things that you were asking him other than ketamine in

17      terms of cutting agents that Mr. Mishra was selling to

18      Mr. Bush?

19      A    Yes, we asked him about the cut that he was selling to

20      Mr. Bush.

21      Q    Tell us what you can recall about that conversation.

22      A    The ketamine — if we could play the call I would be able

23      to —

24             MR. SILVERMAN:  Objection, non-responsive.

25             THE COURT:  The objection is overruled.

10:53:49AM 1                THE WITNESS:  Would you be able to re-ask the
2    question?
3    BY MR. CONWAY:
4    Q    Okay.  Well, obviously we're having a problem with, a
5    difficulty --
6    A    I know.
7    Q    Did you have a discussion with him with regard to
8    ketamine?
9    A    Yes.
10    Q    And what can you recall about that?
11    A    He said he had given -- we played the call for him, and he
12    said that he had given all of the ketamine to the other member
13    on that, on the -- the other person that was talking on the
14    line, who was Richard Bush.
15    Q    And at that point did you decide to end the interview?
16    A    Yes.  When we -- when we established that he wasn't being
17    truthful with the identification of Mr. Bush, we decided to end
18    the interview.  It was pointless.
19    Q    Now, I've also placed before you another demonstrative
20    exhibit marked FBI-485.
21    A    Yes.
22    Q    And what is FBI-485?
23    A    These -- it's an exhibit showing the different heroin
24    stamp bags that were found at Richard Bush's search warrant,
25    discussed on wiretap calls, and found at the search warrants of

10:55:24AM 1   both Rock America and Middle Road.

2   Q     And is that, the information contained on there, something

3   that you verified by reviewing the evidence that was seized in

4   connection with this matter?

5   A     Yes.

6          MR. CONWAY:  Your Honor, request permission to

7   display Government Exhibit FBI-485.

8          MR. SILVERMAN:  There's not a proper foundation.

9          THE COURT:  I'm sorry?

10          MR. SILVERMAN:  That's not a proper foundation.

11          THE COURT:  Objection overruled.

12          Anything, Mr. Burney?  Any objection, Mr. Burney?

13          MR. BURNEY:  Your Honor, earlier I filed a motion.

14   The Court had ruled, so I would just renew that objection as

15   far as the connection.

16          THE COURT:  I'm sorry?

17          MR. BURNEY:  Earlier I filed an objection through a

18   motion and I would just renew that at this particular point.

19   That's the only objection I have between the search and dealing

20   with February 26, 2013, and Mr. Bush.

21          THE COURT:  The objection is overruled.

22          You can publish.

23          MR. CONWAY:  FBI-485.

24   BY MR. CONWAY:

25   Q     And could you just take us through the columns here, sir,

10:56:56AM 1    and explain what they mean.

2    A    Yes.  We'll start on the far left where it says stamp

3    bags.  These again are things we've talked about before,

4    essentially the brand used to distribute the heroin.  Stamp

5    bags.  Starting at the top you have Diesels, World War IIIs,

6    Wizards, Daily Dose, Pink, and that's just a plain pink bag,

7    New Arrival, Gold, again a plain gold bag, Pale Green, Pale

8    Blue, Call of Duty.  Again, those are the brands.

9        Now, the next column you have Bush search warrant and the

10    exhibit numbers that are going to be used here.  And these were

11    found in — the brands were found in Bush's search warrant, so

12    you have 84 and 87 Diesels were found at Bush's house, World

13    War IIIs, Wizards, Daily Dose, Pink, New Arrival, Golds, Pale

14    Greens and Pale Blues.  And you could see the next line, every

15    one was discussed on the wiretap.  Every brand on the far left

16    was discussed on the wiretap.

17        And then you have the search warrants of Rock America and

18    Middle Road kind of matching them up.  So the Diesels, you

19    have — it begins with the wiretap calls, then the search

20    warrants of Bush and search warrants of Rock America to match

21    them up.  And then you go down to the Pinks.  You have your

22    phone calls and then you have the search warrants at all

23    locations, bush's house, Rock America, and Middle Road.

24        And again with the New Arrivals, the Golds, the Pale

25    Blues, and then you see with the Pale Greens and the Call of

10:59:02AM 1    Duties —— I'm sorry, the Pale Greens you have found at both

2    Bush's and the Middle Road, and the Call of Duties which were

3    not found at Bush's, but you have the phone calls and they were

4    found at Middle Road.

5         MR. CONWAY:  No further questions, Your Honor.

6    Obviously we reserve the right to recall him with regard to the

7    wiretaps.

8         THE COURT:  Okay.

9         Does counsel wish to cross examine now?

10        MR. BURNEY:  Yes, we wish to cross examine,

11   Your Honor.

12        THE COURT:  You as well, Mr. Silverman?

13        MR. SILVERMAN:  Yes.  Mr. Burney can go first because

14   of the order.

15        THE COURT:  All right.  Mr. Burney?

16                    CROSS EXAMINATION

17   BY MR. BURNEY:

18   Q    Detective Barrett, in dealing with the call, Government

19   FBI-328, you were giving, again, the call comes in, correct,

20   and then you do a line sheet at the same time, correct?

21   A    I do the summary at the same time.

22   Q    The summary at the same time and then the line sheet,

23   correct?

24   A    No, the line —— you're still not understanding what the

25   line sheet is.  The line sheet is all relevant information

11:00:56AM 1  pertaining to the call.

2  Q    Okay.  And the texts that were just displayed, I see on

3  them as far as text there's different information that's on

4  there, deals with minimization also?

5  A    Could you pull it up again?  I can go through it line by

6  line.

7  Q    Okay.  There's — on each text message there is a section

8  that says minimization.

9  A    Yes.

10  Q    Is that correct?  And on each call there's also a section

11  saying minimization, correct?

12  A    Yes, I believe.  So on the line sheet —

13  Q    Right on the line sheet.

14  A    Right.

15  Q    And this reflects when a call comes in whether or not you

16  listen to the whole call or whether you minimize the call, and

17  then that would be on the line sheet later on.  Correct?

18  A    No, I don't — I don't — I don't believe that's on there.

19  I mean it would — you would be able to play the call to see if

20  it was minimized.

21  Q    Okay.  What I'm saying is like — when I was looking at

22  these text sheets, it has a place where it says minimization.

23  A    Again, if you could pull the text message up, I could go

24  through it line by line and we can —

25          MR. BURNEY:  Okay, why don't we pull up — let me see

1   which text message — how about FBI-459.  Let's look at that.

2          THE WITNESS:  Okay.  Yeah, this is just — I'm sorry,

3   yeah.  This is just the — like we talked about before, all

4   relevant information pertaining to this call or text message,

5   so to speak.  The line sheet, when you — when you go into the

6   system and you filter the calls and you do reviews of the

7   calls, in order to get the line sheet on this form the way

8   you're seeing it you have to filter through and you have to

9   actually click on line sheet, and there's an option that says

10  line sheet minimization details, and that gives you everything

11  pertaining to that call.  And this is what you have here.

12         You have obviously the case number, the target name,

13  the line that it was intercepted on.  You see (412)628-8635.

14  Now, you can see the user with my name up in the right-hand

15  corner.  This was just me preparing the line sheet, not that I

16  monitored this call, because I did not monitor this call.  I

17  can show you who did.  You'll see a session number, 6567.

18  That's just starting with one and going up.  This was Session

19  6,567.

20         Now, this is a text message so it says times

21  minimized, one.  I don't know what that means because it was

22  not minimized.  So Associate DN, I don't — and then we talked

23  about your start time and stop time and the date.  The

24  direction, it shows outgoing.  And then you have duration.

25         Now, text messages usually come in like this.

11:04:25AM 1    There's no duration because there's no length of the call.

2    It's just a text message that comes in, it starts and stops

3    immediately.  You have your participants, Richard Bush and

4    Willis Wheeler.  You have the monitor, J. Fiori, that's who was

5    working the line live when this text message came in.  You have

6    the outgoing digit or in/out digits it says, in and out digits,

7    (412)584-7614, and then you have your content.  When you see

8    content, this is how it comes in.

9             So if you're working the line, the text message comes

10   in just like that, content.  "Yo."  And then what you do is you

11   cut it or copy it -- you don't cut it.  You can't cut the

12   content.  You copy it and you bring it over to the synopsis and

13   that's where you can make your notes.  You can't make any notes

14   where it says content.  The system will not allow it.  So any

15   comments you have, like you could see here Richard Bush texts

16   to Willis Wheeler, the "Yo"," that's what he copied and brought

17   over, and then the monitor's initial, JF.  And when you see up

18   here monitor, J. Fiore, that was him working on that call.

19   BY MR. BURNEY:

20   Q    Now, when a call comes in for this line sheet, would it be

21   similar, all the different classifications that are up there?

22   A    It would be similar, but a call would have duration.

23   Q    And would also have that section where it says its

24   duration and it would have whether it was minimized, correct?

25   A    Correct.

11:06:05AM 1    Q    Now, when it says session like 6,567, what does that mean?

2    A    That was — that was the session number.  Like we said,

3    starting from one, like the first call or text you receive

4    starts at one.

5    Q    Okay.

6    A    Sometimes that is an equipment test, where the tech agents

7    that are setting up the line will test the equipment.  So

8    typically your first call is an equipment test.  And then you

9    start with the calls or texts after that, two, three, four,

10    6,567.

11    Q    So this isn't just a reflection of one day.  This is like

12    ongoing.

13    A    Correct.

14    Q    And I think you said in — regarding calls related to —

15    as you — in your opinion, Richard Bush, there's like these

16    18,000 or so calls and texts —

17    A    I don't believe I gave an actual number.  I said

18    thousands.

19    Q    You said thousands.

20    A    Yes.

21    Q    I think when you said thousands, some of those were

22    minimized and some were not.

23    A    Correct.

24    Q    All right.  Now, I went back and I looked at the summaries

25    and I can't find in any summaries where any of these thousands

1   of calls were minimized with regards to Mr. Bush.  Like none of

2   them.  Like it was always came up zero minimized, just like

3   with this one call where it says zero percent.  You said that

4   was for the text, excuse me.  But none of the calls from

5   Mr. Bush in your summaries said that they were minimized at

6   all.

7   A    Okay.  If I could go back and review the actual call -- I

8   don't know.  We don't put in times minimized.  That's computer

9   generated by the voice box system.  So I wouldn't put that in.

10  So I don't know what that number -- like if it was minimized

11  five times, I don't know if that would do that correctly or

12  not.  Because, like I said, this text message was not minimized

13  and it says times minimized, one.

14  Q    Right.

15  A    We don't have the option to minimize a text.

16  Q    You're saying if you, during the call, if you minimize,

17  then there would be a reflection in the records that that call

18  was minimized and that would come out in the computer printout,

19  correct?

20  A    I don't know that.  It should be in the summary.  I know

21  when I work on the call and I minimize it, I type in the

22  summary "Call minimized."  And then if I go back in and check

23  it, I type in "Spot check" and then I begin another summary.

24  And then if I deem it -- if it's nonsense again, I'll put right

25  there "Call minimized" and I'll wait.  And if I go back in,

11:08:48AM 1  I'll put "Spot check" and I'll begin with another summary.

2  Q   And that would reflect in the summary of the total calls

3  as far as what percentage of those calls were minimized,

4  correct?

5  A   It should.  Mine do.

6  Q   And I'm saying when I went back and checked, I saw in the

7  summaries of all the calls for Mr. Bush none of them were

8  minimized.  It said percentage minimized, zero.  So is that

9  correct or not correct?

10  A   I don't know that answer.  If you could show me -- if you

11  could show me those calls, we can go through it.

12  Q   Not the individual calls.  I'm saying the summary said of

13  all these calls -- and I know you said there were thousands of

14  calls; and you said of the thousands of calls, your

15  responsibility, legally, is when you're listening, if it's

16  pertinent, you could listen; but if it's not really pertinent,

17  you know, you're supposed to minimize that.  And there would be

18  a reflection in the record that those calls were minimized.

19  A   Yes.

20  Q   And I know your testimony was that you had in many

21  situations minimized calls.  You -- not just you, yourself, but

22  you and the other officers doing it.  And I'm saying when I

23  look back at the affidavits, I saw where it says summaries,

24  minimization of all the calls for Mr. Bush said zero percent

25  were minimized.

11:09:58AM 1  A    Okay.  Then — again, I can speak on the calls that I

2  worked on and I'm not — I think when we were talking before,

3  we were talking wiretap generalities, like we were getting into

4  how do you work on calls, how does the voice box system work.

5  I wasn't talking specifically about Richard Bush.  I was

6  talking about the process of monitoring wiretapped phone calls.

7  Q    Okay.

8  A    So if the system said that he wasn't minimized, then he

9  wasn't minimized then.  I don't —

10  Q    Okay.  And like — I know with all the different calls

11  you're seeing you have nothing to indicate that any of the

12  calls for Mr. Bush were minimized.

13  A    I'm sorry —

14          MR. COCAS:  Asked and answered.

15          THE COURT:  Sustained.

16          MR. BURNEY:  Okay.  If we may approach for a minute,

17  Your Honor?

18          THE COURT:  Yes.

19      (At side bar.)

20          THE COURT:  All right.  Go ahead.

21          MR. BURNEY:  Your Honor, I think the Government has a

22  legal responsibility when they do wiretaps that they are

23  supposed to minimize certain calls or not minimize certain

24  calls as either pertinent or non-pertinent.  And from the

25  requirement of the law as far as minimization, I think this

11:12:01AM 1  witness is basically saying — and when I looked in the records

2  none of the calls related to texts or alleged texts or calls

3  from Mr. Bush were minimized.  So at this particular point I'm

4  figuring there's a violation of law and moving to suppress all

5  the calls, all the texts regarding Mr. Bush because they

6  violated the law regarding minimization.

7        THE COURT:  Mr. Conway?

8        MR. CONWAY:  First of all, I have an objection to

9  relevance just with regard to this whole testimony.  And if he

10  wants to file a motion, he can file the motion.  That's not the

11  proper inquiry before the jury on this point.  I'm confident

12  that we have complied with the law and — so I think this is

13  all — should be outside the presence of the jury, this type of

14  inquiry about necessity or proper minimization procedures.  All

15  of it is irrelevant to what the issues are before the jury, so

16  I'd ask Mr. Burney be instructed to move along.  And if he's

17  got a motion, he should file his motion.

18        THE COURT:  I agree with the Government.  Moreover,

19  with respect to minimization, this witness has already

20  testified the text messages are not by their very nature able

21  to be minimized.  With respect to the calls, this witness has

22  asked you repeatedly to show him the calls.  If you don't want

23  to show him the calls, I'm really not sure where we go on this

24  issue at all.  But if you have particular calls you want to

25  show him or your representation that all the calls were not

11:13:20AM 1    minimized -- he asked you to show him.  You have not done so.

2    And so this issue for me is moot.  So  the objection is

3    overruled and I'd ask that you move along.

4            This is not the appropriate spot for this type of

5    motion.  You have a motion to suppress, you're more than able

6    to file it at the appropriate time when we're not in court in

7    session.

8        (In open court.)

9    BY MR. BURNEY:

10   Q    Officer Barrett, I know you've made mention of alleged

11   telephone calls from Mr. Bush.  Can you tell me how it was that

12   his voice was identified on these calls?

13   A    I don't recall how his voice was identified.

14   Q    In your team was there someone who had some expertise in

15   dealing with voice recognition, training or whatever, that they

16   could compare Mr. Bush's actual voice and these calls to give

17   an opinion, expert opinion, as far as that's Richard Bush on

18   these calls?

19   A    I don't -- I don't recall that.  I think he was

20   identified -- I believe he was identified through the meet

21   after the phone call, the meeting between him and

22   Sherron Whitehead.  He --

23   Q    I know --

24   A    He was seen physically.

25   Q    Yeah, I think that you had asked Officer Diven do a

11:15:16AM 1   surveillance, correct?

2   A   Correct.

3   Q   In that surveillance there was a person who showed up in a

4   1983 automobile, Chevrolet automobile, correct?

5   A   Richard Bush showed up.

6   Q   Follow my questioning.

7   A   Okay.

8   Q   After the point you're saying Richard Bush showed up.  You

9   were not there, correct?

10   A   Correct.

11   Q   Your surveillance and the information that came back from

12   Officer Diven was a person showed up in a 1983 white Chevrolet.

13   A   Yes.

14   Q   He wrote down the license plate number, correct?

15   A   I believe so or he -- or he told someone in the wire room

16   what the -- I don't know if he wrote it down or someone else

17   ran the plate.

18   Q   You obtained that information from Officer Diven on the

19   license plate and it was -- a certified copy was entered into

20   evidence -- came back and the registered owner was

21   Richard Bush, correct?

22   A   Correct.

23   Q   With an address of Montezuma Street, correct?

24   A   Correct.

25   Q   What I'm saying like is that only showed that that person

11:16:16AM 1  showed up for that less than one minute supposedly meeting with

2  three or four people.  And I'm saying are you saying as a

3  result of that, that is what caused Richard Bush's voice to be

4  able to be recognized on these calls?

5  A    I'm saying that that's initially how he was identified.

6  I'm not sure if anyone else recognized him by his voice. I'm

7  not sure about that.

8  Q    Okay.  I mean that would be -- you said the team -- and

9  you should have a record of that, how it was that -- when a

10  call came through, that you could say that this is the voice of

11  Richard Bush.

12  A    I don't have that.

13  Q    Should you?

14  A    No, I don't have that.

15  Q    Okay, you don't have that information.

16  A    No.

17  Q    So your testimony regarding these calls and you're saying:

18  Oh, that's Richard Bush on the call," is based upon some

19  information that somebody else has, not you.

20  A    I was in the wire room, yes.  I --

21  Q    That's what I'm saying.  You said you heard the call,

22  correct?

23  A    Correct.

24  Q    And I know on these exhibits there would be initials RB or

25  WW or MM or something of that nature.  But I'm saying regarding

11:17:26AM 1 Richard Bush, from the beginning as far as listening to a

2 telephone, a cell phone, you don't have the information as far

3 as how it was that it was Richard Bush whose voice was on that

4 call. Is that correct?

5 A    I don't know.  I'm not sure if other members of my team

6 do.

7 Q    I'm saying you do not.

8 A    I do not, correct.

9 Q    So all the opinions you've been giving as far as

10 Richard Bush said this or Richard Bush said that, it would be

11 based on some other type of information that someone else had,

12 but not you personally.

13 A    Correct.

14         MR. BURNEY:  No further questions, Your Honor.

15         THE COURT:  Okay.

16         Mr. Silverman?

17         MR. SILVERMAN:  Yes, ma'am.

18                  CROSS EXAMINATION

19 BY MR. SILVERMAN:

20 Q    Directing your attention to the statement you claim make

21 Mishra made to you, do you understand —

22 A    What statement?

23 Q    The statement you just told the jury that he made to you.

24 Do you know what I'm talking about?

25 A    No.

11:19:08AM 1   Q   Okay.  You and Mahoney went to Mishra's house, Mishra

2   agreed to talk to you, remember?

3   A   O'Mahoney.

4   Q   O'Mahoney, right.  You with me?

5   A   Yes.

6   Q   Okay.  You just told -- okay.  First of all, is that

7   statement recorded?

8   A   No statements were recorded.

9   Q   You didn't record the interview of Mayank Mishra?

10   A   No.

11   Q   Now, it was obviously a pretty significant event.  You

12   went to his house early in the morning, right?

13   A   Yes.

14   Q   And you took him out to your car, right?

15   A   Yes.

16   Q   All right.  And you read him his Miranda warnings, right?

17   A   Yes.

18   Q   You told him he had the right to remain silent.  Right?

19   A   Yes.

20   Q   The right to stop answering questions at any time.  Right?

21   A   Yes.

22   Q   The right to have a lawyer present before and during any

23   questioning, right?

24   A   Yes.

25   Q   All right.  And the -- what else -- what are the other

11:20:07AM 1  ones — oh, that anything you say would be used against you in

2  court or at trial.  Right?

3  A    Yes.

4  Q    Okay.  So that's a pretty solemn event here.  We're making

5  sure that this person understands their constitutional rights,

6  right?

7  A    Yes.

8  Q    And there's no recording of that, correct?

9  A    Correct.

10  Q    And so when you tell the jury how that conversation went,

11  we just have to take your word for it, right?

12  A    And the report.

13  Q    Right.  We're going to talk about that.  Okay?

14  A    Yes, sir.

15  Q    And the reason you just told us "and the report" is

16  because the report was made soon after the alleged statement

17  was taken, right?

18  A    Yes.

19  Q    All right.  And so what the report says would be more

20  accurate than what you're saying here in 2015, right?

21  A    Correct.

22  Q    All right.  Because the statement was taken on

23  February 26th of 2013.  Right?

24  A    Yes.

25  Q    And here we are today on —

11:21:07AM 1   A   — Pearl Harbor Day.

2   Q   — Pearl Harbor Day, yes, thank you. 12-7-15.

3     Now, when Mr. Conway was talking to you, you told the jury

4   that during Mishra's statement he told — Mishra told you that

5   he had given all the ketamine to Richard Bush. Right?

6   A   Yes.

7   Q   The truth is that what Mishra said — the truth was you

8   played a tape for Mishra and it was a tape of a person asking

9   Mishra for ketamine. And on that tape Mishra told the person

10   he had already given all of it, right?

11   A   Yes, that's correct.

12   Q   And then when you said, well, what about this or — Mishra

13   then said: Oh, yeah. The ketamine, yes. Right?

14   A   Right.

15   Q   So Mishra did not tell you during that statement that he

16   had, in fact, given ketamine to Bush, right?

17   A   That's correct.

18   Q   So that statement then is only the subject of one of these

19   calls, right?

20   A   Yes.

21   Q   And you searched Mr. Bush, right? You searched his house,

22   right — not you, the police.

23   A   Yes.

24   Q   You, the collective you, okay?

25   A   Okay.

11:22:48AM 1    Q    All right.  You searched his house, right?

2    A    Yes.

3    Q    And you, the police, searched his car, right?

4    A    Yes.

5    Q    Did you find any evidence of ketamine?

6    A    I don't recall.

7    Q    Well, you didn't, did you?

8    A    I don't know.  I don't know what the lab reports -- if

9 there's something in the lab report, I don't know.

10    Q    Okay.  Likewise, we hear in these various calls

11 discussions of fetti, right?

12    A    Right.

13    Q    Okay.  And the agents at one time had a suspicion that

14 what was being described was the controlled substance fentanyl,

15 right?

16    A    Right.

17    Q    And that was when there were calls going on between Mishra

18 and Bush, right?

19    A    Yes.

20    Q    But then subsequently the agents learned that that was a

21 nickname for some type of an adulterant, right?

22    A    Well, they -- they mentioned fetti on the phone calls, and

23 we use -- we believed that term was cut.

24    Q    But you -- well, you believed it was fentanyl, which is a

25 controlled substance, right?

11:23:54AM 1   A   It's also used as a way to cut the heroin.

2   Q   What is used as a way to cut the heroin?

3   A   Fentanyl.

4   Q   Right.  And the fentanyl is a controlled substance,

5   correct?

6   A   Correct.

7   Q   All right.  But you later learned that what they were

8   calling fetti was not a controlled substance.  Right?

9   A   I think what you're asking — I don't believe any of the

10  lab reports showed that there was fentanyl in any of the

11  heroin.  Is that what you mean?

12  Q   It was a nickname for a non-controlled substance, correct?

13  A   Correct.

14  Q   All right.  And the person that used the nickname that was

15  constantly referring to it as fetti or brown fetti, that was

16  Mr. Bush, right?

17  A   I'm not sure.  If we could listen to the calls, I could —

18  Q   I know we're going to do that when we get up to speed

19  technology-wise, okay?

20  A   Okay.

21  Q   And you're right, that's fair.

22  A   Okay.

23  Q   We'll come back to that and we'll listen to all of that.

24  Likewise, there was a — there was an adulterant that was

25  called — or there was a powder substance that was called M,

1   right?

2   A    Right.

3   Q    And you heard them talking about that, correct?

4   A    Correct.

5   Q    And you thought, well, that's morphine, right?

6   A    I don't recall that.

7   Q    You don't recall any Government agent ever saying they

8   thought that was morphine.

9   A    I don't recall that.

10  Q    Okay.  You wouldn't have thought that, would you?

11  A    I — I don't know what I — I mean they just said the

12  letter M?  I don't know.

13  Q    Okay.

14  A    It could be any number of cutting agents.

15  Q    Based on your experience, you wouldn't have drawn the

16  conclusion that "M" means morphine, right?

17  A    I'm not sure.

18  Q    All right.  And morphine is a controlled substance, right?

19  A    Yes.

20  Q    But you didn't find morphine, did you?

21  A    No.

22  Q    All right.  So that's probably another nickname for one of

23  these powdered substances, right?

24  A    Right.

25  Q    All right.  Now, you had — you went to — you surveilled

11:25:59AM 1    Deondre Steave's, right?  You, the collective you, the police.

2    A    I don't know if we had surveillance on Deondre Steave.  I

3    can't recall that.

4    Q    Okay.  Well, how many calls of Steave's did you intercept?

5    A    I don't know.

6    Q    18,000, would that surprise you?

7    A    If you say.  I don't know.

8    Q    How many calls of Richard Bush's did you intercept?

9    A    Mr. Burney asked me that.  I just said thousands.  I don't

10    know.  I don't recall.

11    Q    Would it surprise you if it was 18,000-plus?

12    A    No, that would not surprise me.

13    Q    Okay.  And Sherron —

14    A    — whitehead.

15    Q    — Whitehead.  How many calls of Sherron's did you

16    intercept?

17    A    Thousands.  Again, I'm not sure.

18    Q    Again, in excess of 18,000 calls.  Right?

19    A    Okay.

20    Q    All right.  And how many calls originated by Mr. Mishra

21    did you intercept?

22    A    I don't recall.

23    Q    Zero, because you weren't up on Mr. Mishra's phone.

24    A    Oh, okay.  Right.

25    Q    And so you weren't up on the phone at Rock America?

1          MR. CONWAY:  Your Honor, this is just asked and

2    answered from the previous cross examination of Mr. Barrett and

3    beyond the scope of this direct examination of Mr. Barrett.  We

4    can't have recross on every issue.

5          THE COURT:  Objection sustained.  Let's move along.

6    BY MR. SILVERMAN:

7    Q    Did you tap the phone at Rock America?

8          MR. CONWAY:  Objection, Your Honor.

9          MR. SILVERMAN:  That's a different question.

10          THE COURT:  I'll allow the question.

11    BY MR. SILVERMAN:

12    Q    Did you tap the phone at Rock America?

13    A    No.

14    Q    All right.  Did you tap Mishra's cell phone?

15          MR. CONWAY:  Objection, Your Honor.  I think you

16    just —

17          THE COURT:  Objection sustained.  Let's move along.

18          MR. SILVERMAN:  Yes, ma'am.

19    BY MR. SILVERMAN:

20    Q    Now, this investigation — oh, did Mishra ever go over to

21    the Steave dude's — Steave — what's his name?

22          MR. CONWAY:  Objection, Your Honor, beyond the scope

23    of the direct examination we just had of Detective Barrett.

24          THE COURT:  Objection sustained.

25

11:27:49AM 1    BY MR. SILVERMAN:

2    Q    Well, you would be telling us if he was seen in these

3    surveillances that you are describing, is that right?

4              MR. CONWAY:  Objection, Your Honor, beyond the scope

5    of direct examination of Mr. Barrett.

6              MR. SILVERMAN:  The Government is trying to suggest

7    that there is this connection here.  The fact that Mishra is

8    not in these places is relevant.

9              THE COURT:  Objection sustained.

10    BY MR. SILVERMAN:

11    Q    Who knows all about this investigation?

12              MR. CONWAY:  Objection, Your Honor, the same

13    objection.  It's beyond the scope of the direct examination

14    here.  We can't have him cross-examined four different times

15    about the same issues.

16              MR. SILVERMAN:  I'm — I'm asking to —

17              THE COURT:  Objection sustained.

18              MR. SILVERMAN:  So —

19    BY MR. SILVERMAN:

20    Q    Did you participate in Dinner Out?

21              MR. CONWAY:  Objection, Your Honor, same objection.

22    We ask that you direct Mr. Silverman to move on to a relevant

23    area that was the subject of direct examination.

24              MR. SILVERMAN:  Judge, this is —

25              THE COURT:  Mr. Silverman, the issue is not whether

11:28:46AM 1   the information is relevant. The issue is whether or not it

2   was covered in direct. If it was not, the objection is

3   sustained. It was not.

4   BY MR. SILVERMAN:

5   Q   What investigation — you talked about Sherron Whitehead.

6   What investigation did he come from?

7         MR. CONWAY: Objection, Your Honor, that's beyond the

8   scope as well.

9         THE COURT: I'm not sure I understand the question.

10   What are you trying to get at?

11   BY MR. SILVERMAN:

12   Q   What — when did you start investigating

13   Sherron Whitehead? Try that.

14   A   I believe we intercepted Sherron Whitehead on

15   Faheem Jackson's line in August of 2011.

16   Q   Never heard of these people before that.

17   A   No, we've heard of them.

18   Q   This investigation — well, Mr. Mishra's been being

19   investigated since 2004?

20         MR. CONWAY: Objection, Your Honor, move —

21         THE COURT: Sustained.

22         MR. CONWAY: We would like to go to side bar. I make

23   the motion that Your Honor knows I'm making at this point.

24         THE COURT: The objection is sustained. Let's move

25   along, Mr. Silverman.

11:29:56AM 1  BY MR. SILVERMAN:

2  Q    You say that —

3          MR. SILVERMAN:  Can I see the Government's summary

4  chart exhibit?

5          MR. CONWAY:  Which one?

6          MR. SILVERMAN:  The one you —

7          MR. CONWAY:  485, FBI-485.

8          MR. SILVERMAN:  Okay.

9  BY MR. SILVERMAN:

10  Q    So what FBI-485 — what this tells us is that Mishra sold

11  this style of stamp bag.  That's what — that's what you're

12  saying, right?

13  A    I'm saying this exhibit is saying where — where it was

14  found in search warrants and when it was — or when it was

15  discussed on the wiretap.

16  Q    Sure.  But what you're saying here is Mishra sold at Rock

17  America Diesels, right?

18          MR. CONWAY:  Objection again.  Mischaracterization of

19  the testimony again, Your Honor.

20          THE COURT:  Objection overruled.

21  BY MR. SILVERMAN:

22  Q    That's what this says, huh?  The fact — well, you found

23  them at Rock America, right?

24  A    And Middle Road — oh, the Diesels?

25  Q    The Diesels.

11:31:17AM 1  A    Yes, just Rock America and Bush's.

2              THE COURT:  One voice at a time, one voice at a time.

3              THE WITNESS:  Sorry.

4  BY MR. SILVERMAN:

5  Q    Let's go through.  The Diesels were at Rock America,

6  right?

7  A    And Bush's house.

8  Q    And Bush's house.  And they were talked about between who

9  in this wiretap calls exhibit?

10  A    Um, at least between Bush and Mishra.

11  Q    Okay.  And the other people?

12  A    I'm not sure.

13  Q    And then the pink ones, you found those at Rock America,

14  right?

15  A    And Bush's house and Middle Road.

16  Q    Right.

17  A    Yes.

18  Q    Okay.  And then the New Arrivals, those were at Rock

19  America, right?

20  A    And Bush's house and Middle Road, yes.

21  Q    Okay.  And the gold ones, same thing?

22  A    All three, yes.

23  Q    Right?  The Pale Blues, right?

24  A    All three again.

25  Q    Okay.  And the reason — what this exhibit is designed to

11:32:29AM 1    do I guess is to show that Bush could have gotten these

2    particular bags from Mishra?

3    A    Yes.

4    Q    Okay.  Now, we went through the other day, you remember,

5    we listed all of them, the different bags that were found at

6    Bush's house?

7    A    Yes.

8    Q    Okay.  And we had a lot longer list than that list.

9    Right?

10    A    Yeah, I believe there were 25 —

11    Q    Something like that, yeah.  And so that means that there's

12    like — what do we have here, one, two, three, four, five, six,

13    seven, eight, nine, ten — so fifteen — so Bush has 15 bags.

14    You have no evidence that those 15 other styles —

15         MR. CONWAY:  Your Honor, again objection to

16    mischaracterization.  There is a difference between stampers

17    and stamp bags, and Mr. Silverman has knowingly not disclosed

18    to the witness to make this testimony clear.

19    BY MR. SILVERMAN:

20    Q    Mr. Silverman wants to know do you have — are you able to

21    link —

22         MR. CONWAY:  Your Honor, I would object.

23         THE COURT:  Let him ask the question.

24    BY MR. SILVERMAN:

25    Q    In response to what the Government is objecting to, are

11:33:42AM 1  you saying you can link every single bag either to a stamper or

2  to a bag that was prestamped to Mishra?

3  A   What I'm saying here in this exhibit is this is where

4  these bags were found and these were the calls in which they

5  were discussed.

6  Q   Right.  And I'm just asking you because of what the

7  Government's objection is.  Do you have some evidence that

8  every bag — every brand of bag found on Bush also is traceable

9  to Mishra?  Either by stamper or prestamped bag?

10  A   I believe that's what this shows.

11  Q   Well — but we had 25 different bags.  That can't be what

12  this shows.

13        MR. CONWAY:  Again, objection to the characterization

14  of the bags, Your Honor.  A list of 25 are not bags.

15        THE COURT:  Objection sustained.

16  BY MR. SILVERMAN:

17  Q   Do you understand what we're arguing about here?  There

18  was 25 different designs, either stamped by a person later or

19  preprinted that way —

20        MR. CONWAY:  Objection, Your Honor, again

21  mischaracterization.

22        THE COURT:  Objection sustained.

23  BY MR. SILVERMAN:

24  Q   Were there any bags found on Bush that you could not with

25  evidence link to Mishra?

11:35:00AM 1  A    I don't recall.  I don't know.

2  Q    Could have been.

3  A    Yeah, I mean -- we found Diesels at -- we found these bags

4  here.

5  Q    Gotcha.

6  A    I mean we found Diesels, World War IIIs -- or, I'm sorry,

7  Diesels, Pinks, New Arrivals, Golds, Pale Blues, these were all

8  found at Bush's house, at Mishra's business, and/or Mishra's

9  residence.

10  Q    Okay.  And I'm with you there.  But there were also stars

11  and Harley Davidsons and all that other stuff.

12  A    Correct.

13  Q    Okay.  Do you have some evidence that links those back to

14  Mr. Mishra?

15  A    Well, we have calls with Mr. Mishra saying he has other

16  customers other than Richard Bush.

17  Q    Oh, he has other customers other than Richard Bush.  So

18  this isn't some sort of preferential deal.  And not only

19  that --

20         MR. CONWAY:  Objection, Your Honor, as to

21  Mr. Silverman testifying.  Move to strike.

22         MR. SILVERMAN:  This is cross examination.

23         THE COURT:  There's no question; objection sustained.

24         MR. CONWAY:  Move to strike, Your Honor.

25         THE COURT:  It is stricken.  The jury is asked to

11:36:07AM 1  disregard that.

2  BY MR. SILVERMAN:

3  Q    Sir, Mr. — I think we agree Mr. Mishra sold bags to other

4  folks, right?

5  A    Yes.

6  Q    All right.  In fact, Mr. Mishra sold these same bags,

7  these same brands of bag to other folks.

8  A    And Richard Bush admonished him for that.

9  Q    Yes.  The point is he sold the same brands of bags to

10  other folks.  Yes or no?

11  A    At least on one occasion he did we believe from the phone

12  call.

13  Q    You know it's a fact that Mishra sold these bags to other

14  people because you stopped other people leaving his store with

15  them.  Right?

16  A    I don't — I don't recall that.

17  Q    The police stopped other people leaving Mishra's store —

18  A    We believe Mr. Mishra had, yeah, other clients, other

19  heroin dealers that were buying bags and cut from him.  Yes.

20  Q    Okay.  Well, now, sir, there is nothing about these bags

21  that is — that requires that they only be used for heroin.

22  Right?

23       MR. CONWAY:  Again, Your Honor, objection for the

24  reasons already articulated.

25       THE COURT:  The objection is sustained.

11:37:30AM 1   BY MR. SILVERMAN:

2   Q    Well, do they have any other purposes?

3        MR. CONWAY:  Objection, Your Honor.  It's just the

4   same exact question that's already — that I just objected to,

5   just phrasing it a different way.

6        THE COURT:  Objection sustained.

7   BY MR. SILVERMAN:

8   Q    Are they made out of wax paper?

9   A    Yes.

10  Q    Okay.  Are they sent through the US mail?

11       MR. CONWAY:  Your Honor, the same nature of the

12  objection.

13       THE COURT:  Objection sustained.

14  BY MR. SILVERMAN:

15  Q    You had an airplane up there, huh?

16  A    Yes.

17  Q    Okay.  And so did that airplane detect Mr. Mishra going to

18  Mr. Bush's house?

19  A    No.

20  Q    Did it detect Mr. Mishra going to Sherron Whitehead's

21  house?

22  A    No.

23  Q    Faheem Jackson's house?

24  A    No.

25  Q    Steave's house?

11:38:27AM 1    A    No.

2    Q    You have monitored — you sat in the wire room, right?

3    A    Yes.

4    Q    And so you in response to -- I think it was one of Lonny's

5    questions, Mr. Bush's lawyer's questions -- you said: I don't

6    know, I wasn't there.  Right?

7    A    Can you direct me to the question?

8    Q    Probably not.

9    A    Okay.

10    Q    It was one of the ones where you said: I was in the wire

11    room, I wasn't there.  You were talking about the pole camera

12    actually, right?  Mr. Conway was going to —

13    A    I think you objected to me testifying to the pole camera.

14    Q    I mean actually you said several times:  I don't know, I

15    wasn't there.  Right?

16    A    If you could be more specific, I could tell you.

17    Q    Okay.  The fact of the matter is if you're not personally

18    there, then you don't know what's going on, right?

19    A    Well — no, I think what he was asking was something that

20    I probably would have had to have been there to answer that

21    question, but I mean we could talk —

22    Q    I mean in fairness to you, you're a member --

23    A    If I wasn't there, I couldn't — I wouldn't say I knew.

24    Q    In a legal sense you wouldn't be able to say "I know" even

25    though you're part of this FBI task force and you guys have

11:40:41AM 1    other ways of sharing and pooling information.  Right?

2    A    Right.

3    Q    Okay.  And do you have any information that Mr. Mishra was

4    there when heroin was being put in these bags?

5    A    Where?

6    Q    Anywhere.

7    A    No.

8    Q    You guys did trash pulls at different people's houses —

9          MR. CONWAY:  Objection, Your Honor, beyond the scope.

10          THE COURT:  Objection sustained.

11    BY MR. SILVERMAN:

12    Q    Your investigation has continued in this case past

13    February 26 of '13, right?

14    A    Yes.

15    Q    You have seized stamp bags, boxes of stamp bags from

16    people as recently as November 14th —

17          MR. CONWAY:  Objection, Your Honor.  Same basis.

18          THE COURT:  Objection sustained.

19    BY MR. SILVERMAN:

20    Q    Do you know based on your investigation what percentage of

21    Mr. Mishra's sales at Rock America had to do with stamp bags or

22    were derived from stamp bags or adulterants.  Do you know?

23          MR. CONWAY:  Objection, beyond the scope, Your Honor.

24          THE COURT:  Objection sustained.

25

BY MR. SILVERMAN:

Q    Well, you were present, though, at Middle Road.  Right?

A    Yeah — yes.

Q    Okay.  Because we — even though you didn't record the interview, there's an interview that you told us about.  You were there, right?

A    Yes.

Q    You went inside the house, right?

A    Yes.

Q    All right.  You saw with your own two eyes —

         MR. CONWAY:  Objection, Your Honor.  The only thing asked on direct examination, as Mr. Silverman well knows, was the statement.  So anything beyond the statement we would object to as beyond the scope.

         MR. SILVERMAN:  Judge —

         THE COURT:  What about the statement?

         MR. SILVERMAN:  It's what he saw at Middle Road.

         THE COURT:  Objection sustained.

         MR. SILVERMAN:  I — I had reserved my right to recall the witness.  We can — I mean I can wait 'til my case-in-chief or I can just —

         THE COURT:  You're limited to the scope of direct.

         MR. SILVERMAN:  All right.

         THE COURT:  That's not cross of the witness.

BY MR. SILVERMAN:

Q   Oh, I found it:  I wasn't there, I obtained the info from Diven.  That's what you said, from Officer Diven.

A   Okay.

Q   All right.  So the — you went through the number of calls with Whitehead and Bush and all that, right?  And did I — I don't remember if I asked this, but in the entire time that you were recording Bush, you recorded Mishra 78 times?

A   I don't — I don't recall.

Q   Does that sound about right?

A   I don't know.

Q   And then a percentage of those calls are just either the person doesn't answer or there's no — nothing of substance there.  Right?

A   I don't know.  We can go through the calls if you would like one by one.

Q   All right, we'll do that.

        During the same meeting that you and O'Mahoney had with Mr. Mishra that day on February the 26th when — after you Mirandized him, he talked to you, you also — you searched his car, yes?

A   Yes.

Q   And —

            MR. CONWAY:  Objection, Your Honor, beyond the scope.

            THE COURT:  Objection sustained.

11:46:19AM 1          MR. CONWAY:  Your Honor, at this point I would ask

2    that you tell Mr. Silverman to sit down and we can move on with

3    the trial.

4          MR. SILVERMAN:  I really don't know —

5          THE COURT:  The objection is sustained.

6          MR. SILVERMAN:  Okay.  They went into the fact that

7    they went to Middle Road, they questioned him.  I was going to

8    go into something else about that, but I —

9          THE COURT:  No, the scope of your cross is the scope

10   of what the direct was.

11         MR. SILVERMAN:  Right, right.

12         THE COURT:  That is not a part of the direct.

13         MR. SILVERMAN:  Okay.  Well, I'm just — I don't mean

14   to be disrespectful, but I'm just trying to understand how we

15   measure the scope.

16         THE COURT:  Just read Rule 611, it will tell you.

17   BY MR. SILVERMAN:

18   Q    Did Mishra give you the keys to his warehouse?

19         MR. CONWAY:  Your Honor, beyond the scope and I also

20   believe it was already asked and answered when Mr. Silverman

21   questioned Detective Barrett the first time.

22         THE COURT:  Mr. Silverman, do you have other issues

23   to explore, anything that was covered on direct?

24         MR. SILVERMAN:  May I have a moment, Your Honor?

25         THE COURT:  Yes.

11:47:21AM 1       (Brief pause in proceedings.)

2  BY MR. SILVERMAN:

3  Q   Of the calls involving Bush and Mishra, do you have any

4  calls where Mishra is talking about heroin?

5  A   Yes, I believe they are talking about heroin.

6  Q   Okay.  Can -- and you're going to identify that for us?

7  A   I mean you're talking about one and the same.  The cut and

8  the heroin, they have to go together.  Mr. Bush said it

9  himself, without Mr. Mishra his program does not exist.

10  Q   Okay.  And so you are telling this jury that adulterants

11  are the same as heroin?

12  A   When they're put in the heroin, they become the same.

13  Q   Do you have some evidence that Mr. Mishra did that?  Was

14  there --

15  A   I believe we do.  I believe the evidence that was seized

16  at Mr. Bush's house had dilutants that were provided to him by

17  Mishra.

18  Q   Yes.

19  A   Yes.

20  Q   I understand.  Mr. Mishra sold those items from his store

21  on Rock America.  Right?

22  A   Yes.

23  Q   Do you have evidence that Mishra participated in the

24  handling of the heroin?

25  A   The -- I'm not sure -- maybe I'm misunderstanding this.

11:49:15AM 1    Q    No.

2    A    I believe — okay.

3    Q    You're saying that the dilutants become dilutants,

4    essentially, when they're added to the heroin, right?

5    A    Yeah, they cut the heroin with the dilutants.

6    Q    Did Mr. Mishra do that?

7    A    With Mr. Mishra's dilutants, yes.  When he provided them

8    to Bush, Bush cut them —

9    Q    Do you —

10    A    One doesn't exist without the other.

11    Q    Isn't it a fact that those dilutants can be used for any

12    substance, right?

13            MR. CONWAY:  Objection, again, Your Honor, same

14    basis.

15            MR. SILVERMAN:  He opened the door.

16            THE COURT:  Objection sustained.

17            MR. SILVERMAN:  Those dilutants can be sold as fake

18    drugs.

19            MR. CONWAY:  Objection, Your Honor.

20            THE COURT:  Objection sustained.  Let's move on.

21    BY MR. SILVERMAN:

22    Q    Do you have evidence that Mishra was there to see with his

23    own two eyes that these substances were actually being used to

24    cut heroin?

25            MR. CONWAY:  Objection, Your Honor, beyond the scope.

11:50:21AM 1          THE COURT:  The objection is sustained.

2          MR. CONWAY:  Your Honor, again we ask that you direct

3   Mr. Silverman at this point to conclude his cross

4   examination —

5          THE COURT:  I've asked Mr. Silverman if you have any

6   questions that were within the scope of direct.  Do you have

7   any such questions remaining?

8   BY MR. SILVERMAN:

9   Q    Any calls between Bush — wait —

10          MR. SILVERMAN:  I'll just pass the witness for now,

11   Judge, reserving the right to recall.

12          THE COURT:  Okay.  We'll continue on with

13   Detective Barrett after lunch.

14          At this point we will break for lunch.  Remember all

15   of my rules, which you guys I know probably could give me by

16   heart at this juncture.  We will reconvene at let's say about

17   1:10.  Okay?  All right?

18          All rise for the jury.

19       (Jurors return to the jury room.)

20          THE COURT:  Okay, Detective Barrett, you may leave

21   the stand.

22       (The witness steps down from the witness stand.)

23          MR. SILVERMAN:  Judge, now that the jury is out —

24          THE COURT:  No, they're not out yet.  Let's let them

25   leave for lunch.

1    MR. SILVERMAN:  Yes, ma'am, then I would like to make

2  an offer of proof.

3       (Jurors exit the jury room by way of the courtroom.)

4       THE COURT:  Okay.  Let me say out of the box here

5  that the scope of cross or the scope of recross is the scope of

6  direct or the scope of redirect.  It is not the scope of other

7  counsel's cross, it's not the scope of an old cross you did

8  before; it is the scope of direct as to cross and the scope of

9  redirect as to recross.  It's just that simple.

10       MR. SILVERMAN:  Yes, ma'am.

11       THE COURT:  And with respect to — I mean with

12  respect to your questioning of this particular witness,

13  Mr. Silverman, not only did we leave the scope — hold on —

14  okay?  Not only was it not within the scope of direct, it was

15  asked and answered numerous times on numerous cross

16  examinations of this witness prior.

17       So when you say, you know, Mr. Burney asked you this,

18  that's not the proper scope of direct — of cross.  The scope

19  of cross is the scope of direct.

20       MR. SILVERMAN:  Yes, ma'am, and I'm not trying to

21  argue with the Court, but —

22       THE COURT:  Well, it seems that you don't understand

23  what the scope of your cross is.

24       MR. SILVERMAN:  Well, Your Honor, I read Rule 611 as

25  not only the scope of the cross, because what it expressly says

11:55:37AM 1  is cross should not go beyond the subject matter of the direct

2  and matters affecting the witness's credibility.  In my view

3  the witness's credibility includes the basis of the opinions

4  that they have expressed on direct and it includes the — which

5  would then include the investigation that they have done to

6  draw those conclusions.  Also, I would point out to the Court

7  that that's Rule 611(b), also says the Court may allow inquiry

8  into additional matters —

9  THE COURT:  And I have not.

10  MR. SILVERMAN:  — as on direct exam.  I am with you

11  there and that is within your discretion.

12  THE COURT:  Perhaps you should read Rule 611(a) that

13  indicates that I can and I have exercised my discretion to make

14  sure this case runs efficiently.  We are in week two of this

15  case now and it is my intent to have this case tried in no more

16  than two weeks.  I've said this to all of you before.

17  And I will not have this constant interruption.  When

18  I've already ruled on an objection, the notion that somehow you

19  can follow up on your question just is completely

20  inappropriate.  I mean the notion that after I rule on an

21  objection and sustain it that you decide that you're going to

22  follow up on a question is not appropriate.  And we're just

23  wasting time every time you do these things.

24  MR. SILVERMAN:  Okay.  I apologize to the Court and I

25  would like to — the prosecutor at one point had objected that

11:57:23AM 1  I was testifying.

2  THE COURT:  Yes.

3  MR. SILVERMAN:  I was making a statement —

4  THE COURT:  Yes.

5  MR. SILVERMAN:  — in asking the witness to agree or

6  disagree with the statement.

7  THE COURT:  You did not ask the witness to agree or

8  disagree with the statement.

9  MR. SILVERMAN:  I was about to when the prosecutor

10  made his objection and I would point out that 611(c) authorizes

11  the use of that style of questioning known as leading

12  questions.

13  THE COURT:  That was not a leading question.

14  MR. SILVERMAN:  Okay.  Well, that was the way it was

15  intended.

16  THE COURT:  I don't care how it was intended, it was

17  not that.

18  MR. SILVERMAN:  Well — okay.  It certainly wasn't an

19  open-ended question.

20  THE COURT:  No, it was a statement by you.  That's

21  what it was and it was properly objected to and properly ruled

22  on.

23  MR. SILVERMAN:  All right.  And now with respect

24  to — I believe that the Court is unfairly limiting my right to

25  confront the witnesses because the Court is narrowly

11:58:20AM 1  interpreting 611 to not permit me to explore the basis of

2  things the witness has said while at the same time allowing

3  this witness to give opinions on direct that substances are

4  heroin when that hasn't been established; that —

5        THE COURT:  Tell me which one of your questions just

6  now had to do with that.

7        MR. SILVERMAN:  Your Honor, what I was going into was

8  the basis of this witness's investigations of these other

9  people, Sherron Whitehead and Deondre Steave.  This witness

10  knows through the investigation that trash pulls were utilized

11  on those witnesses.

12        THE COURT:  And that's not a subject that was covered

13  at all in direct.

14        MR. SILVERMAN:  No, ma'am, but the — you see, the

15  witness is trying to show —

16        THE COURT:  If you want to call the witness and ask

17  him about trash pulls in your case-in-chief, you are free to do

18  so.

19        MR. SILVERMAN:  Okay.  That's what we'll do.

20        THE COURT:  Okay.  I mean there's a rule for a

21  reason, Mr. Silverman, and if you have — if you want to call

22  Detective Barrett to ask him about trash pulls in your

23  case-in-chief, you're welcome to do that.  The prosecution has

24  objected to the line of questioning as being outside of the

25  scope of direct, it is, and I so ruled.

1          MR. SILVERMAN:  I wanted to explain the reason that

2     it affects the credibility of the witness, if I could.

3     Because, you see, the witness is trying to suggest that the

4     stamp bags are the only items that are uniquely suited for the

5     distribution of heroin when, in fact, the trash pulls show that

6     there were cut corner baggies known as diapers, there were

7     receipts found from the sale of other items of paraphernalia

8     from K-Mart and other stores.

9          THE COURT:  The first thing I would say is I did not

10    hear the witness testify to that on his direct to this

11    examination.  The witness has been on the stand several times;

12    clearly that could lead to some confusion.  But I'd ask that

13    you keep track of what the witness says on the direct that

14    you're cross examining on.

15         MR. SILVERMAN:  And I intend to and I'll pay close

16    attention, but what I'm trying to say is that it undermines the

17    opinion — the credibility of the witness's conclusion that —

18         THE COURT:  The witness did not so conclude in this

19    direct.

20         MR. SILVERMAN:  That was the purpose of Government

21    FBI Exhibit 46 — whatever the summary chart —

22         THE COURT:  I believe you actually asked him whether

23    the purpose of that exhibit was to demonstrate that certain of

24    the bags found at Mr. Bush's residence were also found to be

25    either at Mr. Mishra's home or at his place of business.  You

12:01:21PM 1   asked him whether that was the purpose of that exhibit, and the

2   answer to that question was yes.

3                MR. SILVERMAN:  Yes.

4                THE COURT:  So that's the purpose of that exhibit.

5                MR. SILVERMAN:  Right.

6                THE COURT:  Not to demonstrate that there is no other

7   way to transport heroin or to sell heroin.  And there was never

8   a point in time that I heard this witness in this examination

9   say that.

10               MR. SILVERMAN:  That is true.

11               THE COURT:  Then it is outside the scope of this

12  particular -- this particular direct.

13               MR. SILVERMAN:  Yes, but it also -- the witnesses

14  don't just testify directly to facts.  The prosecution will

15  then invite the jury to draw inferences from what the

16  witness --

17               THE COURT:  That's correct, and you can draw -- you

18  can question him about things that he said.  That is not

19  something he said during this particular examination.

20               MR. SILVERMAN:  What I'm --

21               THE COURT:  Period.

22               MR. SILVERMAN:  What I'm trying to offer would

23  undermine the conclusion that these bags are uniquely required

24  for heroin procession and distribution.

25               THE COURT:  That was not a conclusion reached -- that

12:02:25PM 1  I found that this witness reached during this examination.

2    MR. SILVERMAN:  And I agree with you.

3    THE COURT:  And my point is we are limiting — I am

4  allowing you an opportunity to wait until the end of

5  Officer Barrett's testimony to do this cross examination.

6  You've chosen not to do so.  And so, as a result, you've been

7  engaged in this piecemeal cross examination, which is fine, but

8  you have to limit it to the scope of the examination, not when

9  he testified to two examinations back.  This examination.  If

10  that's the way you choose to proceed on cross, that's what you

11  need — that is what you need to do.

12    MR. SILVERMAN:  All right.  But I — I just want

13  to — the Court to understand why I believe that the

14  credibility of the witness relative to the conclusions he draws

15  pursuant to the investigation in toto is always fair game for

16  cross, and I'm objecting —

17    THE COURT:  You could have asked questions in toto at

18  the end of Officer Barrett's direct examination.  You have

19  chosen a piecemeal method, and Officer Barrett said nothing

20  about that in this particular session.  So to the — I'm not

21  challenging your ability to ask questions about credibility,

22  but let's be clear those questions about credibility have to

23  relate to what the witness is currently testifying about.  It

24  is — must be within the scope of direct.

25    We spent a whole week last week with a lot of the

12:03:54PM 1    same sorts of objections having to be lodged because I think

2    you think that you're allowed to question about what Mr. Burney

3    asked, I think you think you're allowed to question about what

4    had been brought up back in the first direct and redirect.

5    That's not appropriate.

6         Your cross needs to connect to Mr. Conway's or

7    Mr. Cocas's direct.  Your recross needs to connect to

8    Mr. Cocas's or Mr. Conway's redirect.  It's that simple.

9         And you can certainly challenge credibility if it's

10   about something they're talking about in the context of this

11   particular direct or redirect.

12        MR. SILVERMAN:  Well, this witness has repeatedly

13   testified along the lines of a summary witness, that he's

14   familiar with the entire investigation.  He said that so many

15   times that I couldn't even begin to --

16        THE COURT:  I've already ruled on this.  I'm not

17   going to argue about it anymore.

18        MR. CONWAY:  Your Honor, I have a motion at this

19   point.

20        THE COURT:  Go ahead.

21        MR. CONWAY:  I have counted five times during the

22   course of that cross examination where Mr. Silverman has once

23   again violated your pretrial order.  In addition, I would count

24   a sixth, which is continuing to follow lines of cross

25   examination that you've precluded.

12:05:17PM 1          He asked about the 2004 Mr. Mishra — under

2    investigation since 2004, a violation of the court order, three

3    different times.  He tried to get into the legality of these

4    substances three different times.  That's at Count 4.  He

5    also — well, and then he also talked about other uses of the

6    dilutants.  Again, another violation of your court order.

7          Your Honor, what's become clear is that he doesn't

8    care what you said.  He doesn't care about your rule of law.

9    He doesn't care about your authority because he will just do

10   anything he wants to do, whether it's going beyond direct

11   examination despite you ruling four or five different times

12   that he's done.  He will — he simply will not comply with your

13   directives.

14          We ask that you sanction him again at this point.  We

15   ask that you revoke his pro hac vice status.  We ask that you

16   hold him in contempt of court and we ask that you put him in

17   jail because that is the only thing that will stop this man

18   from violating your Court's orders.  He has competent counsel

19   who can continue to represent Mr. Mishra during the course of

20   the trial, but you've seen enough, Your Honor, we've had a week

21   of trial.  You think he's going to stop?  There's nothing

22   that's going to stop him.  And we are going to be here until

23   January 30th —

24          THE COURT:  We are not.

25          MR. CONWAY:  — unless you do something, unless you

12:06:38PM 1    do something, because I have a right to put on my case.  I have
        2    a right to present my evidence.  And if I don't have time
        3    within that two weeks because Mr. Silverman chooses to violate
        4    your court order over and over again, then the time has come to
        5    take appropriate action in this case.
        6        He will not stop, Your Honor.  He does not deserve to
        7    be in this courthouse.  He does not deserve to be in this
        8    courthouse.  He doesn't.
        9        THE COURT:  Mr. Silverman, why should you continue to
        10   serve as pro hac vice counsel in this court by the Court's
        11   invitation?
        12       MR. SILVERMAN:  I am Mr. Mishra's lawyer, Your Honor.
        13   I'm his lawyer of choice.  I've been his lawyer the entire time
        14   this has been going on, when his other lawyer was conflicted.
        15   He hired me.  I'm not trying to —
        16       MR. CONWAY:  He's —
        17       THE COURT:  Let him finish, Mr. Conway.
        18       MR. SILVERMAN:  I'm not trying to violate the
        19   Court's —
        20       THE COURT:  I think you are, though.  I think that's
        21   the problem here.  I mean whenever you try to slip by an
        22   impermissible question like asking about whether or not
        23   Mr. Mishra was being investigated since 2004 or asking about
        24   the legality or illegality of stamp bags or cutting agents, I
        25   mean we've gone down this road before, and I think my direction

12:08:05PM 1    on these issues is clear.

2                      With respect to the legality or illegality of the

3              stamp bags or cutting agent, I've held that not only are those

4              irrelevant, but they are more prejudicial than probative.  And,

5              frankly, they're confusing to the jury.  The notion that you

6              would engage in a discussion about the legality of these

7              particular products is of no consequence to your client's —

8              your client's charge here that he engaged in a heroin

9              conspiracy.

10                     MR. SILVERMAN:  Yes, Your Honor.

11                     THE COURT:  I think I've said that numerous times at

12             this juncture.  And the notion that you would try to get into

13             that testimony again with Detective Barrett strikes me as

14             nothing but very purposeful.  I mean it's your question.  It's

15             not something Officer Barrett was getting into.  These are your

16             questions.

17                     MR. SILVERMAN:  No, Your Honor.

18                     THE COURT:  The notion that you would raise

19             presumably out of thin air this notion that Mr. Mishra had been

20             investigated, has been the target of an investigation since

21             2004 also suggests that you did not — that you were

22             purposefully attempting to circumvent my order regarding any

23             sort of theory of vindictive prosecution of this witness or

24             with respect to the evidence suggesting that somehow again the

25             Mishras have been target of an investigation by the Government,

12:09:50PM 1    all of which you have been precluded from getting into.

2              And you claim to be a practitioner who has been

3       practicing presumably criminal law for 20 such years.  I have

4       no reason to think that these are inadvertent in any way.  In

5       fact, they were your theory.  I understand that you were

6       displeased with the Court's ruling, but the Court has ruled.

7              I don't know if you're trying to set up some sort of

8       situation where Mr. Conway is forced to ask for a mistrial or

9       maybe you're trying to cause your client to file some

10      ineffective assistance of counsel claim.  I'm not sure what the

11      method to the madness is here, but I can only assume based on

12      the Court's rulings on numerous occasions at this point that

13      you know exactly what you're doing and that you are doing so in

14      complete contravention, purposefully, to the Court's order.

15             MR. SILVERMAN:  May I respond?

16             THE COURT:  Yes.

17             MR. SILVERMAN:  All right.  That's not correct,

18      Your Honor, with all respect.  The reason that I was inquiring

19      about the other purposes for the dilutants is because

20      Officer Barrett opined that those are the equivalent of heroin,

21      that they're always and only used with heroin.

22             THE COURT:  And I should add that that was a question

23      that Mr. Barrett answered last week as well, but go ahead.

24             MR. SILVERMAN:  Okay.  I didn't recall that question

25      being asked.

1          THE COURT:  I do.

2          MR. SILVERMAN:  All right.

3          THE COURT:  So let's try to pay attention.

4          MR. SILVERMAN:  All right, yes, ma'am.  And I have

5     the utmost respect for the Court and its rulings.

6          THE COURT:  I don't think so.  I disagree.  In fact,

7     I mean it has been disrespectful to the Court, it has been

8     disrespectful to the Government, it has been disrespectful to

9     the witness, it has been disrespectful to the jury.  And I'm

10    through wasting time.

11         So I will ask the Government in the time that we have

12    before lunch to brief the issue as to whether or not it is

13    appropriate to revoke Mr. Silverman's pro hac status in light

14    of the fact that he has other competent counsel -- Mr. Mishra

15    has other competent counsel certainly present throughout this

16    trial, and I will ask you to do the same.

17         MR. SILVERMAN:  If I may get one other thing on the

18    record here --

19         THE COURT:  Yes.

20         MR. SILVERMAN:  The 2004 had nothing whatever to do

21    with any theory of the Government persecution against the

22    Mishras.  What it had to do with is that there is -- has been

23    presented a large amount of evidence regarding Whitehead and

24    the other people we've heard about and that Mishra had been

25    under investigation at various times, and there was no similar

12:13:01PM 1  quantum of evidence regarding his involvement in any heroin

2  conspiracy.  That was the purpose of that.

3         THE COURT:  Okay.  Certainly outside the subject of

4  direct.  But I'll even -- I'll even give you that one,

5  Mr. Silverman.  I mean that's one in a bucketful of

6  transgressions.  So I'll give you an opportunity to brief those

7  issues.

8         Court will stand in recess.

9         MR. IMHOF, DEPUTY CLERK:  All rise.  This court now

10 stands in recess.

11     (Whereupon, the luncheon recess was taken.)

12     (In open court, with Defendants seated.)

13        THE COURT:  Okay.  Before the break the Court asked

14 counsel to prepare for argument on the Government's motion that

15 I jail Mr. Silverman at this point and revoke his pro hac vice

16 status in response to the Government's allegations of contempt

17 pursuant to 18 United States Code Section 401.  I'll hear

18 argument.

19        MR. SILVERMAN:  The defense moves to recuse this

20 Honorable Court at this time, and that motion is made pursuant

21 to 28 USC Section 144.  May I be sworn as a witness so I can

22 state the good faith basis I have?

23        THE COURT:  You may.

24        MR. SILVERMAN:  All right.

25        THE COURT:  Mr. Imhof.

1:34:34PM 1        (Attorney Norman Silverman sworn.)

2            THE COURT:  Okay.

3            MR. SILVERMAN:  Your Honor, it's my concern — first

4  of all, this trial is not about our — any personality

5  conflicts you and I — the Court and I might have.  This trial

6  is about Mayank Mishra's right to have a competent defense and

7  to have a lawyer that enforces the presumption of innocence and

8  the requirement that —

9            MR. CONWAY:  Your Honor, I would object.  If he has

10  facts that he's ready to present, let's have the facts.  Not a

11  speech —

12           THE COURT:  You said you wanted to be sworn as a

13  witness.

14           MR. CONWAY:  Let's give factual evidence.

15           MR. SILVERMAN:  Can I continue?

16           THE COURT:  It's not about argument, it's about

17  evidence.

18           MR. SILVERMAN:  I'm just directing the Court to the

19  fact that it's about Mr. Mishra.

20           THE COURT:  I am perfectly aware of that.

21           MR. SILVERMAN:  All right.

22        The Court has repeatedly punished me and permitted

23  the Government to threaten to punish me.  Now the record will

24  reflect that it's now escalated to the point where I'm being

25  threatened with jail.  It's my professional opinion as a lawyer

1:36:07PM 1  that this creates a problem in that the defense is having to

2  defend itself and at the same time try to defend Mr. Mishra.

3  And the way that this is adversely affecting

4  Mr. Mishra's right to a lawyer unhampered by a conflict is that

5  Mr. Mishra would ordinarily be permitted to elicit evidence and

6  then argue what inferences ought to be drawn from the evidence

7  to the jury without waving a flag in front of the Government

8  and indicating where it is we're going.

9  The Court I believe has made several orders that were

10  calculated to prejudice Mr. Mishra's defense, including an

11  order that Mr. Mishra turn over to the Government all evidence

12  that he intended to use in cross examination and in his

13  case-in-chief. And that includes — and we've provided it.

14  We've tried hard to follow the Court's rulings even though we

15  disagreed with them.

16  That included us having to give back to the

17  Government Jencks Act material, and we've done that. And the

18  Government continues to e-mail us new Jencks Act material which

19  I guess we then have to re-give to the Government in order to

20  make use of this.

21  Additionally, with all respect to the Court, I do not

22  believe that I violated the Court's order not to inquire into

23  the witness's opinions about whether the items Mr. Mishra was

24  selling were lawful. My question to the witness was do they

25  have other purposes besides heroin distribution. And the

1    witness has repeatedly been permitted to testify on direct

2    examination that these items are uniquely suited for heroin

3    distribution.

4              And the case law that we found —

5              MR. CONWAY:  Objection as to referencing case law,

6    Your Honor.  I'm asking him to give factual —

7              THE COURT:  You can have argument after the facts.

8    You've been sworn to give evidence.

9              MR. SILVERMAN:  Yes, ma'am.  And part of that

10   evidence is that I as a lawyer have researched the issues

11   and —

12             MR. CONWAY:  Objection, Your Honor.  Again —

13             THE COURT:  The objection is overruled.

14             MR. SILVERMAN:  And the — when there's an adverse

15   inference that can be drawn from conduct and then there's a

16   parallel non-criminal inference, then the admission of evidence

17   that there is another purpose —

18             THE COURT:  You're just arguing the motion over

19   again.  That motion has been ruled on.  I think that's probably

20   part of the problem here, Mr. Silverman.  You seem not to

21   understand that despite what you say, I've already ruled on

22   that.  And I ruled against your client on that issue.  And

23   therefore it's over.

24             Now, it does not permit you, notwithstanding your

25   research in the area, to attempt to re-litigate it in front of

1    this jury.

2              MR. SILVERMAN:  Your Honor, as I understood the

3    Court's ruling, I was precluded from asking the witness if

4    these items could be used lawfully.  I didn't do that.

5              THE COURT:  You were precluded from arguing,

6    suggesting, eliciting testimony, or adducing evidence that

7    chemical dilutants, stamp bags or other efforts —— other

8    materials seized by the Government during their searches were

9    legal to possess or sell.

10             MR. SILVERMAN:  And I haven't asked that.  I didn't

11   ask that at all.

12             THE COURT:  That is exactly what you asked.

13             MR. SILVERMAN:  Your Honor, with all respect to the

14   Court, I was very cautious in asking my question to ask if

15   these items have other purposes.  I didn't use the word lawful,

16   legal.  The witness could have very easily have said —— could

17   have listed a string of unlawful purposes.  It wouldn't have

18   mattered.  I didn't ask that question.

19             But the Government is permitted over and over and

20   over to jump up, threaten me with —— now with jail, and

21   repeatedly move during trial to have me fined.  And so I'm

22   having to defend myself and explain myself all the time,

23   thereby giving away the defense work product.  The Court made

24   me turn over work product to telegraph to the prosecution where

25   we plan to go with the evidence on cross and in the development

1    of our case.  And while the pretrial order did say turn over

2    the documents from your case-in-chief, it didn't say to turn

3    over the documents that you would use to cross examine

4    witnesses.

5           And I -- I don't see how it's even possible to turn

6    over Jencks Act material that's only turned over a few days

7    before trial.  And it seems to me to undermine the accused's

8    ability to confront the witnesses and it violates his Sixth

9    Amendment rights.

10           And I've tried hard to walk the line and to not ask

11   the question the Court told me not to ask.  And I didn't ask

12   that question.  And yet now I'm being threatened with prison

13   and I have to defend myself and I'm -- we're just in a

14   situation here.  And I mean we could — we could go through

15   this record point by point.  I don't have the benefit of having

16   a transcript to look at right now, but I will also tell the

17   Court that when the Court permitted the PowerPoint presentation

18   to be introduced without any underlying foundation or

19   predicate -- and I understand it's with the caveat that it's

20   not offered as evidence, but only as what the prosecutor

21   expects the evidence to show -- it certainly looked a lot like

22   evidence to the defense.

23           And then the witnesses have been permitted over

24   defense objection repeatedly to testify to their conclusions.

25   And then every time the defense tries to explore the foundation

1:43:20PM 1   for the conclusions that the witness has testified to on

2   direct — and I say every time, I'm probably exaggerating —

3         THE COURT: I mean it's just not true, so you can

4   continue on.

5         MR. SILVERMAN: There have been times when probably

6   the Court did allow us to explore the foundation. But many,

7   many times the Court has sustained objections that were

8   attempting to do nothing other than explore the foundation for

9   which — upon which a conclusion was made and explore the bias

10   or credibility of the maker of the statement.

11         And I think that I'm — I am — additionally, for

12   example, the Court chastised the defense a few moments ago for

13   making the decision to cross examine the witness as he is

14   presented rather than wait for the Government to get done

15   calling him on multiple — at multiple different times. And

16   I'm not controlling the order the Government calls —

17         THE COURT: You know that wasn't what I chastised you

18   for. So I — are you done?

19         MR. SILVERMAN: No.

20         THE COURT: Okay.

21         MR. SILVERMAN: My efforts to cross examine the

22   Government's witnesses have been uniformly made in good faith,

23   and my motion to — this motion to recuse, which must be

24   referred, is also made in good faith. And with all respect to

25   the Court, I sincerely apologize for any misunderstandings and

1:45:25PM 1    I mean no ill will to the Court, but Mr. Mishra deserves to

2    have a trial where the Government is allowed to put on its case

3    and the defense is allowed to cross examine the witnesses in an

4    effort to undermine that case, and Mr. Mishra shouldn't be in

5    the position of having to -- his lawyer be constantly attacked

6    by the Government and the Court condone that type of attack.

7         And I believe that the bias has been established, and

8    I'm very certain that 28 USC Section 144 requires that this

9    issue be decided before all other issues and that it be decided

10   by a neutral and different Court than yourself.

11              THE COURT:  Okay.

12              Mr. Conway or Mr. Cocas?

13              MR. CONWAY:  I mean -- let me deal with the facts

14   first of all.  We've all been in the courtroom throughout the

15   course of the trial, so Mr. Silverman's representations now

16   under oath about what has happened in this courtroom can be

17   compared to reality.  And the reality is that Mr. Silverman has

18   taken the strategy to try to create a mistrial, try to create

19   some other process so his trial can be separated from Mr. Bush

20   or so that he can delay or get some issue on appeal or whatever

21   he's trying to do.

22         It's clear that that's the trial strategy for

23   Mr. Silverman.  It's clear that he just lied over and over

24   again about what happened in court because we were all here.

25   We are all witnesses to what happened in court versus what

1   Mr. Silverman said.  So now he's added perjury to the list of

2   things that he's done incorrectly.

3           And what's clear is that he doesn't care what

4   Your Honor says, he has no true respect for Your Honor or for

5   this court.  Those are the facts already established I think

6   beyond any doubt.

7           Your Honor, frankly, has shown an egregious amount of

8   patience in this particular case, perhaps recognizing that the

9   point here is to try to bait you into some sort of rash action

10   that you've refused to be baited into by Mr. Silverman.  But

11   again, in my opinion that's a true trial strategy of

12   Mr. Silverman, to try to bait you in some sort of reversible

13   error.

14           And that's again — we can go back to the motion to

15   parole the witness if we want to and understand that

16   Mr. Silverman's true strategy there wasn't to get Ms. Mishra to

17   testify as he hadn't bothered to confer with us with regard to

18   her testimony via video.  So we now know that was just a

19   facade.  It was just a trial strategy that he's chosen to

20   employ to try to get an issue on appeal or try to create some

21   sort of mistrial and that's what's happening.

22           It's crystal, crystal clear to the Government that

23   that's what's happening.  Your Honor has shown an amazing

24   amount of patience, frankly, in this regard.

25           Now, those are the facts.  If I could turn it over to

1:48:44PM 1  Mr. Cocas because I know he's done the research with regard to

2  this —

3  THE COURT:  We'll talk about contempt in a second.

4  Let's just deal with the issue of recusal.

5  The Court will not recuse from this case.  It is

6  incredible that, frankly, defense counsel would suggest that

7  the Court has somehow acted inappropriately when all the Court

8  has done in this case is tried to keep, first of all, order;

9  second of all, tried to maintain the integrity of the Court's

10  orders by insisting that they be followed when they have been

11  faced with variety after variety of transgression.  That is not

12  recusable and the Court will not recuse under that statute or

13  any other.

14  So let's move on to contempt.

15  MR. SILVERMAN:  If I may, Your Honor, the Court —

16  MR. CONWAY:  Your Honor, I think it's the

17  Government's motion.  We would like to be heard first.

18  MR. SILVERMAN:  If I may —

19  MR. CONWAY:  Well, it's the Government's motion,

20  Your Honor.

21  MR. SILVERMAN:  With all respect to the Court, the

22  Court lacks the jurisdiction, as I understand it —

23  THE COURT:  I disagree.  The issue has been resolved.

24  If you have —

25  MR. SILVERMAN:  I would like to appeal —

1:50:03PM 1          THE COURT:  You can file a motion or whatever you'd

2     like on the record, sir.  I have ruled on the issue.  You have

3     been given an opportunity to speak.  The Government has spoken.

4     And I have ruled on it.

5          The issue of contempt.

6          MR. BURNEY:  Excuse me one second, Your Honor.

7     Before they start, I know we're dealing with the Government and

8     dealing with Mr. Silverman —

9          THE COURT:  If you have something to say, Mr. Burney,

10    I'm sorry.

11         MR. BURNEY:  If the Court — before the Court makes

12    its ruling, I want to place something on the record regarding

13    that.

14         THE COURT:  Yes, please.  I apologize.

15         MR. BURNEY:  I'm saying regarding any type of ruling

16    the Court makes regarding the contempt.

17         THE COURT:  Yes.  Go ahead.

18         MR. COCAS:  I'm sorry, I thought you wanted me to

19    speak first.

20         THE COURT:  No, he wants to speak on the issue of

21    contempt.

22         MR. COCAS:  Is this about regarding revocation of pro

23    hac vice status?

24         THE COURT:  Correct, and the other sanctions that you

25    indicated you wanted.

1          MR. COCAS:  It took me about an hour, but I briefed

2    the issue.  It's about five pages.  Essentially what the Court

3    has to ask itself is would it tolerate what it has tolerated so

4    far from Mr. Silverman out of a regular member of the bar of

5    this Court.  If it wouldn't and it could point to things in the

6    record that Mr. Silverman has done or hasn't done that violated

7    this Court's orders or were otherwise not professional, then it

8    has the discretion to find that it should revoke its permission

9    for him to practice here on a pro hac vice basis.

10          And I laid out what I could remember from this past

11   week.  It's all been kind of a blur and I don't have the

12   record, but I do remember that when I drafted the — what I

13   call the notice of evidentiary issues in consultation with

14   Mr. Conway, we pinpointed eight issues that we thought from

15   reading Mr. Silverman's various briefs over November that he

16   might be trying to tread into what we viewed as irrelevant or

17   unduly prejudicial to the Government, either because it had no

18   connection to anything or it would be confusing, et cetera.

19          And when I filed that and the Court granted it,

20   Mr. Silverman had not filed any response to that.  He got up

21   here and he gave reasons as to why the Court shouldn't grant

22   some of those requested reliefs, but as to some of them he

23   represented to the Court that he wouldn't be violating the

24   order.

25          Never in my wildest dreams did I imagine that a week

1:52:27PM 1   later here we are.  Out of, by my count, out of the seven

2   different — the eight different kinds of relief that the Court

3   granted to us, the Government, Mr. Silverman has violated at

4   least once and often multiple times seven of those.  The only

5   thing that he hasn't tried to go into yet that I have seen is

6   the immigration status of Mr. Mishra's mother, and I just get

7   the feeling that that's coming.

8        The problem this presents for us is even though, you

9   know, we go up to side bar and the Court says, you know,

10   Mr. Silverman, that violates my order — the Court recalls it

11   did this numerous times before it actually started sanctioning

12   him — the problem is it's a cumulative effect of ringing a

13   bell that we can't now unring.

14        And I think Your Honor hit it right on the head, that

15   you observed maybe Mr. Silverman is trying to bait us to move

16   for a mistrial — I think possibly we could because of

17   prejudice to us — it won't be coming.  We just want to get

18   this proceeding finished in accordance with the rules and in

19   accordance with the Court's orders.

20        If Mr. Silverman has a problem with the eight kinds

21   of relief the Court has granted in the order that it entered on

22   December 1st and then modified on December 3rd, he needs to

23   file a motion for reconsideration.  He can't just arrogate unto

24   himself the right to put him above Your Honor and just decide:

25   I don't like this aspect of the order; or in my 20 years of

1:53:45PM 1  practicing in Texas, I have not seen this kind of order before,

2  so I'm just going to disregard it and ask the witness about it;

3  or I'm going to blurt it out in opening statement a couple of

4  times.

5       It just isn't how things are done.  And, Your Honor,

6  I mean I submit –– and I don't want to put words in your

7  mouth –– but I do remember you saying last week in your

8  20 years of working in this court as a law clerk, as an

9  attorney, and a judge you haven't seen this kind of disrespect.

10  I practiced 18 years as a clerk for three federal judges and

11  then working as an attorney now for the Government.  I haven't

12  seen this kind of disrespect.  To me it's almost amazing

13  chutzpah that someone would try this and then be surprised that

14  someone even mentions he could be put in jail for criminal

15  contempt.

16       At what point does Mr. Silverman get the message?  I

17  think the answer is he won't get the message.  Whenever the

18  Court calls him up to ask him why he's violated the order yet

19  again, he gets this kind of perplexed look on his face and he

20  makes the representation he didn't mean to do it.

21       I think Your Honor needs to find that he has worn out

22  his welcome here.  He no longer deserves the privilege, the

23  honor of practicing here in this district by the Court's

24  permission, which it did not have to give him in the first

25  place, because he has violated all the rules that this Court

1  would not tolerate violation of by members of its own bar.

2           So in our view that's the appropriate sanction.

3   Mr. Mishra has three attorneys he's paying for somehow.  You

4   know, Sally Frick is a well-respected member of this Court's

5   bar and I'm sure Mrs. Silverman who has been sitting here the

6   whole time, who has been involved in the preparation of this

7   case from day one along with Mr. Silverman anyway, can

8   adequately and competently and ably represent Mr. Mishra the

9   rest of the way through.

10          If the Court is unwilling to consider that as a

11  sanction at this point, we definitely will be moving to

12  reconsider if we see further violations of this.  And that's

13  not in any way to say Mr. Silverman is being threatened.  This

14  has a little bit of the air of somebody who runs up and hits

15  you in the face ten times and when you stand up for yourself,

16  he says:  Oh, that person is threatening me.

17          This is what we put up with the entire time.  It's

18  within our right to mention to the Court at least that here is

19  the full panoply of remedies that are available to us should we

20  choose to seek them.  At this point we think it is -- that the

21  least intrusive remedy and the only one that's going to have

22  any effect on the proceedings will be to disqualify

23  Mr. Silverman from continuing to practice in this case, from

24  continuing to practice for sure in the related paraphernalia

25  case.  There is just no indication that he is willing to follow

1:56:28PM 1  the Court's orders or at least move for reconsideration of

2  them.

3  THE COURT:  Okay.

4  Argument from defense.

5  MS. SILVERMAN:  Let me just start by saying that we

6  are acting in good faith and we are working together in this

7  regard; and so if there is something that the Court and the

8  Government feels that Mr. Silverman has done wrong, most of

9  those questions have been carefully researched and culled

10  together, and that would be something that I have done wrong as

11  well by sitting here and joining in that part of the defense.

12  But I would also —

13  THE COURT:  And do you say that because you think

14  it's a likely outcome that I'll ask you to represent Mr. Mishra

15  going forward?  It seems like you're trying to set this up.

16  MS. SILVERMAN:  No, Your Honor.  No, I'm not.

17  THE COURT:  Okay.

18  MS. SILVERMAN:  I'm trying to make it clear that I

19  agree with his position and I side with his position on the

20  law.  I sided with his position initially, the Court ruled, we

21  looked at what that meant, we researched the law, we consulted

22  with one of our senior advisors in Texas who said, well, what

23  she is saying is — and she could be correct — is that the

24  jury gets to make the decision about lawfulness and therefore

25  the witnesses cannot testify to the word lawful.  They cannot

1:57:46PM 1    say the legal conclusion.

2          We looked at the law and decided all right, they

3    cannot make that lawful conclusion.  That makes sense.  We need

4    to present the facts.  And so that's what we've attempted to

5    do, is how do we present the facts?  And so there's no intent

6    to violate the Court's order —

7          THE COURT:  But I've already ruled on this issue

8    during the course of trial.  So even if there was some

9    misunderstanding regarding the nature of what was and was not

10   appropriate to the same types of questions, I have upheld

11   objections by the Government.  So the notion that you didn't

12   know or somehow the question had to have the word legal or

13   illegal in it doesn't seem to make much sense or hold much

14   water.

15         MS. SILVERMAN:  My recollection is that they all had

16   the word legal or lawful in it.  That was my recollection

17   completely.

18         THE COURT:  Well, that's not true.  So go on.

19         MS. SILVERMAN:  I'm telling you that in good faith.

20   I'm telling you that's my recollection.  I'm telling you that's

21   the time that we understood that we were bringing brought up

22   there again, and it remains our understanding that we can

23   present the alternate explanation.  And that would be an issue

24   we would want to brief before the Court made a ruling that we

25   cannot present an alternate explanation for our conduct.  Then

1:59:02PM 1  we definitely —

2  THE COURT:  What I told counsel on the day that we

3  heard argument is that they are within their rights to attempt

4  to argue that Mr. Mishra in connection with Mr. Bush had a good

5  faith belief that it was not unlawful to sell that to Mr. Bush

6  in that context or if you can demonstrate that you sold that to

7  Mr. Bush for some other reason, perhaps.  But that's not the

8  nature of the testimony that you're trying to put on here.

9  The nature of the testimony that you're attempting to

10  put on here is about the legality or illegality of the items

11  seized.  And you insult my intelligence by suggesting that a

12  question about alternate uses is not the same thing.  And I

13  think that counsel who has been practicing, as I understand it,

14  longer than even her husband is well aware of that.

15  MS. SILVERMAN:  I disagree.  I think that — I think

16  that what we are presenting and based on the case law that I've

17  already pulled in just a few minutes —

18  THE COURT:  Okay.  Well — go on.

19  MS. SILVERMAN:  Our position there is that we're

20  acting in good faith.  Secondly — and that's the question that

21  we're looking at.  We're acting in good faith and representing

22  that he's done nothing that merits contempt, nothing that

23  merits jail time or removal; but I would also say that I am not

24  in a position to provide the Defendant assistance of counsel.

25  Although I have been at all of the things where we reviewed the

2:00:31PM 1    evidence, physical evidence, it was my responsibility to cull

2    and gather, and I did that.  I culled and gathered all the

3    evidence, organized it for trial, put it into binders to make

4    it easier to find.

5         I am not the one who read the thousands of pages;

6    that was Mr. Silverman.  It is the reading of the thousands of

7    pages that is necessary to confront the Government's case.  It

8    is necessary to cross examine the witnesses.  And I'm in no

9    position ready to be able to do that and to read a thousand

10   pages overnight and be -- thousands of pages overnight and be

11   ready to do it and listen to somewhere around 18,000 or more

12   tape recorded phone calls.

13        I have not listened to those either.  I've heard the

14   ones with the Court in court.  I have never heard the

15   conversations before that, before we were in court, so I don't

16   know which ones might be out there that would be exculpatory.

17   I don't know which ones are out there that are -- works for us.

18   I don't know any of these things.  I am not in a position to

19   provide effective assistance of counsel and not really

20   medically prepared to do that.

21        THE COURT:  And Miss Frick?

22        MS. SILVERMAN:  Miss Frick has not really been

23   involved.  She's not -- as you can see, she's not here today.

24   She is covering other matters throughout this trial.  She

25   wasn't -- as I understand it, she wasn't required to be here.

2:01:43PM 1  I believe she even asked the Court's permission to make sure

2  she would not be required to be here every day of court.

3  She's not been there for the preparation.  She's been

4  kind enough to do the legwork in town and did appear for some

5  of the evidence reviews.  She hasn't reviewed the evidence and

6  read the material and would be in no position to take over the

7  defense either.

8  MR. SILVERMAN:  I will represent to the Court,

9  without waiving any relief I might be entitled to, I will

10  represent to the Court that if it is the Court's order that I

11  not cross examine any Government witness on whether there's

12  another -- whether there's any purpose beside heroin

13  distribution for the items that Mr. Mishra was selling, I won't

14  do that.

15  THE COURT:  That has already been ordered,

16  Mr. Silverman.

17  MR. SILVERMAN:  I really truly did not -- I

18  understood --

19  THE COURT:  There is no way you don't know that,

20  Mr. Silverman.  And, again, you insult the Court's intelligence

21  by suggesting otherwise.  I mean it just -- I mean it was

22  raised in opening, it was raised during questioning, again.  I

23  mean that is not going to win you any arguments here today.

24  MR. SILVERMAN:  What I am trying to say is -- and it

25  certainly -- there's no intention -- intent here to insult the

2:03:11PM 1  Court in any way, insult the Court's intelligence.

2          I won't do that if that's the order.  I won't do it.

3  I've got a lot of hours invested in this case and I don't have

4  any — I have the intent to preserve error as it occurs.  I try

5  hard to do that because I'm supposed to.

6          THE COURT:  Let me ask you a question, Mr. Silverman.

7          MR. SILVERMAN:  Yes, Your Honor.

8          THE COURT:  What was the Court's order on

9  December 2nd?

10          MR. SILVERMAN:  With — on which —

11          THE COURT:  On all the points.  Tell me what the

12  Court's orders were.

13          MR. SILVERMAN:  I have to look at the motion.

14          I was not to talk about any punishment the Defendant

15  was facing —

16          THE COURT:  First of all, there's no talking.

17  There's arguing, implying, suggesting, eliciting testimony, all

18  of those sorts of things are covered.  It's not talking.  So

19  certainly suggesting is one of those things that you were

20  precluded from doing.

21          MR. SILVERMAN:  Okay.  I don't have the text of the

22  order and I —

23          THE COURT:  Okay.  Should we print up the text of the

24  order for you?

25          MR. SILVERMAN:  Sure, then I can at least be on the

2:04:16PM 1    same page.

2    THE COURT:  So you've never read the order?

3    MR. SILVERMAN:  No, I've read the order, Judge.  I'm

4    standing here in court without a copy in front of me.

5    THE COURT:  So you are questioning the witnesses and

6    presenting this case without knowing the full breadth of the

7    order, is that —

8    MR. SILVERMAN:  No, Your Honor.

9    THE COURT:  So tell me what the full breadth of the

10    order is.

11    MR. SILVERMAN:  That I was not to mention the

12    punishment we were facing, that I was not to mention the legal

13    status of the items we were selling, that I was not to comment

14    on immigration matters — oh, and I was not to comment on

15    Akhil Mishra's prosecution — oh, and I was not to mention

16    Mayank Mishra's paraphernalia case.  What else —

17    THE COURT:  So you're unfamiliar with the order.

18    MR. SILVERMAN:  No, Your Honor, I'm on the spot.

19    THE COURT:  Well, you're on the spot here in court.

20    I mean either you know what's in the order or you don't.

21    MR. SILVERMAN:  Your Honor —

22    THE COURT:  I mean you're trying this case.  You

23    either know whether you're violating the order or you don't

24    know whether you're violating the order.

25    MR. SILVERMAN:  Yes, Your Honor, and — if the Court

2:05:54PM 1  just -- as a lawyer, I generally have a document in front of me

2  before I say what a document says.

3            THE COURT:  Right.

4            MR. SILVERMAN:  And so if I could please see the

5  document --

6            THE COURT:  Oh, you should have the order.  The order

7  was made available to you, to everyone.

8            MR. SILVERMAN:  We're pulling it up on the Internet

9  now.

10           THE COURT:  I don't need the order read back to me, I

11  just wanted to satisfy myself that you're wholly unfamiliar

12  with the parameters of the order.

13           MR. SILVERMAN:  I think I'm familiar -- I don't think

14  I've mentioned, alluded to, solicited testimony about the

15  punishment --

16           THE COURT:  Yes, you did.  But go ahead.

17           MR. SILVERMAN:  When did I do that?

18           THE COURT:  Remember?  We talked about it.  You

19  brought up forfeiture in the context of your question.

20           MR. SILVERMAN:  The intention --

21           THE COURT:  I don't care about the intention.

22           MR. SILVERMAN:  It was not a punishment issue.  It

23  was not --

24           THE COURT:  Forfeiture is a part of the remedy that

25  the Government is seeking in this case.

2:06:47PM 1    MR. SILVERMAN:  And also the Government is seeking

2 to, in our view, to wrongly take Mr. Mishra's money.

3    THE COURT:  That's not something that you are allowed

4 to say to the jury.  It is a part of the punishment in this

5 case.

6    MR. SILVERMAN:  Okay.  But when they — okay.  Like

7 that's an example of something that we were offering for a

8 proper purpose to show bias and improper motive, not to show

9 that it's a punishment that Mr. Mishra's facing.

10    THE COURT:  Did I make those exemptions in the

11 context of my order or did I simply say that you are precluded

12 from doing that?

13    MR. SILVERMAN:  I didn't view that as a punishment.

14 I viewed that as a bad motive on the part of the Government.

15 That's different.

16    THE COURT:  How is that a bad motive?  It is

17 something that is authorized by statute if the Government is

18 successful in this case.  How is that a bad motive?

19    MR. SILVERMAN:  If the — if the purpose — if it is

20 not justified, if the —

21    THE COURT:  That's up to the jury to decide whether

22 it's justified.

23    MR. SILVERMAN:  Yes, I understand that.  But

24 anything — any motive, any improper motive would be fair game

25 to explain bias.

2:08:04PM 1                    THE COURT:  Okay, that's just a wholly unsatisfying

2          response.

3                    MR. SILVERMAN:  And I had, Your Honor — the

4          Government was permitted, number one, in its opening and — to

5          show the pictures of the money.

6                    THE COURT:  Okay.  What does that have to do with my

7          ruling?

8                    MR. SILVERMAN:  Mr. Mishra is contending that that's

9          not even his money.

10                    THE COURT:  And he's free to put on the defense and

11          you've asked those questions.

12                    MR. SILVERMAN:  I know.

13                    THE COURT:  Yes.

14                    MR. SILVERMAN:  And that was the reason we were

15          discussing the forfeiture, not to discuss punishment.

16                    THE COURT:  I don't care what the reason was.  You

17          were precluded from doing so and I think that that's probably

18          at least part of the problem here, Mr. Silverman.  You seem to

19          not understand what the word "precluded" means.  I mean

20          "preclude" means you don't do it.

21                    MR. SILVERMAN:  Your Honor —

22                    THE COURT:  Not that you decide that you have some

23          other purpose for it.  You don't do it.

24                    MR. SILVERMAN:  Yes, Your Honor.  And I did not —

25          when I — honestly, I conceive of the punishment in this case

2:09:08PM 1  as ten to life.  I didn't really think of the forfeiture as the

2  punishment.  And if I — I had an independent basis for wanting

3  to discuss the money, and it had nothing whatever to do with

4  punishment.  And I don't believe I have blurted out or

5  suggested that Mr. Mishra is facing ten to life and I wouldn't

6  do that.

7         THE COURT:  That's not relevant to the discussion.

8  The discussion is whether or not — don't look perplexed.  You

9  know exactly what I'm saying, Mr. Silverman.

10         MR. SILVERMAN:  I can't control how I look.

11         THE COURT:  It's very clear, as someone who has been

12  practicing in this area, that you're well aware that forfeiture

13  is one of the sanctions faced by Mr. Mishra in this case.  You

14  raised it.  You just raised it as a matter of course.

15         MR. SILVERMAN:  May I have a moment here, Your Honor?

16  I found a docket entry —

17         THE COURT:  Yes?

18         MR. CONWAY:  Frankly, he's making our case for us.  I

19  mean every time he opens his mouth he makes it clear that he

20  doesn't respect the Court, he doesn't respect the Court's

21  orders, and he's acting like that's the only one.  There are

22  seven different provisions of that court order that he has

23  violated.  Every — seven of the eight.  Seven of the eight.

24  It's just unbelievable.

25         And he — you can't — everything that comes out of

2:10:28PM 1    his mouth, you can't trust it to be true.

2              I mean you are an officer of the court.  What comes

3       out of your mouth is supposed to be the truth.

4              What comes out of his mouth is not the truth.  Every

5       single time.  I can't think of a completely, fully, truthful

6       sentence that he's said — take a 30 second blink of anything

7       he's said, and can you say that really he's told you the truth

8       in that full 30 seconds?  I don't think you can.  I certainly

9       can't think of a full 30 seconds where Mr. Silverman has spoken

10      and I believed every word coming out of his mouth.

11             You're an officer of the court, you address

12      Your Honor, and you tell the truth.  Mr. Silverman can't or

13      won't do that.  And that's just another reason to not only

14      revoke his pro hac vice status, but to place him in jail,

15      because that's the appropriate remedy at this point.  We are

16      going to be trying this case through the end of January if you

17      let him continue doing this.

18             Now, I know Your Honor said over and over again

19      that's not going to happen.  The only way to stop that from

20      happening is to remove him.

21             THE COURT:  Okay.

22             MR. SILVERMAN:  The additional prong of the order was

23      that we not discuss discovery disputes.

24             THE COURT:  You're still misciting my order.  My

25      order was very specific, and perhaps you — those words — the

2:11:50PM 1  words weren't put in there just for my — my own edification.

2       MR. SILVERMAN:  The parties —

3       THE COURT:  You need not read it to me.  I'm familiar

4  with the order.  That's why we sit here, Mr. Silverman.  You

5  need not — I think you need to read it because you seem to not

6  understand it.  I understand it fully.  And I understand all of

7  your transgressions of it during the course of this case.

8  Every single day.

9       Mr. Burney, you wanted to speak on this issue.

10      MR. BURNEY:  Yes, Your Honor.

11      I understand that time is always very important and a

12  very important issue.  Just to bird walk for a moment, of

13  course, what's been going on, I guess, the allegations by the

14  Government and what's been going on in the course with regards

15  to Mr. Silverman to me has had an effect on Mr. Bush and his

16  right to a fair trial.  So I'll try to address that.

17      Some of the reasons that we are in this position, of

18  course, Mr. Bush, is because of the actions of the Government

19  from the very beginning of this case.  I know the Court has

20  stated from the beginning that we will finish this case in two

21  weeks' time.  The Court's time is very important, and I

22  understand that.  How the Court came to that evaluation I'm not

23  sure.  I know you have all that within your discretion —

24      THE COURT:  Based on trials in like matters with far

25  more Defendants than this one, Mr. Burney.

2:13:30PM 1      MR. BURNEY:  But I'm saying I know the Court has come

2      to that conclusion.

3          THE COURT:  Yes.

4          MR. BURNEY:  The time in the court that I have to be

5      concerned with is not how long the Government takes to prepare

6      their case, but the time if Mr. Bush is convicted he's facing

7      on a mandatory sentence in this particular case, so I have to

8      try as best I can to make sure he has a fair trial.

9          THE COURT:  Sure.

10          MR. BURNEY:  The Government in the beginning — when

11     we talk about time, the Government in the beginning, which they

12     had a right to do, they filed an indictment against Mr. Bush,

13     also with regards to Mr. Wheeler.  At that particular point he

14     was detained.  The Government's concerned about that time that

15     he was serving.  They had a right to have him detained.  The

16     Court ruled that he would be detained.

17          One year later, as Mr. Bush and Mr. Wheeler were on

18     their way to trial — and we talk about time — the Government

19     filed a superseding indictment.  They did not file any changes

20     in the indictment regarding Mr. Bush.  They didn't file any

21     changes in the indictment with regards to Mr. Wheeler.  They

22     added Mr. Mishra, Mr. Mishra alone.

23          Now, that's not unusual because I know the Government

24     on various occasions and various cases have filed superseding

25     indictments.  But in this particular matter the Government did

2:14:42PM 1    not start out indicting maybe a group for conspiracy of 10, 20

2    or 30 or 40 that's been historically done in this particular

3    court.  They from the very beginning separated out indictments

4    of maybe one person or two people or three people, all along

5    prior to almost the year that the superseding indictment for

6    Mr. Bush came.

7        To me the Government knew with their experience

8    historically that when they filed that superseding indictment

9    by adding Mr. Mishra or they added other charges that the delay

10   would automatically take place regarding Mr. Bush because new

11   counsel for Mr. Mishra, a new Defendant, would have to go

12   through those thousands and thousands of documents and calls

13   and texts and everything which they have demonstrated is part

14   of discovery in this particular case.  That automatically

15   without control from Mr. Bush would delay and he was detained.

16       As that went along, of course, being detained, there

17   were three, of course, Defendants in this particular matter.

18   And, of course, we came back, of course, to June in this

19   particular matter, June of this year.  At that particular point

20   because of reasons not in the control of the Government, not in

21   the control of the Court, when Mr. Zimmerman asked for a

22   postponement at that particular point, in dealing with time and

23   the delay as far as time, Mr. Bush objected.  He wanted to go

24   to trial then.  The Government was not concerned about the

25   delay in time for him to come to court.  The Government

2:16:08PM 1  objected.  The Government said because of judicial comity and

2  several other reasons Mr. Bush would be connected.  No one at

3  that time said he'd still be connected with regards to the

4  other two Defendants.

5  As we came up to approaching trial date of

6  December 1st there was a motion joined by the Government to

7  separate out Mr. Wheeler.  We understand the reasons why.  The

8  whole case wasn't postponed.  The whole case wasn't postponed,

9  said time was of the essence for Mr. Bush.  As we come into

10  this particular situation, motions, there are many motions that

11  have been filed on behalf of — before the Court made its

12  motion on behalf of Mr. Mishra.  And to me the Government knew

13  that that would affect the time aspects of what would take

14  place, the rulings that would take place, and so they are not

15  just now being manifested in this trial.

16  So to me in dealing with the time aspect, if — in

17  fact, in preparation, once I realized that there would be two

18  Defendants and once I realized for the defense it would be a

19  joint defense regarding Mr. Bush and Mr. Mishra, lead counsel

20  in this case, Mr. Silverman, is the one that I mainly dealt

21  with as far as discussing trial strategy, discussing as

22  witnesses would be called as far as possibly who would go

23  first, who would go second, who would more so concentrate in

24  this particular area.  And that now will be at a — to me, a

25  severe prejudice if he is taken off the case.

2:17:35PM 1        To me if he's taken off the case, to me I would ask

2  the Court to ask for a mistrial and separate Mr. Bush away from

3  Mr. Mishra and that we would be able to start all over again

4  and not be subjected to what has taken place in this particular

5  trial, so we could therefore be able to separately come up with

6  our own trial strategy and not be concerned with the issues

7  that's come up in this particular court.

8        So I understand the Court has discretion, I

9  understand the Court has certain remedies.  But we're

10  requesting that that remedy, if it is that Mr. Norm Silverman

11  is taken off –– and we have not dealt with Mrs. Daphne

12  Silverman or Miss Frick in dealing with preparation of this

13  defense –– we will be severely prejudiced, and we would ask

14  that there would be a mistrial and Mr. Bush be able to go on

15  his way by himself as far so he can have a fair trial, and we

16  can do the proper preparation as far as the defense by ourself.

17        Thank you, Your Honor.

18        THE COURT:  Okay.

19        Mr. Cocas?

20        MR. COCAS:  I mean it's kind of ironic that

21  everything Mr. Burney has said up until the moment he said if

22  Mr. Silverman is taken off the case we want a mistrial, all of

23  that would militate in favor of taking Mr. Silverman off the

24  case.  Mainly, I guess, the theory was Mr. Silverman's antics

25  would somehow prejudice the jury to both Defendants.  I assume

2:18:53PM 1    the Court is going to instruct the jury that, you know, not to

2    view — to view each Defendant individually, so I guess that's

3    neither here nor there.

4          You know, I did point out this potential in my

5    motion, the one I just filed, that it's possible that if

6    Mr. Silverman is allowed to continue in these kinds of antics

7    Mr. Bush could have this argument at the end of trial.  But now

8    it seems that Mr. Burney wants to have his cake and eat it.  He

9    wants to state everything that would justify getting

10   Mr. Silverman off the case and then conclude on a complete 180

11   that's all why I want to keep him on the case he says, I

12   suppose because they've allocated how to question witnesses.

13         It seems to me this is something that a few hours

14   with Mrs. Silverman could resolve.  You know, it seems to me

15   Mrs. Silverman could take over the areas of questioning that

16   Mr. Silverman was going to undertake and Mr. Burney could do

17   what he's been doing.

18         THE COURT:  Mrs. Silverman represents to the Court

19   that she's unprepared to try this case.

20         MR. COCAS:  I find it a little hard to believe that

21   Mr. Mishra is paying three attorneys and paying two of them

22   essentially to be paralegals.  That's what Mrs. Silverman is

23   asking the Court to believe.  I don't find it plausible, given

24   the amount of communication, e-mail traffic where Mr. Silverman

25   is on it, that he's been on this the entire time.

2:20:14PM 1        If, God forbid, Mr. Conway got hit with a bus walking

2        out of here tonight, I would have to be prepared to take over.

3        And, you know, I may not be as prepared as he would be, but I

4        think I could do a competent job.  So I just — I don't find it

5        plausible.

6               And now that said, I'm not in the room alone with the

7        Silvermans so I can't — you know, I don't have a basis for

8        saying this.  I guess that's the virtue of Mrs. Silverman's

9        story here, there is no way we can contradict it.

10               THE COURT:  Okay.  All right.

11               During this trial Mr. Silverman has been fined by the

12        Court pursuant to 18 United States Code Section 401 for

13        contempt for his blatant and purposeful disobedience of this

14        Court's December 2nd order as well as the Court's

15        December 3rd order amending the December 2nd order.

16               Those violations do not stand alone.  Mr. Silverman

17        as recent as this morning persists in his efforts to circumvent

18        this Courts evidentiary order by raising areas of inquiry such

19        as the legality or illegality of chemical dilutants, stamp bags

20        and other materials seized.  Indeed, he has engaged in these

21        efforts on every day of trial thus far and has been warned

22        repeatedly about his failure to follow the Court's order.

23               Counsel for the Government has requested in response

24        to Mr. Silverman's continued contempt of this Court's orders

25        that his pro hac vice status be revoked and that he be

2:21:39PM 1    incarcerated.

2              Counsel for both sides were afforded an opportunity

3         to prepare for arguments on this hearing.

4              The Court orders that at this juncture Mr. Silverman

5         will be permitted to continue as counsel in this case.  The

6         Court's order is made with respect to the due process concerns

7         that it has regarding Mrs. Silverman's ability to adequately

8         represent Mr. Mishra in this matter.  Moreover, it appears that

9         Miss Frick, serving as local counsel, really has not been

10        present during the course of these proceedings and therefore

11        would be ill-prepared to handle the defense in this case.

12             I agree with Mr. Cocas, that we must at this juncture

13        take Mrs. Silverman at her word, although the Court likewise

14        finds it very improbable that Mr. Mishra is paying merely for

15        her paralegal services in this case.

16             Nevertheless, the Court will consider down the line

17        the possibility of invoking the sanction of jail time should

18        this behavior continue.  Based on the transgression this

19        morning the Court will order that Mr. Silverman pay an

20        additional thousand dollars to the Court for his most recent

21        contempt of the Court's order.

22             The Court does not buy Mr. Silverman's argument that

23        this was inadvertent or accidental or that he did not

24        understand the Court's order.  I think the Court's order at

25        this juncture has been perfectly clear.  The Court has

re-emphasized what is and isn't in violation of the Court's order at this juncture.  There should be no room for any sort of miscomprehension of the Court's order.

Mr. Silverman is instructed to review the Court's order in detail, review all of the verbs in the Court's order in detail.  The Court's order does not specifically even use the word — does not solely rely on the word mention.  While mentioning is one of the things you were precluded from doing, you are precluded from suggesting, implying, things of that nature.  It is not limited to merely mentioning.

Moreover, I don't find compelling the argument that with respect to the issue of whether or not the parties can back door it by asking questions about other uses of these materials, I don't find the argument compelling that you did not understand my order to preclude that.  First of all, you've done that very thing in this case and you have been instructed not to do that before.  So the notion that you did not understand that to be the case is unpersuasive.

But more importantly, it's just common sensical to read the order to preclude that as the order specifically indicates that you may not suggest it, and that is most definitely a suggestion of it.  So please read my order so that we do not have any additional delays in this case.

The jury, I am sure at this point, is frustrated by the number of objections and side bars and the like that have

2:25:12PM 1   been necessitated by the continuing behavior of counsel.

2        To be clear and so you are on notice, Mr. Silverman,

3   the Court will incarcerate you if there are additional

4   violations of the Court's order.  Now, I'm not necessarily

5   saying that the Court will incarcerate you during the pendency

6   of this trial, as it is clear to me at least at this juncture

7   that you appear to be the only one who has the knowledge to

8   continue on in this case.  But be — rest assured you will be

9   put in jail if you continue to hold this Court's order in

10   contempt.

11        Okay.  All right.

12        Jim, let's get the jury.

13        MR. IMHOF, DEPUTY CLERK:  Yes, Your Honor.

14        THE COURT:  There's no redirect of Officer —

15        MR. CONWAY:  I'm going to have to recall him with

16   regard to the calls, so I'll just deal with it then with your

17   permission.

18        THE COURT:  Any objection?

19        MR. SILVERMAN:  No.

20        THE COURT:  Mr. Burney, any objection?

21        MR. BURNEY:  I'm sorry, I didn't hear everything he

22   said.

23        THE COURT:  I asked if there was any redirect of

24   Mr. Barrett and he indicated he would do redirect the next time

25   he calls Mr. Barrett to the stand.  Any objection?

2:26:43PM 1          MR. BURNEY:  No, Your Honor.

2          THE COURT:  All right.

3       (Jurors seated.)

4          THE COURT:  Okay, ladies and gentlemen, have a seat.

5  And thank you for bearing with us.  We had some legal issues we

6  had to discuss and so we had a little bit of an extended break.

7          The Government ready with it next witness?

8          MR. CONWAY:  Yes, Your Honor.  The United States

9  calls Matthew Lebedda.

10         MATTHEW LEBEDDA, a witness herein, having been first

11  duly sworn, was examined and testified as follows:

12                  DIRECT EXAMINATION

13         MR. IMHOF, DEPUTY CLERK:  Would you spell your name

14  for the court reporter please.

15         THE WITNESS:  Sure.  First name is Matthew, the last

16  name is Lebedda.  L-E-B-E-D-D-A.

17  BY MR. CONWAY:

18  Q    Good afternoon, sir.  Would you please introduce yourself

19  to the members of the jury.

20  A    Sure, my name is Matthew Lebedda.  I'm a Pittsburgh

21  policeman.  I've been a detective with the city for ten years

22  and been employed with the city for the last 21 years.

23  Q    I want to turn your attention to around March 4th, 2012,

24  around 1:00 p.m.  Were you on duty on that date and time, sir?

25  A    Yes, sir; I was.

2:29:36PM 1    Q    And what was your assignment?

2    A    I was assigned with another officer to work with the FBI

3    and possibly take down a vehicle that they were tracking on an

4    ongoing investigation.

5    Q    And when you say "take down a vehicle," what do you mean?

6    A    Do a traffic stop and detain the driver.

7    Q    And at that point had a search warrant already been

8    obtained for the vehicle and the driver?

9    A    Correct.

10    Q    And could you take us through the traffic stop itself.

11    A    Sure.  We were sitting in a fixed location near Robinson

12    Boulevard.  We were told by the FBI that the vehicle --

13            MR. SILVERMAN:  Objection, hearsay.

14            THE COURT:  Objection sustained.

15    BY MR. CONWAY:

16    Q    Well, based upon your discussions with the FBI, what did

17    you do?

18    A    We went ahead and stopped a black Honda with the person

19    that the FBI said was the target of the interview.

20            MR. SILVERMAN:  Objection, hearsay.

21    BY MR. CONWAY:

22    Q    Can you try to answer the questions without describing

23    what was told to you by other people?

24            MR. SILVERMAN:  May I have a ruling, Your Honor?

25            THE COURT:  The objection is sustained.

2:30:41PM 1          MR. SILVERMAN:  Move to strike and ask the jury to

2  disregard.

3          THE COURT:  The jury is instructed to disregard what

4  other people told Officer Lebedda.

5          MR. SILVERMAN:  Move for a mistrial.

6          THE COURT:  The objection — the motion is denied.

7          THE WITNESS:  We stopped a black Honda during the

8  course of a traffic stop.

9  BY MR. CONWAY:

10  Q    And did you ultimately conduct a search of the Honda?

11  A    Yes.

12  Q    Now, I've placed before you a map marked as Government

13  Exhibit FBI-486.  Do you see that, sir?

14  A    Yes, I do.

15  Q    And do you recognize that as a map in sort of the

16  Rankin/Braddock/East Hills section of Pittsburgh?

17  A    That is correct.

18  Q    And could you — I ask that you — can you tell — does

19  that map contain the approximate location of where you would

20  have stopped the Honda vehicle?

21  A    Yes, it does.

22          MR. CONWAY:  Okay.  Your Honor move for the admission

23  of Government Exhibit FBI-486.

24          THE COURT:  Any objection?

25          MR. SILVERMAN:  Improper foundation.

2:31:43PM 1          THE COURT:  Any objection, Mr. Burney?

2          MR. BURNEY:  No, Your Honor.

3          THE COURT:  The objection is overruled.

4          MR. CONWAY:  If we could display Government Exhibit

5  FBI-486.  If we could, Ms. Wikert, if you could sort of blow up

6  this portion of it.

7  BY MR. CONWAY:

8  Q    The portion that's on your computer screen now, sir, what

9  area of Pittsburgh is that?

10  A    It's roughly the East Hills area of the City of

11  Pittsburgh.

12  Q    And do you see where Montier Street turns into

13  Robinson Boulevard?

14  A    Correct.

15  Q    And where did this traffic stop occur?

16  A    On Robinson.  I believe 2121 Robinson, near that area.

17  Q    So can you just get up from your seat for a moment and

18  just point on the screen that's right behind you to your right,

19  sir, approximately where on Robinson Boulevard that you would

20  have stopped the Honda at issue.

21  A    I was -- I would believe it was right in here, right in

22  this area somewhere.

23  Q    So approximately this area, sir?

24  A    Yes, on Robinson.

25  Q    Okay.  If you could just take your seat again, sir.

2:33:01PM 1     Now, I've also placed before you, sir -- well, were

2  pictures taken during the course of the execution of the search

3  warrant?

4  A   Yes, they were.

5  Q   I've placed before you what's been marked as Government

6  Exhibits FBI-145 through FBI-151.  What are those?

7  A   This is evidence that was taken from the black vehicle

8  and/or from the person that was the driver of the black

9  vehicle.

10  Q   So were those the pictures taken during the course of the

11  execution of the search warrant?

12  A   Yes.

13       MR. CONWAY:  Your Honor, move for the admission of

14  Government Exhibits FBI-145 through FBI-151.

15       THE COURT:  Any objection?

16    (No response.)

17       THE COURT:  Any objection?

18       MR. SILVERMAN:  May we have a moment, Your Honor, or

19  could we see the exhibits?

20       MR. CONWAY:  Your Honor --

21       THE COURT:  Do you have the exhibits?

22       MR. SILVERMAN:  We have them; we're trying to find

23  them.

24    (Brief pause in proceedings.)

25       MR. SILVERMAN:  150 or 151?

2:34:55PM 1     MR. CONWAY: FBI-145 through FBI-151.

2     MR. SILVERMAN: No objection.

3     THE COURT: Mr. Burney?

4     MR. BURNEY: No objections, Your Honor.

5     THE COURT: Okay. Admitted.

6     MR. CONWAY: If we could display Government Exhibit

7 FBI-149.

8 BY MR. CONWAY:

9 Q What is the jury looking at in 149, sir?

10 A That is the black Honda that I pulled over.

11 Q FBI-150.

12 A That's the open passenger door of that same vehicle.

13 Q FBI-151.

14 A Same vehicle's glove box that's opened, and you could see

15 a brown plastic bag in that with other materials, papers and

16 such.

17 Q FBI-145.

18 A That is the plastic baggie that was inside the glove box.

19 Q FBI-146.

20 A That is the suspected heroin or heroin that was inside

21 that same plastic baggie that was pictured in 145.

22 Q And FBI-148.

23 A Those are the personal possessions of the gentleman who

24 was driving the vehicle that day.

25 Q Now, were you the one that actually found the suspected

2:36:26PM 1    heroin in the glove compartment?

2    A    Yes, sir.

3    Q    Now, what did you do with the evidence or what did the

4    team sort of do with the evidence once it was seized?

5    A    After I — after the evidence was discovered, we were told

6    not to touch it and that the FBI would be processing the

7    evidence itself.

8    Q    And was there a Special Agent named James Muha that was

9    there?

10    A    Yes.

11    Q    Okay.

12        MR. CONWAY:  I have no further questions, Your Honor.

13        THE COURT:  Any cross examination?

14        MR. SILVERMAN:  None from Mr. Mishra.

15                    CROSS EXAMINATION

16    BY MR. BURNEY:

17    Q    Officer, about what time of day was this as far as on

18    March 14, 2015, when you received the directive to stop this

19    black Honda?

20    A    I could — from what I recall, around 12:45.

21    Q    Okay.  You said — and you said who gave you that

22    directive, the FBI?

23    A    One of the case agents.

24    Q    Okay.  And at that particular point were you — were you

25    in possession of any type of an arrest warrant, search warrant

2:37:54PM 1  or anything of that nature?

2  A    I wasn't in possession of it, but I was aware of it.

3  Q    Okay.  What were you aware of?

4  A    That there was a search warrant for the vehicle and a

5  search warrant for the person driving the vehicle.

6  Q    Okay.  So when you say that you stopped a black Honda

7  during the course of a traffic stop, this was not a traffic

8  stop.

9  A    It was stopped in traffic, but it did not commit a traffic

10  violation.

11  Q    Okay.  The reason you stopped it was because of the

12  information you had that there was going to be a search warrant

13  for that vehicle and also a search warrant for the person

14  driving the vehicle?

15  A    To stop the vehicle and detain the driver.

16  Q    Okay.  Did they give you a license plate number?  Did they

17  give you the name of the person that was supposed to be driving

18  the vehicle or anything of that nature?

19  A    Yes, we knew who it was and we knew the plate.

20  Q    Okay.  So you had had some information prior to receiving

21  that call as far as the person and the car, is that correct?

22  A    Correct.

23  Q    And let me see, did you work on the task force?

24  A    Loosely I was on the task force.  I work in the area, so

25  they swore me in because of this case because it ran through

2:39:02PM 1  the area that I worked in.  So I was a part of it, yes.

2  Q    Let me see if I understand it.  So you work for the City

3  of Pittsburgh?

4  A    Yes, sir.

5  Q    Okay.  And you work for the City of Pittsburgh and you

6  said what area?

7  A    It's actually Homewood, East Hills.  It's Zone 5 police

8  station, which encompasses East Liberty, East Hills, Homewood,

9  this section where this specific person was.

10  Q    Okay.  Now, when you said you were sworn in —

11  A    Uh-huh.

12  Q    — because sometimes you're in that area, how much prior

13  to that were you sworn in?

14  A    I don't recall how much further before the investigation

15  started, I don't know.  I can't recall.

16  Q    And when you mean you were sworn in, did you stop doing

17  your normal duties for the City of Pittsburgh as a police

18  officer then only start working for the task force?

19  A    No, I was only — when I was needed by the task force, my

20  agency would let me work with them.

21  Q    And this would — this would be like on an hourly, daily

22  or weekly basis?

23  A    Whenever they called.  If I was on duty, I would help them

24  out.

25  Q    Okay.  So you would be on your normal duty.

2:40:12PM 1    A    Yes, sir.

2    Q    Then there may be a call for you to do something.

3    A    Yes, sir.

4    Q    Now, when you made this stop, you said you were by

5    yourself or was there somebody else with you?

6    A    I was with someone, yes, sir.

7    Q    And who was that?

8    A    Craig Gator.

9    Q    Another police officer?

10    A    Yes, sir.

11    Q    At that particular time I guess in executing this search

12    warrant, is that what you were doing or you just held the

13    individual?

14    A    I helped execute the search warrant of the vehicle.

15    Q    Okay.  So when you stopped the vehicle, did you just have

16    the person stay in the vehicle until you had assistance or did

17    you do anything prior to assistance coming?

18    A    No, we — we stopped the vehicle, had him turn off the

19    vehicle.  At one point we had him exit the vehicle, and then

20    after he exited we conducted the search shortly after that.

21    Q    Now, when you say shortly after that you executed the

22    search, does that mean after assistance came or you and —

23    A    After assistance came, after the — after the FBI was

24    actually on the scene.

25    Q    Okay.  Now, you were — you were shown a map which is

1  Government Exhibit FBI-486.

2          MR. BURNEY:  If we can have that up, please.

3  BY MR. BURNEY:

4  Q    I guess you can see that on the screen.

5  A    Yes, sir.

6  Q    And you said I think on the screen there is a street

7  that's either -- Wilner Drive that's close to 2121 Robinson

8  Street?

9  A    Yes.

10  Q    So on that map that would be the location near where you

11  conducted this stop on Robinson.

12  A    Yes.  Yes, sir.

13  Q    And as far as -- were you involved in taking the

14  photographs that are in FBI Exhibits 145 through 151?

15  A    Absolutely not.

16  Q    Someone else?

17  A    Yes, sir.

18  Q    So basically when the task force came, did that end the

19  duties you had with regard to being present at the scene?

20  A    Yes.

21  Q    I think you said you found the suspected heroin in the

22  glove box?

23  A    Yes, sir.

24  Q    Okay.  Now, was this before or after the task force came?

25  A    They were there during -- during when the task force was

2:42:40PM 1    there.

2    Q    So when the task force came, your duties did not stop.

3    You assisted in what they were doing?

4    A    Yes.

5    Q    And as part of that you did the search.

6    A    Yes.

7    Q    And what different areas did you search?

8    A    I believe I just searched that specific — that area, the

9    front seat and the back seat, the front passenger seat and the

10    front — or the back rear passenger there, just for — I was

11    just searching for whatever may be found, guns, drugs, whatever

12    that they were looking for, whatever you needed to find; but I

13    didn't search the driver compartment or the passenger or the

14    driver's rear compartment.

15    Q    Someone else was doing that?

16    A    I believe so; yes, sir.

17    Q    And like you said, when they arrived at the scene, they

18    had the to execute — they had the search warrant for the car

19    and they had the search warrant for the person of the one who

20    was driving?

21    A    Yes.

22    Q    He was by himself?

23    A    The driver, yes, sir.

24    Q    Now, are you familiar on the map, Government's Exhibit

25    FBI-486, are you familiar with 132 Madonna Street?

2:43:46PM 1   A    I'm familiar with it; yes, sir.

2   Q    Now, as far as 132 Madonna Street, how far is that away

3   from the stop of where this Honda took place?  Approximately.

4   A    A couple miles, mile and a half maybe.  I don't think it's

5   real far.

6   Q    Okay.  A couple miles.  And I guess as this map goes,

7   you — on Robinson Boulevard where it was stopped you could go

8   into other areas and other streets versus going directly to

9   132 Madonna Street?

10   A    Yes, sir.

11   Q    All right.

12        MR. BURNEY:  Okay, thank you.  No further questions.

13        THE COURT:  Any redirect?

14        MR. CONWAY:  Not from the Government, Your Honor.

15        THE COURT:  Okay.

16        You may step down.

17    (Whereupon, the witness was excused.)

18        THE COURT:  The Government's next witness.

19        MR. CONWAY:  The United States calls Jason Binder.

20        JASON BINDER, a witness herein, having been first

21   duly sworn, was examined and testified as follows:

22                 DIRECT EXAMINATION

23        MR. IMHOF, DEPUTY CLERK:  Spell your name for the

24   court reporter, please.

25        THE WITNESS:  Jason Binder.  B-I-N-D-E-R.

2:45:07PM 1          THE COURT:  Please have a seat and put that mike

2      right in front of you.

3      BY MR. CONWAY:

4      Q    Good afternoon, sir.  Would you please introduce yourself

5      to the members of the jury and tell them how you're employed.

6      A    Jason Binder.  I'm an Allegheny County police officer.

7      Q    And how long have you worked in law enforcement, sir?

8      A    I'm in my 19th year.

9      Q    I want to turn your attention to March 14th, 2012.  Were

10     you assisting the FBI in connection with a matter on that day?

11     A    I was.

12     Q    And what was your basic assignment?

13     A    To assist with search warrants and arrests that day.

14     Q    Now, I want to refer you to an Apartment 4 at 500 Mills

15     Avenue in the Braddock section of Pittsburgh.  Are you familiar

16     with that?

17     A    I am.

18     Q    How did you become familiar with that address?

19     A    On that day I was detailed there to secure that residence

20     for a search warrant.

21     Q    And did you eventually execute the search warrant and

22     conduct a search of that particular residence?

23     A    I did.

24     Q    Now, I want to show you what's been marked as Government's

25     Exhibit 12 -- FBI-124 through FBI-130.  And what are those?

2:46:40PM 1    A    Photographs of items seized from that residence on that

2    day.

3              MR. CONWAY:  Your Honor, move for the admission of

4    Government Exhibits FBI-124 through FBI-130.

5              THE COURT:  Any objection?

6              MR. SILVERMAN:  Just a moment, Your Honor.

7         (Brief pause in proceedings.)

8              MR. BURNEY:  Your Honor, while Mr. Silverman is

9    looking, we would hope the foundation would be laid.

10   Otherwise, we would object to see if he was present when those

11   photos were taken and he can identify they are true and

12   accurate as far as the scenes that were depicted at that

13   location.

14             THE COURT:  Lay your foundation, Mr. Conway.

15   BY MR. CONWAY:

16   Q    Were pictures taken during the course of the execution of

17   the search warrant?

18   A    They were.

19   Q    And were you present while the pictures were taken?

20   A    I was.

21   Q    And do those pictures accurately reflect the items that

22   were seized at the 500 Mills Avenue, Apartment 4 on

23   March 14th, 2012?

24   A    Yes.

25             THE COURT:  Any additional objection?

2:47:49PM 1          MR. BURNEY:  Not from Mr. Bush, Your Honor.

2          MR. SILVERMAN:  I mislaid two of them.  Can I just

3  take a look at the tender, please –– thank you.

4          No objection.

5          THE COURT:  Okay, they're admitted.

6          MR. CONWAY:  Ms. Wikert, if we could display starting

7  with Government Exhibit FBI-124.

8  BY MR. CONWAY:

9  Q   And, Detective Binder, if you could describe what the jury

10  is viewing here.

11  A   The first photograph, 124, that's a photograph of US

12  currency that was found on a table.

13  Q   And FBI-125?

14  A   That's a photograph of drug paraphernalia found in a

15  closet in the residence.

16  Q   FBI-126?

17  A   It's a photograph of a receipt and a digital scale found

18  in the same closet.

19  Q   FBI-127?

20  A   That's another photograph of the plastic bag containing

21  paraphernalia.

22  Q   FBI-128?

23  A   That's a photograph with the same plastic bag opened.

24  Q   And FBI-129?

25  A   That's a photograph of a safe that was inside a box on the

2:50:00PM 1    floor.

2    Q    And FBI-130.

3    A    That's a photograph of two Ziploc bags containing large

4    amounts of suspected heroin.

5    Q    And where did these — where were these items found?

6    A    They were found in another safe that was in that same

7    closet that you saw photos of of the drug paraphernalia.

8                MR. CONWAY:  I have no further questions, Your Honor.

9                THE COURT:  Cross examination.

10                              CROSS EXAMINATION

11    BY MR. BURNEY:

12    Q    Good afternoon, Officer Binder.  I'm sorry, you work for

13    what Police Department?

14    A    Good afternoon.  Allegheny County Police.

15    Q    Okay.  And were you working for the task force at this

16    particular point on March the 14th, 2012?

17    A    On that date, yes.

18    Q    On that date.  So, what, it would be off and on, your work

19    with the task force?

20    A    Correct.

21    Q    So on March 14th, 2012, you were assisting the FBI in

22    the execution of search warrants.  So did you know what search

23    warrants you were assisting in on that day?

24    A    On that day?

25    Q    Yes.

2:51:37PM 1   A    Yes.

2   Q    What were they?

3   A    On — in Rankin it was 217 Fourth Street, I believe, in

4   Rankin.  And then a possible one at the Mills Avenue address

5   that these photos are from.

6   Q    Okay.  So I think — so on that date already in existence

7   was a search warrant for a Rankin street address, which is

8   217 — is that Fifth Avenue?

9   A    Yeah, that's — it was 217.  I don't recall if it was

10   Fourth or Fifth Avenue but, yes, it was a Rankin address.

11   Q    And you were with those members of the task force who had

12   that search warrant.

13   A    Yes.

14   Q    And so did you go to that address, 217 Fifth Avenue,

15   first?

16   A    Yes.

17   Q    And after being there, did you participate in any of the

18   search that took place there?

19   A    I participated in a secondary search.  I don't recall if I

20   was there for the entry, but I was inside that residence at

21   some point.

22   Q    So what your recollection is is that when you arrived, the

23   search of that 217 Fifth Street in Rankin was already in

24   progress?

25   A    Yes.  I arrived there I'd say shortly after entry was

2:52:54PM 1  made.

2  Q    Okay.  And what was your participation in that search?

3  A    To search the residence.

4  Q    Okay.  With others.

5  A    Correct.

6  Q    Okay.  Now, these photographs that you're making reference

7  to as far as Government's Exhibit 124 to 130, those are not

8  from 217 Fifth Street in Rankin.

9  A    They are not.

10  Q    Okay.  Now, while you were there, at some particular point

11  you received a notification to go to this 500 Mills Avenue?

12  A    Correct.

13  Q    And who did you receive that notification from?

14  A    Special Agent Hedges.

15  Q    Okay.  And I think you said you were informed to secure

16  the residence until a search warrant could be secured.

17  A    Not by Agent Hedges.  I proceeded to that residence and

18  made a phone call to Attorney Conway concerning that residence

19  and then proceeded.

20  Q    Okay.  Now, as far as going to 500 Mills Avenue, so what

21  precipitated the fact for you to go there since you were

22  participating in a search at 217 Fifth Avenue in Rankin?

23  A    To take a set of keys that were found on Mr. Wheeler and

24  go to that residence.

25  Q    So when you went there, did you go by yourself or were you

2:54:18PM 1  with other police officers?

2  A    I went by myself.  I met other police officers that had

3  already been there.

4  Q    Let me see if I understand you correct.  When you went to

5  500 Mills Avenue and you arrived, there were already other

6  police officers that were there?

7  A    Yes.

8  Q    Okay.  What directed you to Apartment 4?

9  A    Trying keys on the key ring.

10  Q    Okay.  So you went -- you arrived with a set of keys.

11  Correct?

12  A    Correct.

13  Q    And then you -- as far as 500 Mills Avenue, what type of

14  structure is this?

15  A    It was a multi-unit apartment building.

16  Q    Like how many floors?

17  A    Three floors.

18  Q    Three floors.  And about -- I note Apartment No. 4 is what

19  we're making reference to as far as the photographs.  How many

20  apartments, if you know, were in that structure at 500 Mills

21  Avenue?

22  A    I believe there were six.

23  Q    Okay.  And can I assume -- or tell me, what, two on the

24  first floor, two on the second --

25  A    Correct, two on each floor.

1    Q    Two on the third floor?

2    A    Yes, sir.

3    Q    So when you arrived, what you did with a set of keys — or

4    with one key that was in your possession?

5    A    There was a set of keys.

6    Q    Okay.  So what you did when you arrived, you said you

7    started utilizing the keys that you had in your possession on

8    this key ring, attempting to open doors?

9    A    Correct.

10   Q    And on the first floor, what took place?

11   A    There was one key used.  There was a security door to gain

12   entry to the building itself.

13   Q    Okay.

14   A    One of the keys was — unlocked that security door.

15   Q    Okay.  And then once you came into the security door that

16   was unlocked, what did you do?

17   A    We started on the third floor and knocked on doors and

18   didn't get any response and started trying different keys on

19   the key ring to those floors.

20   Q    So as you said, first thing you said, when you arrived,

21   there were already other police officers there.

22   A    Outside the residence.

23   Q    Outside.

24   A    Yes.

25   Q    So when you came in through the security door with the key

2:56:21PM 1  for the security door, those other officers entered with you.

2  A    Correct.

3  Q    And then you went to the third floor first?

4  A    Correct.

5  Q    And started knocking on doors.

6  A    Correct.

7  Q    Okay.  And after you started knocking on doors, then you

8  started to -- how -- how did you get directed to Apartment 4 is

9  what I want to know.

10  A    A process of elimination.  The -- none of the keys worked

11  on the doors on the third floor and then moved down to the

12  second floor, and that's where keys worked on Apartment 4 on

13  that -- on the second floor.

14  Q    And so you had knocked on the doors on the third floor

15  first and no response?

16  A    Correct.

17  Q    Then you checked the keys with the lock on the fourth

18  floor?

19  A    Correct.

20  Q    I mean third floor, excuse me.  And then you went to the

21  second floor.

22  A    Yes, started on the third, ended up on the second.

23  Q    And you went through the same process of knocking on

24  doors, correct?

25  A    Yes.

2:57:10PM 1    Q    And then checking keys.

2    A    Correct.

3    Q    And so how did you obtain, if you did, entrance into

4    Apartment 4?

5    A    Once I found the key that worked on it, I was again in

6    contact with Attorney Conway who advised me to go ahead and

7    clear the apartment.

8    Q    Okay.  So when you say Attorney Conway, Attorney Brendan

9    Conway?

10    A    Yes.

11    Q    And he advised you to clear the apartment.  So what does

12    that mean?

13    A    To check it for any persons for officer safety and to make

14    sure, you know, there wasn't anyone in there that could have

15    potentially destroyed any potential evidence.

16    Q    Okay.  And you did that.

17    A    Correct.

18    Q    And there was no one there, is that correct?

19    A    That's correct.

20    Q    And after that, what did you do?

21    A    I had called Attorney Conway back and advised him no one

22    was in the residence.  And he said that — to secure the

23    apartment and wait for a search warrant.

24    Q    Okay.  And so the conversation you had with him was:  I

25    went in, there's no one here.  And then he was — instructed

2:58:14PM 1  you to secure it, which means, what, make sure no one comes in

2  or out?

3  A    Correct.

4  Q    And you did that by, what, standing outside or remaining

5  inside the apartment?

6  A    I don't recall.  I don't recall if I stood in the hallway

7  or just inside the apartment, but definitely inside the

8  building.  It was not maintained from outside the building.

9  Q    And along with yourself were there other police officers

10  who stayed with you?

11  A    Yes, there was Detective Love and Detective Klobchar,

12  K-L-O-B-C-H-A-R.

13  Q    And how long did you wait there before — I'm assuming a

14  search warrant came?

15  A    Several hours.  It was secured at approximately 3:40 p.m.

16  And at approximately 6:50 p.m. was the time that the search

17  warrant arrived along with additional agents.

18  Q    An additional — so once the additional agents came, how

19  many persons approximately were there for the execution of this

20  search warrant?

21  A    Approximately ten.

22  Q    And during that time period did anybody come or go from

23  this apartment building?

24  A    No, other than officers that were on scene.

25  Q    And I'm assuming that when these other officers came, a

2:59:45PM 1 photographer came with them?

2 A   One of them had a camera, yes.

3 Q   One of the officers.

4 A   One of the agents, yes.

5 Q   Okay, one of the agents.  Now, I know you were shown

6 Government's Exhibit 124 through 130.  Government Exhibit

7 124 — I think it shows, you testified, US currency on a table.

8 Do you have that one?

9 A   Yes.

10 Q   Okay.  And was that exactly the way the table was and the

11 currency was on the table when you first observed it?

12 A   To the best of my recollection, yes, it was.

13 Q   Okay.  And so that's the way you first observed it.  So

14 the picture, like you say, when it was taken shows exactly how

15 it was when you entered at apartment.

16 A   Correct.

17 Q   I think 125 — Government Exhibit 125, I think you

18 mentioned there was drug paraphernalia.

19 A   Correct.

20 Q   And down there later you mentioned — now, the drug

21 paraphernalia, was this the one that was in the plastic bag?

22 A   Yes.

23 Q   So really what we are — you're looking at is a — from

24 the surface you just saw a bag, is that correct?

25 A   That's correct.  But there's also Ziploc baggies you can

1    also see on that photo on the same shelf.

2    Q    So the drug paraphernalia that you're referring to, Ziploc

3    baggies and what else?

4    A    There was, you know, grinders, sifters, digital scale,

5    other things like that that were eventually found inside that

6    plastic bag and on that shelf.

7    Q    Okay.  So as you said, as you continued to look into that

8    area, that's when you said you also came across grinders,

9    sifters, scales?

10   A    Correct.

11   Q    Exhibit 126, Government Exhibit 126, would be a receipt

12   and a digital scale.

13   A    Correct.

14   Q    Correct?

15   A    Yes.

16   Q    Now, is this digital scale separate from the one that was

17   with the drug paraphernalia or is this one and the same?

18   A    This was separate.

19   Q    And I notice in Government Exhibit 127 you said plastic

20   bag of paraphernalia.  Is that the photograph of 125 before you

21   went into what was inside?

22   A    That's correct.  As items were removed from the shelf,

23   that's just another photo before that bag was opened.

24   Q    Okay.  And I know 128 — Government Exhibit 128 is the bag

25   opened and you can see some material or some paraphernalia,

3:02:40PM 1  whatever that was in there.

2  A     That's correct.

3  Q     Now, Government's Exhibit 129, you stated that there was a

4  safe inside the house.  And where was this located?

5  A     The one in this photo was located in the back room on the

6  floor, exactly where you see it in that photograph.

7  Q     Now, this safe, was it opened that you could just open it

8  up and then observe the contents that were inside or did

9  something have to take place to open up the safe?

10  A     You're referring to the safe in this picture?

11  Q     In 129, yes.

12  A     Okay.  I don't recall exactly how that was opened.  I

13  believe that a key was used to open that, but I am not a

14  hundred percent certain on that particular safe.

15  Q     So your recollection is that when you came in, your

16  knowledge is that it could not be just opened by turning the

17  handle or whatever.  Some other means had to be utilized to get

18  into — to observe the contents of the safe.

19  A     Yes.  Now, this safe —

20  Q     This safe in 129?

21  A     Okay.  Let me just clarify there were two safes.

22  Q     Right.

23  A     Okay.  Yes, this one, this one was empty here.

24  Q     Okay.  So that safe was empty.  And you're right, I guess

25  Government Exhibit 130 — correct me if I'm wrong.  I guess

1    there's two Ziploc bags with suspected heroin found in a second

2    safe.  So is there a photograph of the second safe?

3    A    No, there's not.

4    Q    Is there some reason there is no photo of the second safe

5    that you know?

6    A    Not that I know of.

7    Q    And as far as these two Ziploc bags of suspected heroin,

8    like you said, found in the second safe, were you present when

9    the safe was opened?

10   A    I was.

11   Q    And what means was utilized?  Was it locked?  Did you need

12   a key?  Did you need a combination?

13   A    The second safe was locked.  It was taken outside by other

14   officers and agents and —— I don't know, they had to smash it

15   on the ground or possibly a crowbar, but that safe was not

16   opened until they had brought it back up into the apartment.

17   And I was present when the safe was opened, but it had to be

18   basically destroyed, the front door, to be able to get that

19   safe opened.

20   Q    So what you visualized was that some other officers took

21   the safe and they —— could one person carry it?  Two people had

22   to carry it as far as the safe, the second safe?

23   A    It was similar in size to the photograph of the other

24   safe.

25   Q    But from my recollection is it able that one person could

3:05:42PM 1  carry this?

2  A    I don't recall if one or two people.  I'm sure one person

3  probably could have handled it, although there were a couple

4  flights of steps.  So I wasn't present on the steps, so I don't

5  know exactly how it was transported, whether it was one or two

6  officers.

7  Q    Your recollection is you saw the safe, it was unable to be

8  opened, two other officers — one or two other officers took it

9  from — away from Apartment 4 down the steps, correct?

10  A    Correct.

11  Q    You stayed in Apartment 4 while they took it down the

12  steps?

13  A    I did.

14  Q    They came back with the safe to Apartment 4?

15  A    Correct.

16  Q    And at that particular point you noticed there was damage

17  done to the door of the safe?

18  A    Correct.

19  Q    And at that particular point you or some other officer

20  opened up the safe.

21  A    Yes.  It wasn't me personally, but I was present.  The

22  safe was opened and these were the contents found inside of it.

23  Q    So when it came back, when you said they opened it up

24  after it was damaged, is it a matter to just turn the — the

25  door knob and it just opened up?

3:06:50PM 1  A   I don't recall if a small crowbar was used or if it just

2  eventually was able to be pulled open from the damage to the

3  door.

4  Q   And there was no photograph taken of these two Ziploc bags

5  of suspected heroin while they were still in that safe.

6  A   Not that I'm aware of.

7  Q   And did that conclude your detail as far as the 500 Mills

8  Avenue?

9  A   Yes.

10  Q   Okay.  After observing the contents of the safe, were you

11  required to do anything else?

12  A   No.  I stood by while the -- you know, all evidence was

13  handled by the FBI and the residence was secured, and we left

14  the residence.  Essentially at the same time, once everything

15  was packaged by the FBI and photographed and the door was

16  secured, and we all exited the residence around the same time.

17  Q   Okay.  So the items that you mentioned in these Government

18  Exhibits 124 to 130 also including what was not shown in the

19  second photograph -- I mean in the second safe by photograph,

20  you were present while the FBI and other agents collected the

21  evidence, correct?

22  A   Correct.

23  Q   Took photographs of the evidence other than a second safe,

24  correct?

25  A   Correct.

3:08:23PM 1    Q    And then packaged that evidence?

2    A    Yes.

3    Q    Okay.  And then all of you left together and then the

4    apartment was secured by locking the door.  Is that correct?

5    A    That's correct.

6              MR. BURNEY:  Okay, thank you.  No further questions.

7              THE COURT:  Mr. Silverman, do you have anything?

8              MR. SILVERMAN:  Yes, Your Honor.

9                        CROSS EXAMINATION

10   BY MR. SILVERMAN:

11   Q    Officer Binder, when you went to that apartment building

12   on Mills Street did you have a warrant?

13   A    I did not.

14   Q    Okay.  And those keys you had, do you know where those

15   came from?

16   A    I was told they came from Willis Wheeler.

17   Q    Okay.  Did Willis Wheeler turn those keys over to the

18   police voluntarily or were they seized, if you know?

19   A    I don't know.

20   Q    And how did they get into your possession?

21   A    One of the agents at the Rankin house gave them to me, and

22   that's when I was detailed to the Braddock house.

23   Q    So an agent told you to go over there and use the keys to

24   enter when you didn't have a warrant, correct?

25   A    To try to see if the keys would fit any of the apartments

3:09:32PM 1  there and then contact the US Attorney, which is what I did.

2  Q    All right.  And what agent told you to do that?

3  A    Special Agent Hedges.

4  Q    Okay.  Was there any discussion about:  Gee, maybe we

5  should wait for a search warrant to do something like that?

6         MR. CONWAY:  Your Honor, objection, calls for

7  hearsay, also goes — well, calls for hearsay at this point.

8         THE COURT:  Objection sustained.

9         MR. SILVERMAN:  It was not for the truth of the

10  matter, Your Honor.

11         THE COURT:  Objection sustained.

12  BY MR. SILVERMAN:

13  Q    Okay.  So you get over there and you go through the

14  security door that leads to the outside, correct?

15         MR. CONWAY:  Your Honor, I'm going to object to the

16  relevance and asked and answered.

17         THE COURT:  Objection sustained.

18  BY MR. SILVERMAN:

19  Q    When you got to the apartment where the key fit in the

20  door, did you hear anybody inside?

21  A    No.  As I testified, I knocked first and announced that,

22  you know, the police were there.  So, no, we didn't hear anyone

23  inside.  That's when I tried the door.

24  Q    You didn't hear any rustling or anything —

25         MR. CONWAY:  Objection.  Objection, asked and

3:10:39PM 1    answered, Your Honor.

2                     THE COURT:  Objection sustained.

3                     Can we move along?

4    BY MR. SILVERMAN:

5    Q    And so you then called someone, right?

6                     MR. CONWAY:  Objection, Your Honor, asked and

7    answered.

8                     MR. SILVERMAN:  I haven't asked this question.

9                     MR. CONWAY:  He doesn't have to ask it, Your Honor.

10   That's what rule you made clear.

11                    THE COURT:  It was asked by other counsel.

12   BY MR. SILVERMAN:

13   Q    Can you identify the person that you called and point him

14   out by an item of clothing they're wearing?

15                    MR. CONWAY:  Objection, Your Honor, asked and

16   answered.  I will stipulate that it was me that

17   Detective Binder called.

18   BY MR. SILVERMAN:

19   Q    Did you tell Mr. Conway that you didn't have a warrant?

20   A    Yes.  He was fully aware that we did not have a warrant.

21   That's the reason I was calling him.

22   Q    Okay.  And did you tell Mr. Conway that you didn't have

23   any specific articulable facts that there was anyone in that

24   apartment that posed a danger to you?

25                    MR. CONWAY:  Your Honor, objection.  And again I'd

3:11:34PM 1 ask you admonish counsel again.

2          THE COURT:  Objection sustained.

3          MR. SILVERMAN:  Judge, could we approach?

4          THE COURT:  No, let's move along.

5          MR. SILVERMAN:  Okay.  I just didn't know what the

6 objection was.

7          THE COURT:  Let's move along.  The objection has been

8 sustained.

9          MR. SILVERMAN:  Okay.

10 BY MR. SILVERMAN:

11 Q    Well, did you see that evidence when you went into the

12 apartment without a warrant?

13 A    No, I did not.

14 Q    How many rooms are in the apartment?

15 A    Approximately five.

16 Q    And you went to each room?

17 A    Cleared the room for officer safety.

18 Q    Was there any reason to believe that you were in danger

19 when you did that?

20 A    Sure.  Anytime you enter a residence you're always in

21 danger.

22 Q    So why did you enter the residence?

23 A    To clear it to make sure there was no one in there that

24 was a potential threat to us or someone who could potentially

25 destroy evidence.

3:12:54PM 1  Q    Why did you enter the common area —

2              MR. CONWAY:  Your Honor, again, objection.  This is

3     not relevant.

4              THE COURT:  The objection is sustained.

5              Move along, Mr. Silverman.

6     BY MR. SILVERMAN:

7     Q    Have you had any sustained complaints regarding evidence

8     handling?

9     A    Have I?

10    Q    Yes, sir.

11    A    No, I have not.

12    Q    Have you — and by that I mean not whether they were —

13    not whether —

14             MR. SILVERMAN:  Well, can we approach, Your Honor?

15             THE COURT:  No.  Are you — just so I understand the

16    question, are you asking him whether anyone has complained

17    against him?

18             MR. SILVERMAN:  Yes.

19             THE COURT:  Okay.

20             MR. SILVERMAN:  May we approach?

21             THE COURT:  No, just ask the question.  The other

22    question has been asked answered.

23    BY MR. SILVERMAN:

24    Q    I'm not asking whether you had these things that were

25    subsequently overturned in an appellate process.  Did you have

3:13:57PM 1  any sustained complaints?

2  A    You asked me if they were sustained.  I said no.  There

3  was one complaint by my superintendent and that was not

4  sustained.  There is nothing in my file.

5              MR. SILVERMAN:  May I approach the witness?

6              THE COURT:  Yes.

7  BY MR. SILVERMAN:

8  Q    Is this a copy of the —

9              THE COURT:  Are you asking him a question?

10             MR. SILVERMAN:  Yes.

11             THE COURT:  On the record?

12             MR. SILVERMAN:  I'm asking him to identify —

13             THE COURT:  If you could please keep it up then.

14             MR. CONWAY:  Your Honor, I'm going to object as to

15  relevance with regard to this.  I think the detective has

16  already answered the relevant questions related to this.  To

17  the extent there are any additional questions, they will be

18  irrelevant.  So I ask —

19             MR. SILVERMAN:  I was trying to — isn't — okay, let

20  me —

21             THE COURT:  What is the nature of the question?

22  BY MR. SILVERMAN:

23  Q    Isn't it true you received a one-day suspension for

24  violation of this evidence control order?

25  A    That's not true.

3:15:10PM 1  Q    Well, the truth is that on appeal that was reversed.

2  Correct?

3  A    In arbitration; that was an internal matter.

4  Q    Yes, sir.

5  A    And I did not — I received a two-day suspension that was

6  overturned.

7  Q    Overturned on appeal.

8  A    There is nothing in my file.

9  Q    Got you.

10        MR. SILVERMAN:  Pass the witness.

11        THE COURT:  Okay.

12        Any redirect?

13        MR. CONWAY:  No redirect, Your Honor.

14        THE COURT:  Okay.

15        Thank you, you may step down.

16        THE WITNESS:  Thank you, Your Honor.

17     (Whereupon, the witness was excused.)

18        THE COURT:  Okay, the Government's next witness.

19        MR. CONWAY:  The Government calls James Muha.

20        JAMES MUHA, a witness herein, having been first duly

21  sworn, was examined and testified as follows:

22                    DIRECT EXAMINATION

23        MR. IMHOF, DEPUTY CLERK:  Please spell your name for

24  the court reporter, please.

25        THE WITNESS:  Any name is James Muha, M-U-H-A.

3:16:58PM 1        THE COURT:  If you can have a seat and pull that mike

2  right up to you.

3        THE WITNESS:  Thank you, ma'am.

4  BY MR. CONWAY:

5  Q   Good afternoon, sir.  Would you please introduce yourself

6  to the members of the jury and tell them how you're employed.

7  A   Sure.  My name is James Muha and I'm a Special Agent with

8  the FBI.

9  Q   And how long have you been a Special Agent with the FBI,

10  sir?

11  A   Approximately nineteen-and-a-half years.

12  Q   Now, I want to turn your attention to March 14th, 2012,

13  around 1:00 p.m. in the afternoon.  Were you on duty that day,

14  sir?

15  A   Yes, sir; I was.

16  Q   And did you participate in the execution of the search

17  warrant of a vehicle operated by Mr. Willis Wheeler?

18  A   Yes, sir; I did.

19  Q   And can you describe the events of that day with regard to

20  the search warrant of the Honda and what you personally went

21  through.

22  A   Sure.  I was assigned to the evidence on the matter which

23  is any evidence that would be recovered at the site.  My duty

24  was to take custody of the evidence.  And shortly after

25  Mr. Wheeler's vehicle was stopped, I approached this scene and

3:18:26PM 1   Officer Lebedda conducted a search on Mr. Wheeler.  And then as

2   evidence was found or items we would seize, I would mark the

3   items and accept custody of them.

4   Q    And do you recall the seizure of a — some suspected

5   heroin from the Honda?

6   A    Yes, sir; I do.

7   Q    I want to show you what's been admitted into evidence as

8   Government Exhibit FBI-146.

9   A    I'm sorry, 146?

10   Q    Yes, if you could just look at the screen, sir.

11   A    Okay.

12   Q    Are you familiar with that picture, sir?

13   A    Yes, sir; I am.

14   Q    And what is that a picture of?

15   A    Those are the three bags that were inside a shopping bag

16   that was in the glove compartment of the vehicle.

17   Q    Now, did you also recover among other things the driver's

18   license of the vehicle — of the driver of the vehicle?

19   A    Yes, sir; we did.

20   Q    Okay.  I want to place before you what's been marked as

21   Government Exhibit HSW-1.  What is HSW-1?

22   A    It's a driver's license, Pennsylvania, for Willis Wheeler.

23        MR. CONWAY:  Your Honor, move for the admission of

24   Government Exhibit HSW-1.

25        THE COURT:  Any objection?

3:20:06PM 1          MR. SILVERMAN:  Relevance, foundation.

2          THE COURT:  Mr. Burney?

3          MR. BURNEY:  Same objection, Your Honor.

4          THE COURT:  Okay.  The objections are overruled.  The

5  document is admitted.

6          MR. CONWAY:  Your Honor, we'd also move for the

7  admission of Government Exhibit HSW-1-A which is essentially a

8  picture of the item in evidence.

9          THE COURT:  Any objections?

10          MR. SILVERMAN:  What is it?

11          THE COURT:  A picture of the item in evidence.

12          MR. SILVERMAN:  Which item?

13          THE COURT:  The item previously referenced.

14          MR. SILVERMAN:  I don't know which one that is.

15  You're talking about the driver's license?

16          THE COURT:  Mr. Conway?

17          MR. CONWAY:  Yes.

18          MR. SILVERMAN:  Okay.  Same objection.

19          THE COURT:  Mr. Burney?

20          MR. BURNEY:  Same one, Your Honor.

21          THE COURT:  Okay.  Those objections are overruled.

22          MR. CONWAY:  If we could display Government

23  Exhibit HSW-1-A.

24  BY MR. CONWAY:

25  Q    And, sir, in terms of the driver's license, was there an

3:21:06PM 1  address for Mr. Wheeler on the driver's license?

2  A    Yes, sir; there is an address of 217 Fifth Avenue in

3  Rankin, Pennsylvania.

4  Q    And did you later participate in the execution of the

5  search warrant at that particular address?

6  A    Yes, sir; I did.

7  Q    Now, in terms of the suspected heroin seized from

8  Mr. Wheeler's vehicle, can you describe the sort of evidence

9  control procedures that would be used when -- that you used in

10  that particular case after you seized the suspected heroin.

11  A    Sure.  The evidence was photographed.  And once it was

12  discovered -- and it was after the evidence was photographed --

13  it was logged in in terms of, you know, we marked what the

14  photographs were of, and I accepted custody of the item.  And

15  then what I would do is that night I ended up entering the

16  evidence into a night storage for the night because usually

17  when -- when we're not --

18        MR. SILVERMAN:  Objection, non-responsive.

19        THE COURT:  Objection overruled.

20        THE WITNESS:  When we seize items and if somebody is

21  not working --

22        MR. SILVERMAN:  Objection.

23        THE COURT:  Objection overruled.

24        THE WITNESS:  When we seize items and someone is not

25  available in the evidence room, we would enter it in night

3:22:38PM 1  storage, and that is what was done in this matter.

2  BY MR. CONWAY:

3  Q    And then the next day or the day after do you then go

4  through a procedure of sealing the suspected narcotics?

5  A    Yes, sir; we do.

6  Q    Okay.  I want to show you what's been marked as Government

7  Exhibit HSW-7.  What is HSW-7?

8  A    These are the items seized from the vehicle that

9  Mr. Wheeler was driving.

10       MR. CONWAY:  Your Honor, move for the admission of

11  Government Exhibit HSW-7.

12       MR. SILVERMAN:  May I see it?

13       THE COURT:  Do you have the exhibit?

14       MR. SILVERMAN:  I'd like to see the actual exhibit --

15  no, I don't have --

16       THE COURT:  Please show counsel the exhibit.

17       MR. SILVERMAN:  Thank you.

18       Pursuant to our earlier objections, Your Honor.

19       THE COURT:  You have a specific objection to this?

20       MR. SILVERMAN:  Um, the earlier objections we made.

21       MR. BURNEY:  Your Honor, on behalf of Mr. Bush, as

22  far as these items, I don't know if he's going to testify, but

23  it has not been documented as far as what's in those actual

24  packages there.

25       THE COURT:  Okay.  The objection is overruled.

3:24:36PM 1      MR. SILVERMAN:  And it's not relevant to Mr. Mishra,

2     Your Honor.

3                THE COURT:  The objection is overruled.

4                MR. CONWAY:  And, Your Honor, we would also move for

5     the admission of the picture of the item in evidence which is

6     Government Exhibit HSW-7-A.

7                THE COURT:  Any objection?

8                MR. SILVERMAN:  Of the picture?  Same objection.

9                THE COURT:  Mr. Burney?

10               MR. BURNEY:  Same objection, Your Honor.

11               THE COURT:  Okay, those objections are overruled.

12               MR. CONWAY:  Would you display Government Exhibit

13    HSW-7-A.

14    BY MR. CONWAY:

15    Q    And does that appear to be a picture of the item as it

16    existed in evidence, sir?

17    A    Yes, it is.

18    Q    Okay.  And did you personally seal that, that suspected

19    heroin, prior to it going into FBI evidence?

20    A    Yes, I did.

21    Q    Now, as we discussed, you later on went to the Rankin

22    address that we referenced earlier that we saw on Mr. Wheeler's

23    license.  Is that true?

24    A    Yes, sir; that's true.

25    Q    And did you take photographs of the -- while you were

3:25:57PM 1 executing the search warrant?

2 A    Yes, sir; I did.

3 Q    Now I've placed before you what I've -- what we've marked

4 as Government Exhibits FBI-166 through FBI-174.  What are

5 those, sir?

6 A    These are photographs I took of the -- during the

7 execution of the search warrant at the Rankin address.

8         MR. CONWAY:  Your Honor, move for the admission of

9 Government Exhibit FBI-166 through FBI-174.

10         MR. SILVERMAN:  If I could have a moment, Your Honor.

11         THE COURT:  Yes.

12    (Brief pause in proceedings.)

13         MR. BURNEY:  Excuse me, what are those numbers?

14         MR. SILVERMAN:  166 through 174.

15    (Brief pause in proceedings.)

16         MR. SILVERMAN:  Seventeen -- with regard to 172, it

17 contains hearsay.  173 contains hearsay.  174 -- I'm sorry, 171

18 contains hearsay and a 403 problem.

19         THE COURT:  Can I see 171?

20         MR. SILVERMAN:  1 --

21         THE COURT:  172?

22         MR. SILVERMAN:  And --

23         THE COURT:  And 173 did you say?

24         MR. SILVERMAN:  Yes, and the proper foundation.  In

25 addition to those specific objections proper foundation has not

3:28:42PM 1   been laid for these documents.

2                    THE COURT:  Okay.

3                    Okay, the Government's response?

4                    MR. CONWAY:  Well, Your Honor, in terms of hearsay,

5   they are indicia evidence, so they're not for the truth of the

6   matter asserted.  They obviously establish Mr. Wheeler's

7   residence at 215 or 217 Fifth Avenue.  In terms of proper

8   foundation, we have the witness here who actually took the

9   photographs, so I'm not sure how one could establish foundation

10  any more clearly.

11                   THE COURT:  Okay.  The objections are overruled.

12                   MR. SILVERMAN:  And the 403 balancing, Your Honor?

13                   THE COURT:  Overruled.

14  BY MR. CONWAY:

15  Q    Now I want to show you what's been marked or now been

16  admitted as Government Exhibit FBI-168.  What is Government

17  Exhibit FBI-168?

18  A    This is a photograph I took of money recovered at the

19  Rankin address.

20  Q    And FBI-169?

21  A    This is a photograph I took at the Rankin address of money

22  wraps.

23  Q    And Government Exhibit FBI-170?

24  A    This is a photograph I took at the Rankin address of a

25  handgun.

3:30:34PM 1   Q   So some of the photographs include something that we in

2   law enforcement call indicia?

3   A   Yes.

4   Q   First of all, what does indicia mean?

5   A   Items that would lead one to believe that there's a type

6   of relationship exists where we would say that — it's not what

7   I would call evidence of a crime, but something leading toward

8   the evidence.

9   Q   So, for example, a letter or something found in a

10   residence addressed to a particular person.

11   A   Yes, sir.

12       MR. SILVERMAN:  Judge, I would like a limiting

13   instruction then as to the proper purpose that these documents

14   were admitted for.

15       THE COURT:  And that will be Exhibits 171, 172 and

16   173, Mr. Conway?

17       MR. CONWAY:  If you just give me a minute to confirm,

18   Your Honor, before — yes, Your Honor, Government Exhibits

19   FBI-171, 172, 173.

20       THE COURT:  Okay.

21       Ladies and gentlemen of the jury, Government

22   Exhibits 171 through 173 are being offered for the purpose

23   of — the purpose stated by the officer just now, to indicate

24   indicia of premises and the like, and you are to use it for no

25   other purpose.

3:31:48PM 1          MR. CONWAY:  So if we could display Government

2  Exhibit FBI-171.

3  BY MR. CONWAY:

4  Q   What is that, sir?

5  A   This is a photograph I took of a letter that was addressed

6  to Mr. Wheeler at the Rankin address that was sent by an

7  individual from -- named -- it looks like it says Louis Reese

8  from SCI Fayette, which is a state correctional institute,

9  prison basically.

10  Q   Were there other letters to Mr. Wheeler at the residence?

11  A   Yes, sir.

12          MR. CONWAY:  And may I display FBI-172.

13  BY MR. CONWAY:

14  Q   Would that be examples of some of that correspondence,

15  sir.

16  A   Yes, sir.

17          MR. CONWAY:  No further questions, Your Honor.

18          THE COURT:  Okay.

19          Cross?

20          MR. SILVERMAN:  With regard to -- what's the exhibit

21  number for the suspected heroin here?  Do you know?

22          THE WITNESS:  Sir, I don't.  I don't know what they

23  have it as.

24          MR. SILVERMAN:  Mr. Conway, what was the exhibit

25  number for this?

1          MR. CONWAY:  HSW-7.

2                    CROSS EXAMINATION

3   BY MR. SILVERMAN:

4   Q    HSW-7.  And so you recovered this?

5   A    No, sir.  Officer Lebedda or someone else discovered it

6   and then I photographed it.  And then I took over custody of

7   it.  So I'm not sure recovery but, yes, it was pulled out.

8   Q    And you took it where?

9   A    I took it back to the FBI offices.

10  Q    And you put it into a night box?

11  A    I put it into night storage the first night.

12  Q    Okay.

13  A    Later on —

14  Q    Before you did that you weighed it?

15  A    Yes, sir, we do.  We do weigh it.

16  Q    And it weighed 221 grams.

17  A    Yes, sir; that's what's listed on there, that's —

18  Q    Okay.

19  A    Yeah.

20  Q    And it says here that that was collected on March the

21  14th of '12, right?

22  A    Yes, sir.

23  Q    And then it was sealed on March the 16th of '12.  Right?

24  A    Yes, sir; that's correct.

25  Q    So when you put it in the evidence locker, you didn't seal

3:34:35PM 1 it. You just put it in there, right?

2 A    I put it into the night storage, yes. It was not sealed.

3 Q    And then a couple days later did you seal it or someone

4 else?

5 A    I was the one who sealed it, sir.

6 Q    Okay. And there's a witness to that right on this

7 evidence slip, right?

8 A    Yes, sir.

9 Q    That's Ian Barrett. Is that correct?

10 A    It is, sir.

11 Q    Okay. And then the evidence slip goes on and it says that

12 it went to the DEA lab on 7-11 of '12?

13 A    Yes, sir; that's correct.

14 Q    Three months later.

15 A    Correct.

16 Q    And then it actually went up in weight to 245 grams, is

17 that right?

18 A    Yes, sir; that's correct.

19 Q    So the weight somehow of the bag that was not sealed but

20 then became sealed actually increased over time, is that right?

21 A    Yes, sir; according to the slip here. The -- the weight

22 of what DEA returned back had a different number on there.

23 Q    And how much was the difference?

24 A    Approximately 23 grams.

25 Q    Can you explain how 23 grams would have gotten into an

3:35:46PM 1  unsealed bag or can you explain why the weight would have

2  increased?

3  A    No, sir; I can't.  I mean what I can say is that once we

4  recover the evidence, night storage is something that's secured

5  and locked.  So where the evidence does not — unless someone

6  signs it out on the chain of custody, it's not something that

7  people would be able to have access to.  So —

8  Q    Is there another document besides the chain of custody

9  that's on the package?  Is there another form or something?

10  A    On here it has our sealing sticker.  There is — we do

11  keep chain of custodies for evidence we recover.

12  Q    Okay.  And do you know if it reflects that — that

13  somebody else had it out for a while or something?

14  A    I'd have to refresh myself with the chain of custody.

15       (Off the record discussion between opposing counsel.)

16  BY MR. SILVERMAN:

17  Q    Oh, you didn't bring it with you as a document that you

18  reviewed or prepared, the chain of custody?  Have you seen

19  that?

20  A    I have seen the chain of custody, sir.  I've signed it.

21  Q    Okay.

22       MR. SILVERMAN:  Well, could we — could I have —

23  could I, Your Honor, request that the witness provide it?

24       THE COURT:  Do you not have the chain of custody with

25  you, sir?

1        THE WITNESS:  I do not have chain of custody.  I was

2   not — no, ma'am.

3        MR. SILVERMAN:  Pass the witness.

4        THE COURT:  Okay.

5        Mr. Burney?  Sir, do you have any cross examination?

6        MR. BURNEY:  Not at this time, Your Honor.

7        THE COURT:  Okay.

8        Any redirect?

9                    REDIRECT EXAMINATION

10  BY MR. CONWAY:

11  Q    When you measure weight of the substance that you're

12  sealing, does it often include all of packaging material that

13  you're packaging it with?

14  A    I'm sorry, can you repeat that, please?

15  Q    When you weigh something —

16  A    Yes.

17  Q    — before you put into it evidence —

18  A    Yes.

19  Q    — do you weigh it?  Does it include all the packaging

20  material, that weight, or do you measure just the powder

21  itself?

22  A    Well, in — in this case we would measure the powder

23  itself.

24  Q    You yourself took it, unopened those sealed packages —

25  A    No.  I mean we're talking — we took what was in the —

3:38:47PM 1  what was in the bag, what was in here, and weighed it.

2  Q    Okay.  And then when you go off and send it to the DEA, do

3  you often include the bag that's now sealed and the postage

4  that you're sending it off to the DEA?

5  A    Yes.

6  Q    So that is one way to explain how something could get an

7  additional weight.  It would be, for example, that bag that is

8  now covered in all of the suspected heroin.

9  A    That is a way, yes, sir.

10         MR. CONWAY:  No further questions.

11               RECROSS EXAMINATION

12  BY MR. SILVERMAN:

13  Q    Can you prove that happened?

14  A    I can prove — I mean by writing, what's written here,

15  it's proven this is what it weighed.

16  Q    I'm not doubting that when you weighed it, it weighed —

17  I'm not questioning the truth of it.  Mr. Conway is suggesting

18  that there was extra packaging added or something.  I'm asking

19  you do you have some evidence of that?  That's all I'm asking.

20  A    I would say by looking at the bag — I mean the — the

21  other things on there include the — like the bag that — the

22  bag that covered it and as you know, the — the grocery shop

23  bag, and then also, you know, all the packaging.  All I could

24  testify to is that this is what it weighed upon entry of

25  evidence.

3:40:06PM 1  Q    Okay.  Well, we can probably get to the bottom of it.  Who

2  received it at the DEA lab?  Do you know?  Do you know who this

3  person is?

4  A    I don't.

5  Q    Okay.  Well, now, you say you sealed this on 3-16.  Right?

6  A    Yes, sir.

7  Q    Okay.  And did you also send it to the DEA lab?

8  A    I can't recall who did the actual sending on there.  I

9  think our process is the evidence lab was the one that did the

10  sending.

11  Q    And the purpose of sending something to the DEA evidence

12  lab is what?

13  A    To have it tested.

14  Q    So you really wouldn't throw extra items into the bag if

15  you're just sending it to a forensic toxicologist or chemist to

16  have it tested, would you?

17  A    We would throw everything that would be tested in there.

18  I don't know what all they test.  This is the way it was found

19  so it was all entered in as an item of evidence.

20  Q    So this is the — this is the bag you sealed, this one,

21  that night.

22  A    Yes.  Up here is where I sealed it.  Yes, sir.

23  Q    So it's the outer bag that was sealed?

24  A    Uh-huh.

25  Q    So the outer bag includes all that stuff, right?

3:41:47PM 1    A    Yes, sir.

2    Q    So at end of the day there's really not an explanation for

3    why the weight increased 20 grams.  There's just not.  Right?

4    You just don't know.

5    A    No, sir, I don't know.

6    Q    All right.

7              THE COURT:  Anything else?

8              MR. CONWAY:  Just briefly, Your Honor.

9                         REDIRECT EXAMINATION

10   BY MR. CONWAY:

11   Q    Mr. Muha, did you get a bunch of heroin from some other

12   case and stick it in that bag so that you could have a greater

13   case against Mr. Wheeler and whoever else was here?

14   A    No, sir.

15             MR. CONWAY:  No further questions, Your Honor.

16             THE COURT:  I will allow re-cross examination.  Any

17   recross?  Any recross?

18             MR. SILVERMAN:  No, ma'am.

19             MR. BURNEY:  No, ma'am.

20             THE COURT:  Okay.

21             Thank you, you can step down.

22             THE WITNESS:  Thank you, ma'am.

23        (Whereupon, the witness was excused.)

24             THE COURT:  The Government's next witness?

25             MR. CONWAY:  Your Honor, we believe that we've gotten

3:42:51PM 1   the problem with our Title III figured out, so we at this point

2   recall Detective Barrett.

3          THE COURT:  You're still under oath,

4   Detective Barrett.  Take a seat.

5          RICHARD IAN BARRETT, a witness herein, having been

6   previously duly sworn, was examined and testified as follows:

7                 DIRECT EXAMINATION

8   BY MR. CONWAY:

9   Q   Sir, I believe when we left off we were playing FBI-328

10   when we had our technical difficulties, so let's try to go back

11   to that.

12      (Exhibit FBI-328 played in open court.)

13   BY MR. CONWAY:

14   Q   And can you tell us what's going on in this call, sir?

15   A   Yes.  This is a call between Richard Bush and

16   Sherron Whitehead.  Sherron Whitehead needs to talk with

17   Richard Bush and he doesn't want to do it over the phone.  He

18   wants to do this in person, and Richard Bush is hesitant

19   because if something happened with Sherron Whitehead, he

20   doesn't want to go into a situation that's — that could be bad

21   for him.

22   Q   And is there a follow-up to this call sort of a minute

23   later?

24   A   Yes.

25         MR. CONWAY:    FBI-329.

1          (Exhibit FBI-329 played in open court.)

2     BY MR. CONWAY:

3     Q    And what's happening here, sir?

4     A    Yeah, this is the follow-up call where Sherron calls

5     Richard Bush again and you can hear the urgency.  He needs to

6     talk to him.  And you can also hear Mr. Bush — the hesitancy

7     of not wanting to come on down to a situation where he could

8     get jammed up himself.  So he finally coaxes it out of

9     Mr. Whitehead what happened.

10          And he tells him they ran into his man's crib — that was

11    Deondre Steave — ran into his crib and the police got all of

12    it, all of his joints, which we talked about before were his

13    heroin.  And Richard Bush instructs him to go to a safe place

14    where — where he can pick him up and then they could talk

15    about it in person, and that was at Sherron's baby's mom's

16    house.

17          MR. CONWAY:  Let's go to FBI-331.

18          (Exhibit FBI-331 played in open court.)

19    BY MR. CONWAY:

20    Q    So this call would have been a follow-up to the call that

21    we just heard about the meeting with Sherron Whitehead and

22    Richard Bush.

23    A    Correct.

24    Q    And this call was with an unknown male, however, though.

25    A    Correct.

1    Q    And what's the nature of this call?

2    A    The nature of this call is basically telling —

3    Sherron Whitehead telling the male:  Don't worry, I'm going to

4    get some new joints and I'll let you know.

5         MR. CONWAY:  And if we go to FBI-333.

6         (Exhibit FBI-333 played in open court.)

7    BY MR. CONWAY:

8    Q    Can you tell the jury what's going on with regard to this

9    telephone call, sir?

10   A    Yes, Sherron Whitehead needs sleeves or the stamp bags we

11   talked about, so he's calling Richard Bush.  And Richard Bush

12   says he can't go there because the police ran into my man's

13   store -- Mr. Mishra's store.  And he goes on -- Sherron goes on

14   to say:  So we're not going to have any sleeves?  And he tells

15   him:  I don't know.  You know, because if the police ran into

16   that store, he can't go there.  He can't go there; and if

17   that's the case, then this messes up his entire program.

18        So with what Mr. Bush said there is if Mishra's store --

19   if the police ran into there and took all of his stuff, then

20   Bush -- Bush's entire program is affected by that.

21        MR. CONWAY:  And let's go to Government Exhibit

22   FBI-350.

23        I may pause this, Ms. Wikert.

24        (Exhibit FBI-350 partially played in open court.)

25        MR. CONWAY:  Let's stop it for a moment.

BY MR. CONWAY:

Q    Now, in terms of up to this point in the call, can you explain to the members of the jury what's going on with regard to this telephone call?

A    Yes.  Based –– we can go off of the call that we just listened to with Sherron and Richard Bush.  He calls –– Richard Bush calls Mishra, just to see:  Hey, what's going on? I heard –– I heard you might have got in trouble, the police ran into your store.  And Mishra is saying:  No, no, that did not happen.

So he runs down –– you'll hear Mishra saying that a tall dude and another dude came in to buy stuff and he asks Richard Bush:  Do you know them?  And Richard Bush didn't know them, but they came in to buy heroin –– heroin packaging material.  So he ––

MR. SILVERMAN:  Objection to that characterization, Your Honor.

THE COURT:  Objection sustained.

MR. SILVERMAN:  Move to strike and instruct the jury to disregard.

THE COURT:  I'll ask that the jury disregard the last statement by the witness.

MR. SILVERMAN:  Move for a mistrial.

THE COURT:  That motion is denied.

Perhaps you can re-ask the question, Mr. Conway.

3:56:47PM 1         MR. CONWAY:  Sure.

2    BY MR. CONWAY:

3    Q    Now, there's a discussion there about a possibility,

4    essentially, that Mr. Mishra is under surveillance by federal

5    agents.  Is that correct?

6    A    Yes.

7         MR. SILVERMAN:  That mischaracterizes the recording

8    and the testimony.

9         THE COURT:  Objection overruled.

10   BY MR. CONWAY:

11   Q    I mean is that your interpretation of the telephone call?

12   A    Yes.  When they said federal agent — Mr. Mishra said

13   "federal agent" in the phone call, I interpreted that to mean

14   that Mishra — someone told him that there was a federal agent

15   outside of his store.

16   Q    And does then Mr. Bush give some advice to Mr. Mishra

17   about how to handle that?

18   A    Um, yeah.  Could we go back a little bit and I could break

19   down where —

20   Q    Well, I think it will be later on in the call, so let's

21   just begin to play the rest of the call and we can come back to

22   it.

23   A    Okay.

24        (Exhibit FBI-350 resumed and partially played in open

25   court.)

BY MR. CONWAY:

Q   So in terms of this call, there's sort of two other subjects that have been discussed since we last paused it, is that fair to say?

A   Yes.

Q   And can you describe those subjects and what's going on with regard to this telephone call.

A   Well, there — they're trying to get — Bush is trying to get his order — his order — to place his order, and they're talking about Richard Bush does not want to go there.  He doesn't want to meet him there because if there's heat there, he doesn't want to be there.

MR. SILVERMAN:  That's a mischaracterization of the recording.

THE COURT:  Is that an objection?

MR. SILVERMAN:  Yes.

THE COURT:  Objection overruled.

THE WITNESS:  So they decide — well, Richard Bush says:  We'll meet somewhere else like the show or the movies or something like that, and then they get back into what — you know, you're 18, 18.  We talked about that, 18 bottles Dormin, 18 of cut —

BY MR. CONWAY:

Q   Is there also discussion about five and five?

A   Yes.

4:01:02PM 1   Q    Do you recall that?

2   A    Yes.  That –– I believe that's the second part of the

3   discussion since we last paused.  We did talk about –– earlier

4   about Mishra's man going out of the country and he needs to get

5   the five thousand off of ––

6            MR. SILVERMAN:  Objection, that's speculation ––

7            THE WITNESS:  –– off Bush ––

8            MR. SILVERMAN:  –– as to five what.

9            THE COURT:  Objection overruled.

10            MR. SILVERMAN:  May I ask the witness a question on

11   voir dire?

12            THE COURT:  Nope.

13            THE WITNESS:  He needs to get the five, the five

14   thousand off of Bush and others so he can get it to his man

15   before his man goes to Israel or one of those Middle East

16   countries.  He needs to make it right with him so the product

17   would keep coming in.

18            So he tells him again:  I need that five thousand

19   before we move forward on this.  And Bush says:  Okay, I got

20   you.  I saw my man, but they messed the money up as far as ––

21   he gave me the five grand, but ––

22            MR. SILVERMAN:  I'm sorry, there is no basis for the

23   conclusion that that's five thousand.  It's not there.

24            THE COURT:  You're free to cross examine.  The

25   objection is overruled.

4:02:11PM 1          MR. SILVERMAN:  Yes, Your Honor.

2          THE WITNESS:  So he gave him — he gave them the five

3     grand, but he also wants to put an order on top of that.

4          MR. SILVERMAN:  Excuse me.  I want a continuing

5     objection to that and argue it's cumulative.  The tape is the

6     best evidence.

7          THE COURT:  The objection is overruled.

8     BY MR. CONWAY:

9     Q    Okay.  There is some discussion about what you believe to

10    be five thousand dollars, is that correct?

11    A    Correct.

12    Q    And the basis of your belief that it's five thousand

13    dollars is, among other things, the telephone calls you've

14    reviewed.

15    A    Yes.

16    Q    Now, what — in terms of the nature of the dispute of the

17    five thousand dollars and Mr. Bush's man, can you describe

18    what's going on here?

19    A    Well, it seems that —

20          MR. SILVERMAN:  Speculation.

21          THE COURT:  Objection overruled.

22          THE WITNESS:  — at some point there was a five

23    thousand dollars — what we like to call a front.  Okay?

24          MR. SILVERMAN:  Objection.  That is not supported by

25    the evidence.  Judge, I'm sorry, that is speculation.

1          THE COURT:  Objection overruled.

2          THE WITNESS:  Because he owes him, he wants that

3 five, he wants the five thousand before he can go to his man.

4 So at some point Mr. Mishra trusted Mr. Bush that they would

5 make it right with five thousand.

6          MR. SILVERMAN:  I'm sorry, I object.  That is

7 speculation as to what Mr. Mishra thought.

8          THE COURT:  Objection overruled.

9 BY MR. CONWAY:

10 Q    Did he actually use the word "trust," in fact?

11 A    He did.

12 Q    So you don't have to speculate about anything.  We can

13 rely on what Mr. Mishra actually said when he said, "I trust

14 you."  Right?

15 A    Correct.

16 Q    So Mr. Mishra trusts Mr. Bush according to Mr. Mishra's

17 own words.  Right?

18 A    Correct.

19 Q    You didn't have to speculate about that, right?

20 A    No, it was in the call.

21 Q    You can hear Mr. Mishra say those very words.

22 A    Correct.

23 Q    Trusts him so much he gave him five thousand dollars and

24 he trusted Mr. Bush would repay him.  Correct?

25 A    For product.

4:04:17PM 1          MR. SILVERMAN:  I believe that's leading.

2          THE COURT:  Objection sustained, leading.

3          MR. SILVERMAN:  Move to strike and instruct the jury

4     to disregard.

5          THE COURT:  I'm not sure that he answered that

6     question.

7          MR. SILVERMAN:  He did —

8          THE COURT:  The objection is noted and the answer

9     "for product" is stricken.  The jury is not to consider that

10    answer.

11         MR. SILVERMAN:  Move for a mistrial.

12         THE COURT:  The motion is overruled.

13         MR. SILVERMAN:  Also I move — I'm sorry, I also

14    object that this is speculation.  It's calling for speculation

15    on the part of the witness without adequate basis in fact.

16         THE COURT:  The objection is overruled.

17    BY MR. CONWAY:

18    Q    So I think where we're going now, just to get us back on

19    track, is we already talked about the trust between Mr. Bush

20    and Mr. Mishra with regard to the five thousand dollars.

21    Correct?

22    A    Correct.

23    Q    Now, is then Mr. Bush trying to explain to Mr. Mishra

24    about the mixup with the money?

25    A    Yes.

4:05:24PM 1  Q   Can you sort of translate that for the members of the

2  jury.

3  A   Yes.  Again getting back to that, Mr. Bush tells

4  Mr. Mishra he did have the money but he wants –– his man, who

5  is his man, who is Willis Wheeler, wants to add onto the order.

6        MR. SILVERMAN:  Speculation.

7        THE COURT:  The objection is overruled.

8        MR. SILVERMAN:  May I have a running objection to the

9  interpretation of this conversation with respect certainly to

10  Mr. Mishra's state of mind and what he means as speculation?

11        THE COURT:  Okay.  You may.

12        MR. SILVERMAN:  Okay.

13        MR. CONWAY:  Your Honor, he can have a running

14  objection ––

15        THE COURT:  The objection is overruled.

16        MR. CONWAY:  He can have a running objection to

17  anything as far as I'm concerned.

18        THE COURT:  The objection is running and also

19  overruled.

20        MR. SILVERMAN:  Thank you.

21  BY MR. CONWAY:

22  Q   I have to go back and re–ask the question because I lost

23  track of where we are, which is probably the point, but could

24  you ––

25        MR. SILVERMAN:  Object to the side bar.

4:06:25PM 1         MR. CONWAY:  Could you read back the question?

2         MR. SILVERMAN:  Objection, side bar.

3         MR. CONWAY:  There is no side bar.

4         MR. SILVERMAN:  I object to the side bar comment of

5 the prosecutor.

6         THE COURT:  The comment is stricken; I instruct the

7 jury not to consider it.

8         MR. SILVERMAN:  Move for a mistrial.

9         THE COURT:  The motion is denied.

10         MR. CONWAY:  If I could have the court reporter read

11 back my last question, Your Honor.

12         THE WITNESS:  I remember the question.

13 BY MR. CONWAY:

14 Q   Do you remember?

15 A   Yes.

16 Q   Mr. Barrett remembers better than I do.

17 A   Yes.

18 Q   If you could answer whatever question I asked you?

19 A   Yes.  We wanted to talk about the money issue and the

20 discrepancy.  So Mr. Bush tells him that his man, Mr. Wheeler,

21 gave him the money to give to Mishra to make everything right.

22 But in turn, in doing that, he wanted to add onto an order so

23 the monies would still be wrong.  So he's waiting now for

24 Mr. Wheeler again to give him the money so he could have the

25 money for the new order and the money for the five thousand

4:07:28PM 1  that was previously owed.

2       MR. CONWAY:  And continue playing, Ms. Wikert,

3  please.

4       (Exhibit FBI-350 resumed and played in open court.)

5       MR. CONWAY:  All right.  Let's move on to Government

6  Exhibit FBI-376.

7       THE COURT:  Before we start a new call, I'm going to

8  break for the day.

9       Ladies and gentlemen of the jury, we're going to

10  break.  It's about ten after four today.  Thank you again for

11  your patience earlier.  We will resume trial again at 8:45.

12       All of my previous rules are still in effect.  No

13  talking to anyone, no trying to do any research on your own,

14  and listening to the full panoply of evidence in this case

15  before reaching a decision.  Again I'll re-emphasize that you

16  must hear my jury instructions before you decide anything in

17  this case and you must be released to deliberate before you

18  start deliberating in this case.

19       So with that have a nice evening.

20       All rise for the jury.

21       (Jurors return to the jury room.)

22       THE COURT:  Agent Barrett, you may step down.

23       THE WITNESS:  Thank you.

24       (Witness steps from stand.)

25       THE COURT:  And everyone can be seated.

1      (Jurors exit jury room through the courtroom.)

2          THE COURT:  Okay.  What's on board for tomorrow with

3  the exception of, obviously, Detective Barrett?

4          MR. CONWAY:  The — well, I'm not sure we'll get

5  through him, Your Honor.  The — if we do, if I could just

6  e-mail Your Honor tonight, I'll look at that and I will —

7  within the hour I'll e-mail your clerk and defense counsel with

8  that information.

9          THE COURT:  Okay.

10         MR. CONWAY:  I have to re-gather where I am with

11  regard to the questions.  I appreciate that.

12         And, Your Honor, we would ask to the extent that

13  there's going to be motions for mistrial, that the counsel just

14  write them all down and we do that outside the presence of the

15  jury at the end of each day, as I anticipate, you know,

16  every — that coming out of his mouth fifty times a day, we can

17  certainly anticipate that; so we'd ask that the Court order the

18  Defendant — or Mr. Silverman to do that.

19         THE COURT:  I will so order.  It has been extremely

20  distracting as well as an interruption to the flow of evidence

21  in this case.  Counsel for Defendant Mishra is not taking

22  advantage of the jury's time in the fashion that he should.

23         And I mentioned early on in this case — actually, I

24  mentioned to these jurors that this case would take two weeks.

25  They have committed to that time period and they've committed

1    to no more.  We asked the jury whether or not they would be

2    available for two weeks for a trial and they said they would be

3    and I intend to hold it to that.  As I mentioned previously, I

4    see no reason why this case cannot take two weeks to try, with

5    the exception of constant interruptions.

6          Now, I recognize that Defendant Mishra is entitled to

7    his zealous advocate.  I recognize that there are certain

8    objections that are appropriate.  I also recognize that certain

9    objections are not appropriate.  For example, an objection of

10   something being non-responsive when it simply seems to be the

11   case that defense counsel just does not like the way the

12   witness is answering the question.  Or a question that

13   obviously requires a narrative being objected to as being

14   narrative.  The rule is clear on that point and I would ask

15   that defense counsel read the rule.

16          So this is taking a tremendous amount of time.  It's

17   obviously very distracting for the jury to have motions for

18   mistrial, which frankly I don't even see the basis for in the

19   context that you've raised them.  And I — but I would add that

20   I will allow you to raise them should you believe that to be

21   appropriate, but not during the course of a witness's

22   testimony.

23          MR. SILVERMAN:  Okay, Your Honor, I'm sorry.  I've

24   always — and I believe that the law is not any different in

25   the Third Circuit than anywhere else, that if a defense lawyer

4:20:54PM 1    does not continue to ask for relief until refused by a Court,

2    that error is generally regarded as waived.  And so I'm doing

3    what I believe the right thing to do is to preserve error.

4           THE COURT:  Well, I will permit you --

5           MR. SILVERMAN:  If you --

6           THE COURT:  I will permit you -- and obviously the

7    Government has consented to hearing any motions for a mistrial

8    you may have based on the testimony outside the hearing of the

9    jury.

10          MR. SILVERMAN:  The problem I have is that the law

11   requires that I make contemporaneous objections --

12          THE COURT:  I don't have an issue with your

13   objections to the extent they are warranted.  Many of them are

14   not.  But, nevertheless, I understand that you feel the need to

15   object.  We're talking about your motions for a mistrial during

16   the course of these objections.

17          MR. SILVERMAN:  Okay.  As long as we're going to be

18   on the same page, we'll be fine with that.

19          THE COURT:  We are on the same page, I hope.

20          MR. SILVERMAN:  So will you excuse me then -- any

21   objections I make be preserved simply by requesting an

22   instruction to disregard and that I am not obligated to move

23   for a mistrial for the purposes of my appellate record?

24          THE COURT:  That is -- I will allow you to do that.

25   To the extent you have a motion for a mistrial based upon any

1  of those particular stricken statements, you are free to move

2  for that mistrial at the appropriate break.

3        MR. CONWAY:  Can we ask that he do that in writing so

4  we don't actually have to be in court to do that?

5        THE COURT:  It would be preferable, but I'm not going

6  to hold him to that.  To the extent he has a motion for

7  mistrial based on evidence that has been stricken from the

8  record, you are entitled to make it at a break outside of the

9  presence of the jury.

10        MR. SILVERMAN:  And if I –– can I just say –– can I

11  just have an agreement with the Court that any errors are

12  preserved without the necessity of having to ask the Court for

13  a mistrial?  That would solve the whole problem.

14        MR. CONWAY:  How many times do I have to say the same

15  thing, Your Honor?

16        THE COURT:  I'm not sure I understand what the

17  question is.

18        MR. SILVERMAN:  Here's what I'm saying.  I move for

19  relief of striking something ––

20        THE COURT:  Yes.

21        MR. SILVERMAN:  –– the Court grants it ––

22        THE COURT:  Yes.

23        MR. SILVERMAN:  Okay?  And so if an –– if an

24  instruction to disregard is for some reason regarded as not

25  sufficient by a Court of Appeals, then I would like to be

4:23:08PM 1  preserved without having to -- I don't want to move for a

2  mistrial in front of the jury.  I hate doing that.

3          MR. CONWAY:  That's another lie of Mr. Silverman.

4          MR. SILVERMAN:  The Court of Appeals will say that

5  I've waived error if I don't do that.

6          THE COURT:  What I am saying is that at our next

7  break in the session you will be permitted to raise those

8  issues.

9          MR. SILVERMAN:  All right.  And I'm preserved.

10          THE COURT:  And you are preserved until the next

11  break.  I mean I'm not assuming that ten days from now or five

12  days from now you're going to make a motion for a mistrial

13  based on something that was said today, for example.

14          MR. SILVERMAN:  Right, got you.

15          THE COURT:  Okay?

16          MR. SILVERMAN:  All right.

17          THE COURT:  Any other issues?

18          MR. SILVERMAN:  One other thing.  We would really

19  appreciate it if we could have a little bit of time with

20  Mr. Mishra.  We feel like our Sixth Amendment ability to -- or

21  our rights under the Sixth Amendment are really not being

22  respected with respect to our ability to consult with

23  Mr. Mishra about his defense.

24          We just don't -- today -- we did have time

25  fortunately this last weekend.  We took advantage of it, had a

4:24:18PM 1  nice meeting with Mr. Mishra in Ohio about two hours from here.

2  And it's not reasonable to ask us to drive two hours, and it's

3  really four hours round trip, and I'm not even —

4        MS. SILVERMAN:  They don't even allow visits for —

5        MR. SILVERMAN:  They don't allow evening visits.

6  Could we make arrangements with the Court to stay an extra hour

7  and a half in the evening or something like that?

8        THE COURT:  As I understand, the marshals need to

9  take these gentlemen back to NEOCC.

10        Who wants to speak on behalf of the marshals?

11        DEPUTY MARSHAL:  Yes, Judge.  They are probably

12  waiting for them as we speak to leave.

13        THE COURT:  All right.  I mean I am starting trial at

14  8:45.  You should get here as promptly as you can before 8:00

15  so that you may meet with your client.  As I understand it,

16  these gentlemen are being brought here at 8:00 in the morning.

17  Is that correct?

18        MR. SILVERMAN:  No, ma'am.

19        MR. BURNEY:  That's not correct.

20        MR. SILVERMAN:  That's not correct.  Actually I went

21  to see Mr. Mishra today.  I arrived at the Marshal's Office at

22  8:14.  He was still being processed in, and I wrote the time

23  down that I actually was able to visit with him.  I think it

24  was around 8:24 or 8:26.  And then, of course, we had to leave

25  to come to court for 8:45, and so we had less than 20 minutes

4:25:36PM 1    of actual conference time.

2              MS. SILVERMAN:  And that's insufficient to prepare.

3    What we need to be able to do is review the testimony from the

4    day — the day before so we can prepare for the next day.

5              THE COURT:  Then you should make arrangements with

6    NEOCC to go down there.

7              MR. SILVERMAN:  It's not possible.  They don't allow

8    visitation in the evening.

9              THE COURT:  They allow visitation in the off-hours.

10   I actually cited the rule to you.  I indicated that you should

11   use their formal process.

12             MS. SILVERMAN:  And we have, by the way.

13             THE COURT:  Use their formal process in order to

14   facilitate meeting with your client.

15             MR. SILVERMAN:  Yes, ma'am.  But the thing is we're

16   in trial 'til 4:30 and then we are in trial again 'til — at

17   8:45 in the morning, and we need time to prepare, and we don't

18   have time to drive four hours —

19             THE COURT:  I'm not going to interfere with the

20   marshals' business in transporting prisoners back and forth.

21             MR. SILVERMAN:  Well, I would object under the Sixth

22   Amendment and the Fifth Amendment, and I don't feel that due

23   process is being afforded to Mr. Mishra or to the defense under

24   those circumstances.

25             THE COURT:  I will also note that you have the entire

4:26:39PM 1    lunch break in order to do this.  But, nevertheless, the NEOCC

2    has a formal process by which you can request to meet with your

3    client in the off-hours.  I have no indication on the record or

4    otherwise that that has been tried and rejected, and that is

5    your recourse.

6             With respect to the mornings, I would ask that every

7    effort be made to have these gentlemen here at 8:00.  Is that a

8    problem?

9             DEPUTY MARSHAL:  No, Judge.  It depends on the NEOCC.

10    I mean they're supposed to be here at 7:45, but sometimes

11    there's traffic or issues in transportation.  But it's usually

12    between 7:45 and 8:00.

13             THE COURT:  Okay.  Well, it — was this morning a

14    different story?

15             DEPUTY MARSHAL:  I wasn't here whenever NEOCC arrived

16    so I can't speak on that, but there are times that it is past.

17             THE COURT:  I ask that every reasonable effort be

18    made to have the Defendants —— Mr. Mishra and Mr. Bush should

19    be here by 8:00 in the morning so that they are allowed an

20    opportunity, in addition to the opportunity afforded by NEOCC,

21    for them to meet.

22             Additionally we have an hour and fifteen minutes for

23    lunch.  Today we did not due to argument.  I grant you that

24    there was some of that time that was taken up, but certainly an

25    hour remained elsewhere.  You are not differently situated than

4:28:13PM 1    any other set of counsel who have had a detained client in this

2    courtroom.

3           MR. SILVERMAN:  And we believe it's a systemic

4    problem.

5           MR. BURNEY:  Your Honor, I came at 8:00 in the

6    morning last week and they do not arrive at 8:00.  And if they

7    arrive, by the time they are processed it may be closer to

8    8:30.  And again when the -- you give us an instruction to be

9    up here at 8:45, then of course we do leave.  Now they may not

10    be brought up here because maybe of what's going on in the

11    courtroom, so instead of waiting down there with them so

12    that -- since we have to be in court by 8:45, then they do not

13    bring them up here.  That could give us additional time if it

14    hasn't started.

15           And as far as NEOCC, I mean their directive is that

16    4:00 is their cutoff.  Sometimes they may let you stay 'til

17    5:00.  I know last week -- I know what the Silvermans went

18    through as far as just Saturday, and I'm not sure if they will

19    change that.  We e-mail them for an appointment, then they have

20    to approve it.

21           THE COURT:  All right.

22           MR. BURNEY:  They're saying their normal hours are

23    between 8:00 and 4:00 and not on Saturday or Sunday.

24           THE COURT:  And we know the normal hours.  This rule

25    that they have in place deals with time outside of their normal

4:29:27PM 1  hours.  And so I ask you to take advantage of that rule in

2  order to facilitate meeting with your client.

3           Anything else from the Government?

4           MR. CONWAY:  No, Your Honor.

5           THE COURT:  Okay.  Again, I will just reiterate my

6  request that the marshals get these gentlemen here as soon as

7  possible.

8           Court will stand in recess.

9           MR. IMHOF, DEPUTY CLERK:  All rise.  This court now

10  stands in recess.

11      (Court recessed at 4:30 p.m.)

12                C E R T I F I C A T E

13  I, Shirley Ann Hall, certify that the foregoing is a correct

14  transcript for the record of proceedings in the above-titled

15  matter.

16

17

18                          s/Shirley Ann Hall
                            Shirley Ann Hall, RDR, CRR
19                          Official Court Reporter

20

21

22

23

24

25